UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

STATE OF NEW YORK,

                              Plaintiff,                    **ORDER**

          -against-                                        12-cv-6276 (JS)(SIL)

MOUNTAIN TOBACCO COMPANY, et al.,

                              Defendants.

------------------------------------------------------------x

**LOCKE, Magistrate Judge:**

Before the Court is Plaintiff State of New York's ("Plaintiff" or the "State")

letter motion, DE [163], to compel jurisdictional discovery from Defendants

Mountain Tobacco Company d/b/a King Mountain Tobacco Company Inc. ("King

Mountain") and its president and sole shareholder Delbert Wheeler Sr. ("Wheeler"

together with King Mountain, "Defendants").

## I.    Background

Familiarity with the factual background and procedural posture of this case,

which were discussed at great length in prior Orders, *see* DE [129, 161], is

presumed.  Notwithstanding, the following brief recital of discovery-related facts is

relevant to the instant motion.

This is an action by the State to enforce and collect damages for alleged

violations of the Contraband Cigarette Trafficking Act, 18 U.S.C. §§ 2341-2346

("CCTA"), the Prevent All Cigarette Trafficking Act, 15 U.S.C. §§ 375-378 ("PACT

Act"), New York's Executive and Tax Laws, the New York Tobacco Product

Manufacturer Certification Statute, and the New York Cigarette Fire Safety Act.

*See* Am. Compl., DE [6], ¶¶ 2, 49, 51. Principally, the State contends that King Mountain is a corporation formed under the laws of the Yakama Nation of Indians and has a principal place of business within the Yakama Indian Reservation in White Swan, Washington. *See id.* ¶ 8. It is undisputed that Wheeler is King Mountain's president and sole owner. *See* May 5, 2015 Declaration of Christopher K. Leung ("Leung Decl."), Ex. "B" (Relevant portions of July 30, 2014 deposition of Jay Thompson ("Thompson Dep.")), DE [163-3], at 127-28 (testifying on behalf of King Mountain that Wheeler is the company's sole owner). The State alleges that King Mountain manufactures cigarettes in the State of Washington and then illegally sells, transfers, or assigns the cigarettes to retailers and/or wholesalers in the State of New York. *See* Am. Compl. ¶ 55. Defendants deny the State's operative allegations.

On or about May 16, 2014, Wheeler moved to dismiss the State's claims against him for lack of personal jurisdiction. *See* DE [94]. King Mountain did not join in the motion and the Court assumed, without deciding, that jurisdiction over the corporation exists. *See* DE [129], at 17-18. In opposing the motion, the State advanced an agency theory of personal jurisdiction over Wheeler—*i.e.*, that he used King Mountain as his agent and, therefore, the company's contacts in New York can be imputed to him. *Id.* By Decision and Order dated October 8, 2014, DE [129], Judge Spatt denied Wheeler's motion without prejudice and permitted the State to conduct jurisdictional discovery aimed at determining whether Wheeler maintained

"minimum contacts" with the State of New York sufficient to subject him to the Court's jurisdiction.  *See id.* at 22.

Consistent with Judge Spatt's Order, on or about December 11, 2014 the State served a first set of jurisdictional discovery requests upon Defendants.  *See* Leung Decl., Ex. "C" (Plaintiff's First Set of Jurisdictional Discovery Requests for Production (hereinafter, the "First Requests")), DE [163-4].  The First Requests included the following:[1]

> 11. All documents and communications concerning the number of cigarettes sold, shipped, transported, and distributed to, or by, each New York Distributor.[2]  This request includes, by way of example and without limitation, any financial statement, report, or analyses; who prepared such documents; and which persons received, reviewed, or had access to such documents.
>
> \*      \*      \*
>
> 13. All documents and communications concerning any distribution of dividends (including without limitation any recorded or unrecorded revenues or profits of dividends) made by [King Mountain] to Wheeler (including any employee, partner, agent, or person acting on Wheeler's behalf).  This request includes, by way of example and without

---

[1] It warrants noting that the State did not identify the temporal scope of the discovery requests forming the basis of the instant motion.  As a result, the Court looks to the substantive allegations in the Amended Complaint to determine the relevant time period for permissible discovery.  In this regard, and as explained more fully herein, the State alleges actionable conduct by Defendants occurring "[s]ince New York's amended tax laws took effect [*i.e.*, September 1, 2010], and continuing through to the present." Am. Compl. ¶ 56.  Thus, although the parties disagree as to the outer boundary of this time period, which also is discussed more fully below, the Court construes the State's discovery requests as seeking documents for the years 2010 through the present.

[2] The term "New York Distributor" is defined by the State as:

> [A]ny person . . . that (a) is located within the State of New York, including Indian country within such State, and is a person to whom [King Mountain] or Wheeler sold, shipped, transported, or distributed cigarettes to; or (b) [i]s identified by King Mountain's Third Supplemental Response to State Interrogatory No. 1, and that is located within the State of New York, including Indian country located within the State of New York. . . .

Leung Decl., Ex. "C" (First Requests), DE [163-4], at Definitions & Instructions No. 3.

limitation, when and how such dividends were distributed, the amount of each dividend, and the portion of each dividend derived from the sale and shipment of cigarettes to, or by, any New York Distributor.

\* \* \*

23. All documents and communications concerning the identity and locations of any bank or securities accounts held by or for Wheeler (including any employee, partner, agent, or person acting on Wheeler's behalf) or [King Mountain], including the identity of each person authorized to use, access, sign for, or draw upon each account.

\* \* \*

24. All bank statements concerning any check, payment, wire, or money transfer made or issued to Wheeler (including any employee, partner, agent, or person acting on Wheeler's behalf) or [King Mountain] by any New York Distributor or any other person located within the State of New York, including Indian country within such state.

*Id.*

After receiving objections, on or about January 29, 2015, the State made a motion to compel documents and information responsive to, *inter alia*, First Requests 11, 13, 23 and 24. *See* DE [153].

**A.    The February 26 Order**

By Order dated February 26, 2015, DE [161], this Court granted in part and denied in part the State's motion to compel.

> **1.    *Ruling on First Request 11—Documents Regarding the Volume of Cigarettes Sold, Distributed, etc. to or by New York Distributors***

The Court denied the motion insofar as it sought to compel a response to First Request 11.  The Court held that such information, while potentially relevant

to establishing the breadth of King Mountain's activities in New York, was not germane to whether such activities were for the benefit of, and with the knowledge and consent of, Wheeler. *See* DE [161], at 8-9. Thus, the Court granted the State leave to serve a more narrowly tailored version of First Request 11, re-worded to assess the percentage of King Mountain's revenues attributable to New York sales that was, in turn, remitted to Wheeler. *See id.* at 9.

Consistent with that directive, the State served the following amended jurisdictional discovery request, which serves as part of the basis for the instant motion:

> 11. All documents and communications concerning the amount and percentage of [King Mountain's] New York Distributor revenue—i.e., revenue generated by [King Mountain's] sale and shipment of cigarettes to each New York Distributor—that was later remitted, distributed, or made available to Wheeler.

Leung Decl., Ex. "D" (Plaintiff's Second Set of Jurisdictional Discovery Requests for Production (Amended Request for Production No. 11) (hereinafter "Amended Request 11")), DE [163-5].

### 2. *Ruling on First Request 13—Documents Regarding King Mountain's Distribution of Dividends*

In addition, the February 26 Order granted the motion insofar as it sought to compel a response to First Request 13, which sought information regarding King Mountain's distribution of dividends. Specifically, the Court found that the request concerned the financial interrelationship between King Mountain and Wheeler, which bears directly upon whether Wheeler benefited from King Mountain's

activities in New York, and is therefore relevant to the State's agency-jurisdictional analysis. *See* DE [161], at 9.

### 3. *Rulings on First Requests 23 and 24—Documents Regarding King Mountain's and Wheeler's Banking Activity*

The February 26 Order also granted the motion insofar as it sought to compel responses to First Requests 23 and 24, which sought King Mountain's and Wheeler's banking records. In this regard, the Court found those requests "aimed at assessing the extent to which Wheeler controlled King Mountain's corporate bank accounts or personally received payments for services provided by King Mountain within New York." DE [161], at 11. Such information is pertinent to the agency-jurisdictional analysis inasmuch as it would tend to demonstrate whether Wheeler was the driving force behind King Mountain's New York business activities. *See id.* (citation omitted). The Court placed no narrowing qualifications on Defendants' obligation to respond to these requests.

### B. <u>Defendants' Document Productions</u>

In response to the February 26 Order, Defendants made supplemental document productions on March 27 and April 3, 2015. *See* King Mtn.'s Ltr. Opp., DE [165], at 2. As relevant here, in response to First Request 13 (seeking information relating to the distribution of dividends) and Amended Request 11 (seeking information relating to the percentage of King Mountain's New York revenue remitted to Wheeler), Defendants produced two pages of an IRS Form 1120S ("U.S. Income Tax Return for an S Corporation"), which had been filed on

behalf of King Mountain for the 2011 calendar year. *See* Leung Decl., Ex. "E" (2011 IRS Form 1120S), DE [163-6]. The document was redacted nearly in full, save for certain identifying information (*e.g.*, corporate name, address, incorporation date, employer identification number, etc.) and a single line item (No. 17c) indicating "[d]ividend distributions paid from accumulated earnings and profits." *See id.*

Defendants also produced two pages each of IRS Form 1120S for calendar years 2012, 2013, and 2014, which had been prepared on behalf of King Mountain but not yet filed, and were stamped "Draft". *See* Leung Decl., Ex. "F" (2012-14 Draft IRS Form 1120S), DE [163-7]. Defense counsel has represented that "[t]here is no target date set for filing" these documents. Leung Decl., Ex. "G" (May 4, 2015 e-mail correspondence), DE [163-8]. These, too, were redacted nearly in full, except for King Mountain's corporate identifying information and line item 17c, indicating dividend distributions paid from accumulated earnings and profits. *See id.*, Ex. "F".

The record is unclear whether and to what extent Defendants complied with the Court's Order as it related to First Requests 23 and 24, which sought Defendants' banking records. However, it appears from the instant motion that Defendants failed to produce any documents responsive to First Requests 23 and 24 for calendar year 2010.

C.     **The Instant Motion**

By the instant motion, the State identifies the following deficiencies in Defendants' document productions to date, each of which is discussed at greater length below:

(1) Defendants failed to comply with the Court's February 26 Order inasmuch as they refuse to produce documents and information responsive to First Requests 23 and 24 (*i.e.*, banking records) that relate to calendar year 2010;

(2) In light of the parties' confidentiality agreement governing the treatment of confidential information, Defendants' heavy redaction of the produced IRS Forms is improper;

(3) As can be gleaned from the sample Form 1120S available on the IRS's website, among the fields redacted from Defendants' IRS Forms are "Gross receipts or sales" and "Gross profit." According to the State, this is significant because King Mountain's CEO testified that the company's profits, which in turn are remitted to Wheeler, can be calculated using gross revenue.[3] *See* Leung Decl., Ex. "B" (Thompson Dep.), DE [163-3], at 75-76. Furthermore, Thompson testified that King Mountain utilizes computer software that would allow it to isolate data concerning the gross revenue generated by King Mountain from New York sales. *See id.* Thus, according to the State, by redacting the gross revenue figure on the 1120S forms, King Mountain is obstructing the calculation of Wheeler's financial interest derived from King Mountain's New York activities. *See* Pl. Ltr. Mtn. at 2;

(4) In light of Thompson's testimony regarding the capabilities of King Mountain's computer software, described above, Defendants' production is incomplete because it omits data generated by such software indicating the company's gross revenue attributable to New York sales (which, in conjunction with unredacted tax documents, would yield responsive information regarding the financial benefit to Wheeler of those New York sales); and

(5) Thompson testified that he prepared quarterly financial statements for the company's Board of Directors, including Wheeler, which reflected King Mountain's cigarette sales, including those in New York. According to the State, Defendants' production is incomplete because it omits these documents, which could demonstrate Wheeler's knowledge of and consent to such sales, and are thus relevant to the agency-jurisdictional analysis.

---

[3] For the proposition that King Mountain's profits are remitted to Wheeler, the State relies, at least in part, on King Mountain's Responses to Plaintiff's Second Set of Request for Admissions. *See* Leung Decl., Ex. "I", DE [163-10], at No. 97. In it, King Mountain admits that its "profits go to the owner(s)" and "not the Yakama Nation, itself," subject to the qualification that "some company profits are paid to the Yakama Nation in the form of tax stamp revenue and some profits are paid to employees, who are members of the Yakama Nation, in the form of wages." *Id.*

King Mountain and Wheeler each submitted letters in opposition to the motion, arguing as follows:

(1) The State is not entitled to bank records relating to calendar year 2010 because the Amended Complaint defines the relevant time period as beginning on June 21, 2011;

(2) The State is not entitled to unredacted tax returns because the language of First Request 13 (*i.e.*, documents regarding dividends) does not specifically demand them—rather, that request is limited to "documents showing" the distribution of dividends, which the produced IRS forms, as redacted, are;

(3) Thompson testified that King Mountain's computer software is capable of isolating data concerning New York-specific revenue, but he did not testify that King Mountain maintains its records in this way in the ordinary course of business. And, in any event, King Mountain never moved to compel King Mountain's financial software prior to discovery closing on October 21 2014[4] and therefore is time-barred from doing so now; and

(4) Similarly, the State is not entitled to the financial statements provided to King Mountain's Board of Directors because they, too, were neither specifically demanded in the First Requests, nor made the subject of a motion to compel prior to the close of discovery.

*See* DE [165, 166].

## II. <u>**Legal Standards**</u>

A complete recitation of the overarching principles of personal jurisdiction is not warranted here. For that, the parties may refer to the Court's February 26 Order, DE [161], at 3-7. Rather, for present purposes the Court reiterates the following framework for considering the discoverability of documents in this case:

Judge Spatt determined that Plaintiff had failed to establish personal jurisdiction over Wheeler, and identified a two-fold pleading deficiency that sets the parameters for permissible jurisdictional discovery[.]

---

[4] *See* Electronic Order dated October 6, 2014, adopting the parties' proposed fourth amended discovery plan.

[Specifically, the State failed to allege facts sufficient to demonstrate whether:] (i) King Mountain engaged in purposeful activities within New York State for the benefit of Wheeler; and (ii) Wheeler was the primary actor in the specific matter in question sufficient to establish personal jurisdiction over him.

DE [161], at 6-7 (citations omitted).

In addition, the following legal principles relate specifically to the State's agency-jurisdictional analysis and warrant restatement here. As the Court previously noted, to establish that a corporation acted as the agent of its principal(s):

[A] plaintiff must show that the corporation engaged in purposeful activities in this State . . . for the benefit of and with the knowledge and consent of the [principals] and that [the principals] exercised some control over [the corporation] in the matter. Put another way, the question is whether the out-of-state corporate officers were primary actors in the transaction in New York that gave rise to the litigation.

DE [129], at 18 (quoting *Barron Partners, LP v. Lab123, Inc.*, 07-cv-11135, 2008 U.S. Dist. LEXIS 56899, at \*30-\*31 (S.D.N.Y. July 25, 2008)). This formula distills into the following elements:

[F]irst, personal jurisdiction is appropriate over a corporate officer who "benefit[s] from the [agent-corporation's] course of dealing in New York." *Rainbow Apparel Distrib. Ctr. Corp. v. Gaze U.S.A., Inc.*, 13-cv-3640, 295 F.R.D. 18, 27 (E.D.N.Y. 2013) (collecting cases); *cf. Family Internet, Inc. v. Cybernex, Inc.*, 98-cv-637, 1999 U.S. Dist. LEXIS 15549, at \*26-\*27 (S.D.N.Y. Oct. 6, 1999) (finding no jurisdiction where record failed to demonstrate that corporate officer benefited from subject transactions). This inquiry is informed by, *inter alia*, the extent to which an officer acquires a financial stake in, or is otherwise financially interrelated with the corporation's activities. *E.g., In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 336 (S.D.N.Y. 2000) (exercising personal jurisdiction where corporate officers "had a

substantial financial stake in" the corporation's transactions); *Ross v. UKI Ltd.*, 02-cv-9297, 2004 U.S. Dist. LEXIS 2970, at *20 (S.D.N.Y. Mar. 2, 2004) (exercising personal jurisdiction where individual defendant "played an active role in the negotiations of a Joint Venture Agreement . . . while directly and personally benefitting from" the project); *cf. Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 87-cv-191, 1989 U.S. Dist. LEXIS 9107, at *33-*34 (N.D.N.Y. July 31, 1989) (declining to exercise jurisdiction where the New York representative lacked "the power to contractually bind the foreign defendant").

DE [161], at 5-6.

Second, for purposes of this analysis, "[b]eing a primary actor in the transaction[s] at issue requires that the officer have knowledge and consent to the transaction carried out by the agent-corporation and that the officer have exercised control over the corporation in the transaction." *Basquiat v. Kemper Snowboards*, 96-cv-185, 1997 U.S. Dist. LEXIS 12653, at *8 (S.D.N.Y. Aug. 25, 1997). For example, courts have found such a relationship where the corporate officer was "the driving force behind" the corporation's business activities. *Karabu Corp. v. Gitner*, 161 F. Supp. 2d 319, 325 (S.D.N.Y. Aug. 4, 1998); *see Sumitomo Copper Litig.*, 120 F. Supp. 2d at 336 (finding jurisdiction over officers where the corporate agent "had no substantial wherewithal apart from" the principal-officers). In addition, courts have recognized that "common ownership" among the corporation and its principal is the "essential factor" in this analysis, *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984), particularly when an officer exercises involvement in and control over the very instrumentalities behind the subject transactions, *see Kinetic Instruments, Inc.v. Lares*, 802 F. Supp. 976, 985 (S.D.N.Y. 1992) (exercising agency jurisdiction where officer was alleged to have been involved in the day-to-day business operations of the corporation, "including the manufacture and sale of the accused product").

*Id.* at 6.

## III. Analysis

The State seeks responses or supplemental responses to the individual discovery requests outlined above.

### A. Bank Records for Calendar Year 2010

As noted above, this Court's February 26 Order granted the State's prior motion to compel complete responses to First Requests 23 and 24 (*i.e.*, bank records), without qualification. Nonetheless, relying specifically upon paragraphs 32 and 36 of the Amended Complaint, Defendants conclude that the relevant time period in this case did not begin until June 21, 2011, and therefore banking records preceding that date are not discoverable. Specifically, these paragraphs allege:

> 32. On June 21, 2010, a bill was signed amending, among other statutes, New York Tax Law §§ 471 and 471-e (collectively, the "amended tax law").[5]  2010 Sess. Law News of N.Y. Ch. 134, Part D and Ch. 136.  The amendment reflected the revocation of the forbearance policy and provides for two alternative systems to ensure that members of an Indian nation or tribe can buy cigarettes tax-free on their own reservation for their own personal use.  The amended tax law became effective September 1, 2010, but was preliminarily enjoined.  The injunction was lifted, and implementation of the amended tax law began on June 21, 2011.

> \*     \*     \*

> 36. The amended tax law was scheduled to take effect September 1, 2010; however, temporary restraining orders were issued and extant until June 21, 2011, when the last of them were vacated by the New York Appellate Division, Fourth Department, in *Seneca Nation of Indians, et al. v. State of New York, et al.*, Docket # CA 11-01193.  *See also Oneida v. Paterson*, 645 F.3d 154 (2d Cir. 2011) (affirming district

---

[5] To avoid confusion, the Court adopts the term "Amended Tax Law" as defined in the Amended Complaint.

court orders which denied motions for preliminary injunctions of amended tax law and vacating district court order which preliminarily enjoined the amended tax law). The amended tax law thus went into effect June 21, 2011.

Am. Compl., DE [6], ¶¶ 34, 36.

Based on these allegations, Defendants argue that the "relevant time period" of permissible discovery in this case is "define[d]" by the date on which the court-issued stay of implementation of the Amended Tax Law (hereinafter, the "Stay") was lifted, June 21, 2011, and not when the Amended Tax Law was written into law, nearly ten months earlier on September 1, 2010. For Defendants' position to prevail, the allegations against them in the Amended Complaint must relate specifically to the Amended Tax Law, such that the complained-of conduct could not otherwise be actionable while the Stay was pending. Necessarily, then, a determination of the proper scope of discovery requires an examination of the State's substantive claims as they relate to the law in effect before, during, and after the Stay.

This approach is consistent with the case law in this District, particularly *City of New York v. Milhelm Attea & Bros.*, 06-cv-3620, 2012 U.S. Dist. LEXIS 116533 (E.D.N.Y. Aug. 17, 2012), where Chief Judge Amon discussed the background of the state tax law provisions implicated here, and considered the legal effect of the Stay. There, the Court noted that even prior to the amendments, New York's taxing scheme "impose[d] a tax on all cigarettes possessed for sale or use in New York State, except for those cigarettes that New York is 'without power' to tax." *Id.* at *4 (citing N.Y. Tax Law § 471). "No specific exception was made for

sales of cigarettes by or to Native Americans or retailers on Native American reservations." *Id.* at *7. Rather, the scheme only exempted from paying cigarette taxes "qualified Indians" purchasing cigarettes for their "own use or consumption." *Id.* (quoting N.Y. Tax Law § 471-e(1)(a)). Specifically excluded from the tax-exemption were: (i) "qualified Indians purchasing cigarettes *off* their reservations or on another nation's or tribe's reservation"; and (ii) "non-Indians making cigarette purchases on an Indian reservation" (hereinafter, collectively the "Non-Exempt Class"). *Id.* (emphasis supplied). However, the New York State Department of Taxation and Finance ("NYDTF") long engaged in a practice of non-enforcement, or "forbearance", of the tax laws against the Non-Exempt Class, "whereby it permitted untaxed cigarettes to be sold to and from Native American reservation retailers." *Id.* at *8-*9 (citations omitted).

It is crucial to note that, as a legal matter, despite the NYDTF's policy of forbearance, the relevant provisions of the New York Tax Law nevertheless remained in effect and imposed a sales tax on cigarettes sold in the state. *See Cayuga Indian Nation of New York v. Gould*, 14 N.Y.3d 614, 622, 647-48, 904 N.Y.S.2d 312, 331 (2010) (stating that "[t]here is no question that Tax Law § 471 'imposes' a tax"; noting that "the issue in th[at] case [wa]s not whether sales taxes are due when non-Indian consumers purchase cigarettes from Indian retailers— they are"); *see also United States v. Morrison*, 686 F.3d 94, 106-07 (2d Cir. 2012), *cert. denied*, __ U.S. __, 133 S. Ct. 955, 106 (2013) ("New York had the power to impose that tax and state law mandated that the tax be paid. New York's

forbearance policy did not free [the defendant] from engaging in conduct that the law forbade").

In 2010 the NYDTF revoked the forbearance policy outlined above and "[o]n June 21, 2010, the New York State Legislature enacted Senate Bill 8285/Assembly Bill 11515, which amended N.Y. Tax Law § 471 and 471-e" (previously defined as the "Amended Tax Law"). *Milhelm Attea & Bros.*, 2012 U.S. Dist. LEXIS 116533, at *6. The Amended Tax Law, which went into effect on September 1, 2010, *see id.* at *15, "create[d] three systems by which cigarettes sold by reservation cigarette dealers may [continue to] be sold to Native Americans for their own use and consumption without paying the applicable tax"—a "coupon system", a so-called "prior approval system", and a third option whereby tribes enter into voluntary agreements with the state, subject to legislative or court approval. *See id.* at *15-*17 (citing N.Y. Tax Law §§ 471(5)-(6), 471-e). A direct effect of the Amended Tax Law was to remove the effective tax-exempt treatment previously enjoyed by the Non-Exempt Class. As a result, court challenges seeking to enjoin implementation of the Amended Tax Law were commenced in the District Courts for the Northern and Western Districts of New York and, though unsuccessful at the trial level, the actions were stayed pending appeal. *See id.* at *17-*18 (citations omitted). The Second Circuit ultimately affirmed the district courts, vacated the stay, and "as of June 21, 2011 all temporary injunctive relief had been lifted by the state Appellate Division." *Id.* at *19 (citations omitted).

The defendants in the *Milhelm Attea & Bros.* case—cigarette wholesalers and state-licensed stamping agents—argued that they could not be held liable under the Amended Tax Law for conduct that took place between September 1, 2010 and June 21, 2011, while the Stay was in effect. *See id.* at *73-*74. The Court disagreed, holding that "[e]ven if these stays could permissibly preclude civil liability premised on the amended tax laws for acts committed during the stays' pendency, they did not repeal the prior, existing version of § 471, which this Court has held was sufficient to impose a stamping requirement on the defendants' sales at issue. . . . Accordingly, a stay of enforcement of the amended collection mechanism could not remove this tax liability." *Id.* at *75-*76.

Thus, under *Milhelm Attea & Bros.*, conduct which was actionable under the pre-amendment version of the New York Tax Law remained actionable during the pendency of the Stay because the injunction did not operate to repeal the prior tax laws. For present purposes, this means that if the State alleged conduct by Defendants that would, if true, have violated the pre-amendment version of the tax laws, discovery into those violations is warranted, regardless of when the Amended Tax Law actually became effective. With these principles in mind, the Court turns to an examination of the State's substantive claims.

The State contends that "King Mountain manufactures the King Mountain brand cigarettes on the Yakama Reservation in the State of Washington" and then "knowingly ship[s], transport[s], transfer[s], s[ells] and distribut[es] large quantities of unstamped and unreported cigarettes to on-reservation wholesalers in New York

State." Am. Compl. ¶¶ 55-56. According to Plaintiff, "[l]arge quantities of those cigarettes have in turn been offered for sale at several tribal (i.e., on-reservation) retailers in New York State," including to non-members of the Yakama Nation and specifically, on at least one occasion, to State investigators. *Id.* ¶ 57; *see also id.* ¶¶ 61-65. In sum, the State alleges that "King Mountain brand cigarettes [are] manufactured and distributed by the King Mountain defendants, upon which no state excise tax has been paid, and the packages of which have no stamps affixed." *Id.* ¶ 87. This conduct, if true, would violate the pre-amendment tax laws which, as noted above, "impose[d] a tax on all cigarettes possessed for sale or use in New York State," except for those cigarettes bought and sold by Native Americans for their own use and consumption. *Milhelm Attea & Bros.*, 2012 U.S. Dist. LEXIS 116533, at *4 (citing N.Y. Tax Law § 471). Accordingly, Defendants may not find shelter from their discovery obligations behind the court-issued Stay of the Amended Tax Law because, as Judge Amon wrote, "[e]ven if these stays could permissibly preclude civil liability premised on the amended tax laws for acts committed during the stays' pendency, they did not repeal the prior, existing version of § 471, which this Court has held was sufficient to impose a stamping requirement on the defendants' sales at issue." *Id.* at *75-*76. In this regard, however, the Court notes that the Amended Complaint only alleges conduct occurring "[s]ince New York's amended tax laws *took effect* [*i.e.*, September 1, 2010], and continuing through to the present." Am. Compl. ¶ 56 (emphasis supplied). Thus, as relates to

the State's claims under the New York Tax Law, Defendants must produce responsive documents dating back at least to September 1, 2010.

However, the analysis does not end here. The principles discussed above relate exclusively to the New York Tax Law. But the State has also asserted claims under the CCTA and PACT Act—both federal statutes—as well as the New York Executive Law, the New York Tobacco Product Manufacturer Certification Statute, and the New York Cigarette Fire Safety Act. Thus, even if Defendants' interpretation were correct and conduct predating June 21, 2011 were beyond the purview of the New York Tax Law, there is no conceivable basis for applying that cut-off date to every other statute implicated here. *Cf. Morrison*, 686 F.3d at 106-07 (explaining the independent though related nature of the New York Tax Law and the CCTA, describing the latter as "a federal statutory 'back-up' for state-level enforcement regimes", and concluding that even where New York chose not to enforce its tax laws, federal cigarette anti-trafficking statutes still applied). To conclude otherwise would be to mechanically install the effective date of the Amended Tax Law as the backstop for permissible discovery in all cases in which it is asserted, regardless of other theories of liability pursued. The Court finds no principled basis for imposing such a requirement, and Defendants do not provide one. Accordingly, and particularly in light of the undisputed fact that Defendants produced sales records and cancelled checks dating back to at least June 2010, *see* Pl. Ltr. Mtn., DE [163], at 3 & Ex. "H", the Court finds it appropriate to permit discovery on the State's alternative theories of liability into Defendants' banking

records for calendar year 2010. This is consistent with the Court's February 26 Order relating to the relevance of the banking information sought. Accordingly, Plaintiff's motion to compel production of documents and information responsive to First Requests 23 and 24 for calendar year 2010 is granted.

**B.**   **Unredacted Tax Returns**

Next, the State seeks King Mountain's unredacted tax returns for calendar years 2010 through 2014. As noted above, Defendants have already produced an IRS Form 1120S for calendar year 2011 and draft IRS Forms 1120S for the years 2012, 2013, and 2014, albeit each is redacted nearly in full, save for identifying information and a line item indicating dividend distributions. *See* Leung Decl., Ex. "E", "F", and "G". In addition, in each instance only two pages of the complete five-page document were produced. *See id.* The parties' arguments regarding these documents are three-fold: (i) the State contends that the redactions violate the parties' confidentiality agreement; (ii) the State contends that the redactions conceal information concerning King Mountain's gross revenue which, in conjunction with other evidence, is relevant to determine the financial benefit inuring to Wheeler from King Mountain's New York activities; and (iii) Defendants contend that their production is appropriate because the State did not specifically demand tax returns; rather, they contend First Request 13 seeks "documents showing" the distribution of dividends, which the produced tax returns, as redacted, do. The Court addresses each of these arguments individually below.

## 1.    *Confidentiality Order*

On or about October 7, 2013, the parties electronically filed a fully-executed Stipulation Regarding Confidential Documents (the "Confidentiality Agreement"), DE [66], which was So Ordered by Magistrate Judge Boyle on or about October 8, 2013.   In relevant part, the Confidentiality Agreement provides that documents produced in response to discovery requests may be designated as confidential, the consequence of which is that such documents may not be disclosed, except to certain enumerated classes of people and only when "reasonably necessary to assist in the conduct of this case."   DE [66] ¶ 4.   The State argues that the Confidentiality Agreement constitutes the sole method by which sensitive information may be protected from discovery, and prohibits Defendants from unilaterally redacting non-privileged information.   *See* Pl. Ltr. Mtn. at 2.   However, the language of the agreement belies this position.

Specifically, paragraph 13 states, in relevant part, that "[e]ntering into, agreeing to and/or producing or receiving Confidential Documents or otherwise complying with the terms of this Stipulation shall not . . . prejudice in any way the rights of a party to object to the production of documents . . . it considers not subject to discovery, or operate as an admission by any party that the restrictions and procedures set forth herein constitute adequate protection for any particular information deemed by any party to be confidential." *Id.* ¶ 13(b).  By this express reservation of rights, Defendants preserved their ability to redact information they consider not subject to discovery or in need of greater protection than that provided

by the Confidentiality Agreement. Thus, the State's reliance upon the agreement does not provide a basis for granting the motion to compel as it relates to unredacted tax returns.

## 2. *Disclosure of Gross Revenue*

Next, the State argues that the redacted portions of King Mountain's tax returns indicating its gross revenue fall within the bounds of the Court's February 26 Order, and therefore must be produced. Specifically, the State's argument is as follows: (i) the February 26 Order permitted the State to seek the percentage of King Mountain's revenues from New York activities that were remitted to Wheeler; (ii) that figure is reflected by King Mountain's profits; (iii) King Mountain's CEO testified that the company's profits could be calculated using its gross revenue; (iv) King Mountain's gross revenue is indicated on its tax returns; and therefore (v) by redacting its gross revenue, King Mountain is obstructing a calculation of the profits remitted to Wheeler, thereby violating the February 26 Order. The Court agrees.

The February 26 Order specifically granted the State leave to seek discovery aimed at discerning "what percentage of King Mountain's revenues generated from its relationships with New York Distributors were, in turn, remitted to Wheeler." DE [161], at 9. The State then served Amended Request 11, which seeks precisely that. And, based on: (i) King Mountain's admission that its "profits go the owner(s)", Leung Decl., Ex. "I", DE [163-10]; (ii) Thompson's testimony that Wheeler is the company's sole shareholder, *see id.*, Ex. "B", [DE 163-3], at 127-28; and (iii)

Thompson's testimony that the company's profits (*i.e.*, the portion that "goes to" Wheeler) can be calculated based on gross revenue, *see id.* at 76, the gross revenue figure may reasonably lead to the discovery of evidence establishing the portion of King Mountain's activities that inured to the benefit of Wheeler. However, the Court notes that this evidence alone is insufficiently narrow to zero in on the jurisdictional inquiry before the Court—that is, to isolate activities occurring in, and profits derived from, New York. According to Defendants, the State's proposed gross revenue calculation would yield a profit figure that reflects King Mountain's sales nationwide and would not inform an analysis of this Court's jurisdiction over Wheeler.

Nonetheless, the Court will not deny the State discovery of such information solely on the basis that its potential probative value may only become apparent in the context of other, more focused evidence. This is particularly so in light of Thompson's testimony that King Mountain's computer software allows it, without difficulty, to isolate New York-specific revenue from gross revenue. *See* Leung Decl., Ex. "B", DE [163-3], at 75. This capability, together with identification of King Mountain's gross revenue figures, is sufficient to yield a computation of the financial benefit remitted to Wheeler from King Mountain's New York sales in those years—the precise jurisdictional question before the Court. Accordingly, in light of Thompson's testimony in this regard, the Court finds Amended Request 11 sufficiently worded to require disclosure of those portions of King Mountain's 2010, 2011, 2012, 2013, and 2014 tax returns indicating gross revenue in those years.

In reaching this conclusion, the Court notes that the State has neither identified nor established the need for the disclosure of any other information redacted from King Mountain's tax returns, including any information contained on the omitted pages. However, consistent with the Court's analysis above, King Mountain shall also disclose the portion of its 2010 tax return indicating its dividend distributions and gross revenues.

Furthermore, the Court rejects Defendants' argument that the Court previously denied a request by the State for this same relief. In its February 26 Order, this Court granted the State leave to seek discovery into a narrow jurisdictional question, and Amended Request 11 closely tracks the Court's directive in this regard. Only after the issuance of that Order, and the State's service of its amended request, did Defendants produce documents concealing the very information sought to be revealed—namely, "documents and communications concerning" Wheeler's financial benefit derived from King Mountain's New York activities. As Thompson's testimony indicates, disclosure of the company's gross revenue inarguably comes within that description. Thus, the Court has not previously opined on this issue, which arose as a result of Defendants' deficient production in response to the February 26 Order.

### 3. *Scope of the State's Amended Discovery Request and Defendants' Argument Regarding Untimeliness*

Finally, the Court briefly addresses Defendants' arguments that the State did not specifically request tax returns and only sought "documents showing" the amount of dividends distributed to Wheeler; and the time for seeking to compel the

production of tax returns has expired.  King Mtn.'s Ltr. Opp. at 2-3.  First, Defendants' reading of the subject request is impermissibly narrow.  Both First Request 13 and Amended Request 11 sought "[a]ll documents and communications *concerning*" the distribution of dividends and/or the amount and percentage of New York-related revenue remitted to Wheeler.  *See* Leung Decl., Ex. "C" (First Requests), DE [163-4], at Definitions & Instructions No. 5; *id.*, Ex. "D" (Amended Request 11), DE [163-5], at Definitions & Instructions No. 5.  Both sets of requests define "concerning" broadly to mean "relating to, referring to, describing, evidencing or constituting."  *See* Leung Decl., Ex. "C" & "D" [163-4, 163-5].  That definition parallels the definition found in Local Civil Rule 26.3(c)(7).  With that definition in mind, it is clear that a reasonable interpretation of the State's requests encompasses King Mountain's tax returns, even if not individually specified in the requests themselves.  *Cf. Muhammad v. Koch*, 86-cv-7383, 1991 U.S. Dist. LEXIS 17461, at *3-*4 (S.D.N.Y. Dec. 4, 1991) (noting that "discovery requests need not be framed with technical precision").  At a minimum, those requests should be read to include King Mountain's gross revenues, which, as its CEO testified, is a component of the profits calculation that could be used to determine Wheeler's financial stake in the company's business activities.  Thus the Court rejects Defendants' argument that the State waived its entitlement to tax returns by not specifically demanding them—a reasonable reading consistent with the applicable rules compels the conclusion that they were at least implicitly included therein.  The Court also finds that there is no rational basis for Defendants' strained construction of the requests

as seeking only documents "showing" the amount of dividends—a straw requirement that Defendants claim they satisfied by redacting everything on King Mountain's tax returns but that very figure.

Second, because the Court finds relevant portions of King Mountain's tax returns responsive to Amended Request 11, which was propounded pursuant to Court Order after the close of discovery, there is no basis for concluding, as Defendants urge, that the State is time-barred from seeking their production. Accordingly, and for all of the reasons set forth above, the motion is granted to the extent that King Mountain shall disclose the portions of its 2010, 2011, 2012, 2013, and 2014 tax returns indicating its gross revenue for those years, as well as the portion of its 2010 tax return indicating the dividends distributed.

### C. **King Mountain's Computer Software**

Next, the State seeks to compel data generated by King Mountain's internal computer software, indicating the percentage of gross revenue attributable to New York sales for 2010, 2011, and 2014.[6] According to Plaintiff, and as discussed more fully above, this information, together with identification of King Mountain's gross revenues, permits a computation of the degree to which Wheeler profited from the company's New York activities, and is therefore relevant to establish his contacts with the State for jurisdictional purposes. Defendants argue in opposition that King Mountain does not organize its records on state-by-state basis, and

---

[6] At his deposition, Thompson testified to a "rough" approximation of King Mountain's gross revenues attributable to New York sales for the years 2012 and 2013, which he stated were derived from his review of computer-generated records for those years. The State appears to rely upon Thompson's representation as to these percentages, and Defendants do not deny their accuracy.

Thompson's testimony concerning the software's capability does not reflect the manner in which King Mountain's records are kept in the ordinary course of business. Thus, Defendants contend they are under no obligation to generate and produce such specific information. Defendants do not, however, deny that Thompson admitted King Mountain has the ability to isolate the percentage of gross revenue attributable to New York sales without difficulty; that Thompson utilized such software to testify at his deposition as to those percentages for 2012 and 2013; and that disclosure of those percentages, together with disclosure of King Mountain's gross revenues, would permit a reasonably accurate calculation of the financial benefit inuring to Wheeler from King Mountain's New York activities—the precise question intended to be answered by jurisdictional discovery.[7]

At the outset the Court notes that the State has known about the capabilities of King Mountain's internal computer software since at least July 30, 2014, when Thompson was deposed, but has not sought to compel the production of related records until now, well after the close of discovery. And, the State has offered no

---

[7] Defendants argue that "allocating profit (or loss) by State (as opposed to revenue) would be further complicated by apportioning various fixed costs—*e.g.*, machinery, maintenance, labor, etc.— to a particular State, an exercise King Mountain does not do in the ordinary course of business, could not reasonably accomplish and should not be required to undertake." King Mtn.'s Ltr. Opp. at 3. However, the State does not contend, and the Court has not held, that an exact dollar amount collected by Wheeler from King Mountain's New York activities is required for the Court to exercise jurisdiction over him. Rather, the State is merely required to show, in any one or combination of various ways, that King Mountain engaged in purposeful activities in New York for the benefit of and with the knowledge and consent of Wheeler. As noted above, this inquiry is informed by, *inter alia*, the extent to which Wheeler acquired a financial stake in King Mountain's New York activities. The degree to which factors such as "fixed costs" bear upon the actual amount of profits collected by Wheeler in relation to gross revenue is a factual matter to be asserted in opposition to the State's substantive application for the exercise of jurisdiction, not as a basis for denying discovery into the issue and short-circuiting the State's ability to even investigate it. This is particularly true in light of the fact that Defendants do not claim that Thompson took such "fixed costs" into account in estimating the percentages of gross revenue attributable to New York sales in 2012 and 2013 at his deposition, or that his calculations were inaccurate as a result of his failure to do so.

explanation for its inaction. Nonetheless, "the federal rules give district courts broad discretion to manage the manner in which discovery proceeds," and even "where, as here, a party has filed a motion to compel after discovery has closed," the Court may modify the applicable discovery plan to permit such discovery if that party "establish[es] good cause for the late filing." *Casagrande v. Norm Bloom & Son, LLC*, 11-cv-1918, 2014 U.S. Dist. LEXIS 158752, at *5-*6 (D. Conn. Nov. 10, 2014) (citations omitted). " '[T]he primary consideration' in determining whether good cause has been shown 'is whether the moving party can demonstrate diligence.' " *Id.* at *6 (quoting *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007)). "In addition to diligence, other factors to consider when assessing whether to enlarge a discovery deadline include: '(1) the imminence of a trial; (2) whether the request is opposed; (3) prejudice to the non-moving party; (4) whether the moving party foresaw the need for additional discovery, in light of the discovery deadline set by the court; and (5) whether further discovery is likely to lead to relevant evidence.' " *Id.* (quoting *Jeannite v. City of New York Dep't of Buildings*, 09-cv-3464, 2010 U.S. Dist. LEXIS 63435, at *4-*5 (S.D.N.Y. June 21, 2010)). On the whole, these factors weigh in favor of considering the motion to compel as it relates to King Mountain's software on the merits, despite the State's failure to move on that ground sooner.

First, the potential trial of this case is not imminent. Rather, the instant motion arises in the unique pre-answer posture of jurisdictional discovery. Second, although the request is opposed, Defendants identify no substantive reason for the

Court not to consider the merits of the request beyond the fact that it is late. Similarly, third, Defendants have not established that they will be prejudiced by the Court considering this branch of Plaintiff's motion on the merits. *Id.* at *12 ("Although Defendant[s] oppose[] the instant motion, [they] ha[ve] made no showing that [they] would be prejudiced *unfairly* by extending the discovery period [for this limited purpose]. For purposes of litigation strategy, Defendants might prefer that additional production of evidence not take place, but that is not what courts mean by unfair prejudice" (emphasis in original)). Fourth, it is likely that the State knew, or at least should have known, nearly ten months ago that it would need the additional discovery it now seeks, and took no steps to compel its production—a factor weighing against considering this portion of the motion on the merits. Fifth, and perhaps most importantly, discovery into the computer-generated percentages of King Mountain's revenue attributable to New York sales is highly likely to lead to relevant admissible evidence. As noted above, King Mountain does not deny that disclosure of those percentages, considered alongside disclosure of King Mountain's gross revenues, would permit a reasonably accurate calculation of the amount Wheeler profited from King Mountain's New York activities. Accordingly, the Court is inclined to "keep[] with the practice in this Circuit" and "decline to deny [this branch of] Plaintiff's motion to compel on the basis that it was filed late, and will consider that [branch of the] motion on its merits." *Id.* at *11 (citations omitted).

Based on this conclusion, the Court turns to Defendants' objections rooted in their argument that the information sought is not maintained in the form requested

in the regular course of business. Federal Rule of Civil Procedure 26(b)(2)(B) identifies circumstances under which the otherwise broad discovery permissible under the Federal Rules must be limited in the context of electronically stored information:

> A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. On a motion to compel discovery or for a protective order, the party from whom discovery is sought must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

Fed. R. Civ. P. 26(b)(2)(B).

Rule 26(b)(2)(C) provides:

On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C).

Here, Defendants have not met their burden of "show[ing] that the information is not reasonably accessible because of undue burden or cost." Rather, Defendants argue in conclusory fashion only that producing the information sought by the State would require a "complicated" departure from its standard record-keeping protocol, which itself is undermined by the testimony of King Mountain's CEO that the specific data sought could be isolated without difficulty and that he undertook such a departure for calendar years 2012 and 2013 in preparation for his deposition in this case. Further weighing in support of this conclusion is the inapplicability of the limitations found in Rule 26(b)(2)(C). While, as discussed above, the State has known about the ability of King Mountain's computer software to perform these relevant calculations since at least July 30, 2014, the delay in seeking to compel such information is far outweighed by other factors, including and especially "the importance of the discovery in resolving the issues" presently before the Court. Accordingly, the motion to compel is granted to the extent that King Mountain shall utilize the method about which Thompson testified to generate and produce any documents and information reflecting the percentage of King Mountain's gross revenue attributable to New York sales in the years 2010, 2011, and 2014.

**D.    King Mountain's Quarterly Financial Reports**

Finally, the State seeks to compel production of financial statements that were prepared by King Mountain for its Board of Directors, including Wheeler. In that regard, Thompson testified that he updated the Board on King Mountain's

finances on a quarterly basis. *See* Leung Decl., Ex. "B", DE [163-3], at 99-100. According to Thompson, these updates included information on King Mountain's sales of cigarettes to certain retailers within the State of New York. *See id.* at 129. Thompson testified that in providing such updates, he prepared financial statements covering the relevant time period, and distributed them to Board members to assist in the discussions. *See id.* at 99-100. In addition, Thompson testified that such documents are "reasonably available to him" if he "were to go back to King Mountain to" look at them. *Id.* at 100. Defendants' only asserted bases for opposing the production of these documents is that, like the computer software records, the financial statements were not specifically demanded in the First Requests and the State did not seek to compel their production prior to discovery closing. The Court disagrees with both arguments. First, as to the timeliness of the request, the Court adopts and reiterates its reasoning, stated above, for considering this portion of the instant motion on the merits. Specifically, the potential probative value of the evidence sought, considered in light of the testimony that such evidence is reasonably accessible, Defendants' failure to identify tangible prejudice, and the fact that trial is not imminent, weighs in favor of a merits-based analysis, despite the motion's alleged untimeliness.

Second, and relatedly, the Court finds that these documents are directly relevant to the jurisdictional inquiry before it. Specifically, as noted above, the State's burden is to show that King Mountain, *inter alia*, engaged in purposeful activities in New York with the knowledge and consent of Wheeler. For purposes of

the agency-jurisdictional analysis, in particular, "[b]eing a primary actor in the transaction[s] at issue requires that the officer have knowledge and consent to the transaction carried out by the agent-corporation and that the officer have exercised control over the corporation in the transaction." *Basquiat*, 1997 U.S. Dist. LEXIS 12653, at *8. Thompson's testimony provides ample basis for concluding that the company's quarterly financial statements were provided to Wheeler for the express purpose of keeping him and the other members of King Mountain's Board apprised of its cigarette sales, including those in New York. Such information goes to the heart of the jurisdictional inquiry. As a result, the motion to compel is granted to the extent that King Mountain shall produce all financial statements Thompson testified he prepared and distributed to King Mountain's Board of Directors in calendar years 2010 through 2014.

## IV.  Conclusion

Based on the foregoing, the motion to compel is granted as follows:

(i)     Defendants shall produce documents and information responsive to First Requests 23 and 24 for calendar year 2010;

(ii)    King Mountain shall disclose the portions of its 2010, 2011, 2012, 2013, and 2014 tax returns indicating its gross revenue for those years;

(iii)   King Mountain shall disclose the portion of its 2010 tax return indicating its distribution of dividends for that year;

(iv)    King Mountain shall produce documents and information reflecting the percentage of King Mountain's gross revenue attributable to New York sales in the years 2010, 2011, and 2014, as determined by its internal computer software; and

(v)     King Mountain shall produce all financial statements prepared for and distributed to King Mountain's Board of Directors in calendar years 2010, 2011, 2012, 2013, and 2014.

This supplemental production is to be served on or before June 30, 2015.

Dated:     Central Islip, New York
             May 29, 2015          **SO ORDERED**

                                    s/ Steven I. Locke
                                    STEVEN I. LOCKE
                                    United States Magistrate Judge