# EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

STATE OF NEW YORK,

                                    Plaintiff,

               -against-

MOUNTAIN TOBACCO COMPANY d/b/a        Civil Action No.
KING MOUNTAIN TOBACCO COMPANY INC.,
and DELBERT WHEELER, Sr.,              2:12-CV-06276 (JS) (SIL)

                              Defendants.

------------------------------------------------------------- X

## STATEMENT OF UNDISPUTED MATERIAL FACTS
## (MOUNTIAN TOBACCO COMPANY D/B/A KING MOUNTIAN TOBACCO COMPANY INC.)

Pursuant to Local Civil Rule 56.1, the plaintiff State of New York submits this Statement of Undisputed Material Facts in support of the State of New York's anticipated Motion for Summary Judgment against defendant Mountain Tobacco Company d/b/a King Mountain Tobacco Company Inc. ("King Mountain").

**The State of New York**

1.      The plaintiff State of New York is a sovereign entity.  State Am. Compl., ¶ 7 (ECF Nos. 6 and 96); King Mt. Answer, ¶ 4 (ECF No. 47).

2.      The State's Amended Complaint alleges that the defendants Mountain Tobacco Company d/b/a King Mountain Tobacco Company, Inc. ("King Mountain") and Delbert Wheeler, Sr. ("Wheeler") sold and shipped—and continue to sell and ship—large quantities of unstamped and unreported cigarettes into the State of New York.  State Am. Compl., ¶ 1.

3.      Each defendant is alleged to have specifically violated (a) the Contraband Cigarette Trafficking Act, 18 U.S.C. §§ 2341–46; (b) the Prevent All Cigarette Trafficking Act, 15 U.S.C. §§ 375–78; (c) New York Tax Law sections 471 and 471-e; (d) New York Tax Law section 480-b; and (e) New York Executive Law § 156-c.  State Am. Compl., ¶¶ 76–98.

**The State of New York's interest in protecting public health**

4.      The State has a strong interest in protecting the public health of its citizens.  *See Medtronic v. Lohr*, 518 U.S. 470, 475 (1996) ("States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons").

5.      Cigarette smoking is the single leading cause of preventable death in the United States, killing over 400,000 people each year.  U.S. Dept. of Health and Human Services, *The Health Consequences of Smoking—50 Years of Progress, A Report of the Surgeon General* ("Surgeon Gen. Rept."), at 11, 678 (2014) (available at http://www.surgeongeneral.gov/library/reports/50-years-of-progress/).

6.      For the millions more living with a smoking-related disease, the health care costs are substantial.  Surgeon Gen. Rept., at 11, 678.

7.      In 2012, New Yorkers spent roughly $10 billion annually on health care costs attributable to smoking.  RTI International, 2012 Independent Evaluation Report of the New York Tobacco Control Program ("RTI Rept. 2012"), at 50 (2012) (available at http://www.health.ny.gov/prevention/tobacco_control/reports_brochures_fact-sheets.htm).

8.      To combat these harms and protect the public health of its citizens, the State of New York—like the federal government, 49 other states, and District of Columbia—taxes the sale and use of tobacco products, such as cigarettes.  N.Y. Tax Law § 470 *et seq*.; Surgeon Gen. Rept. at 788, 790.

9.      And, because higher taxes improve public health (*i.e.*, by decreasing the consumption of tobacco products, especially cigarettes) and increases public revenues, such taxes are a valuable and effective policy lever.  Surgeon Gen. Rept. at 788 (citation omitted).

10.      Stated differently, raising cigarette prices "is one of the most effective interventions to prevent and reduce cigarette use."  RTI International, 2011 Independent Evaluation Report of the New York Tobacco Control Program, at 40 (2011) (citation omitted) (available at http://www.health.ny.gov/prevention/tobacco_control/reports_brochures_fact-sheets.htm).

11.      Given these facts, New York has become "a national leader with respect to tobacco control policies."  RTI Rept. 2012 at 5; *see also* RTI International, 2013 Independent Evaluation Report of the New York Tobacco Control Program, at 2 (2013) (available at http://www.health.ny.gov/prevention/tobacco_control/reports_brochures_fact-sheets.htm).

12.      In 2012, New York's cigarette excise tax was the highest in the country and nearly $3 more than the national average tax.  RTI Rept. 2012 at 5; RTI Rept. 2013 at 2.

13.      But as different levels of state taxation have widened, tax avoidance and evasion practices have increased.  Surgeon Gen. Rept. at 791.

14.      Such "illicit trade" practices include "individual cross-border, Internet and untaxed purchases on tribal lands"; small scale organizations bootlegging cigarettes from low tax jurisdictions for resale in high tax jurisdictions; and large-scale organizations engaging in "organized smuggling."  Surgeon Gen. Rept. at 791.

15.      In whatever form, these illicit trade practices hurt the public health and public fisc.  Surgeon Gen. Rept. at 789.

16.     In New York, for example, cigarette tax evasion was estimated to cost the State "between $465 million and $610 million per year in lost tax revenue."  RTI Rept. 2012 at 41 (citing RTI Rept. 2011).

**The State's authority to tax off reservation and non-Indian transactions**

17.     Article 20 of the New York Tax Law imposes a tax on all cigarettes possessed for sale or use in New York State, except those cigarettes that New York is "without power" to tax. N.Y. Tax Law § 471; *Dep't of Taxation & Fin. of N.Y. v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 64 (1994).

18.     Under New York Tax Law section 471, all cigarettes are presumed taxable "until the contrary is established."  N.Y. Tax Law § 471(1); *City of New York v. Golden Feather Smoke Shop, Inc.*, 2013 U.S. Dist. Lexis 47037, *7 (E.D.N.Y., Mar. 29, 2013) ("*Golden Feather*").

19.     The State normally collects this cigarette tax through a system of prepayments where the cost of the tax is passed down the distribution chain.  *Golden Feather*, 2013 U.S. Dist. Lexis 47037, at *7.

> a. The process begins with State-licensed "stamping agents," usually wholesalers, who buy cigarettes from manufacturers and then pre-pay the State tax by purchasing tax stamps from the State and affixing them to cigarette packages as evidence of payment.  *Golden Feather*, 2013 U.S. Dist. Lexis 47037, at *7.
>
> b. This stamping system "mandates that these agents be the only entry point for cigarettes into New York's stream of commerce."  *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 158 (2d Cir. 2011).
>
> c. The tax burden is subsequently built into the cost of the cigarettes and thereby passed on to other wholesalers or retailers, such as defendants, and ultimately to

the consumer.  *See* N.Y. Tax Law § 471(2); *In re N.Y. Assoc. of Convenience Stores v. Urbach*, 92 N.Y.2d 204, 209 (1998).

    d.    The purpose of this system is to prevent the widespread evasion of New York cigarette taxes.  *Golden Feather Smoke Shop*, 2013 U.S. Dist. Lexis 47037, at *8 (citing *Milhelm Attea*, 512 U.S. at 75).

20.    Due to the unique status of Native American tribes, however, federal and state governments lack authority to tax cigarettes sold to members of Native American tribes for their own consumption.  *Golden Feather*, 2013 U.S. Dist. Lexis 47037, at *8.

21.    New York is thus "without power" to tax cigarettes to be consumed on the reservation by enrolled tribal members, rendering cigarettes sold for that purpose tax-exempt. *Golden Feather*, 2013 U.S. Dist. Lexis 47037, at *8 (citing *Milhelm Attea*, 512 U.S. at 64).

22.    "On-reservation cigarette sales to persons other than reservation Indians, however, are legitimately subject to state taxation." *Golden Feather*, 2013 U.S. Dist. Lexis 47037, at *8 (quoting *Milhelm Attea*, 512 U.S. at 64).

**The State of New York's cigarette excise tax framework**

23.    Since July 1, 2010, the State of New York has imposed an excise tax on each pack of cigarettes, at the rate of $4.35 per package of twenty cigarettes.  N.Y. Tax Law § 471(1); 20 N.Y. Comp. Codes R. & Regs. § 74.1(a)(2).

24.    The excise tax is paid when a licensed cigarette stamping agent purchases New York State tax stamps and affixes a stamp to the bottom of each pack of cigarettes sold in New York State as evidence that the state excise tax was paid.  N.Y. Tax Law § 471(2); 20 N.Y. Comp. Codes R. & Regs. §§ 74.2(a), 74.3(a)(2)(i); N.Y. State, Dept. of Taxation and Finance, Cigarette And Tobacco Products Tax (available at http://www.tax.ny.gov/bus/cig/cigidx.htm).

25.     Only licensed cigarette agents are authorized to purchase and affix New York State cigarette tax stamps.  N.Y. Tax Law § 471; 20 N.Y. Comp. Codes R. & Regs. §§ 74.3(a)(2), 74.2(c); N.Y. State, Dept. of Taxation and Finance, Cigarette And Tobacco Products Tax (available at http://www.tax.ny.gov/bus/cig/cigidx.htm).

26.     Cigarette agent licenses may be issued to certain qualifying wholesalers and retailers; importers, exporters, or manufacturers of cigarettes; and certain other businesses dealing in unstamped cigarettes.  N.Y. Tax Law § 472(1); 20 N.Y. Comp. Codes R. & Regs. § 71.1; N.Y. State, Dept. of Taxation and Finance, Cigarette And Tobacco Products Tax (available at http://www.tax.ny.gov/bus/cig/cigidx.htm).

27.     Only licensed wholesale dealers of cigarettes may sell cigarettes to a retail dealer or other person for the purpose or resale.  N.Y. Tax Law § 470(8); 20 N.Y. Comp. Codes R. & Regs. §§ 70.2(h)(2), 74.4(b); N.Y. State, Dept. of Taxation and Finance, Cigarette And Tobacco Products Tax (available at http://www.tax.ny.gov/bus/cig/cigidx.htm).

**King Mountain (defendant)**

28.     Defendant King Mountain is a for profit corporation that manufactures and sells King Mountain brand cigarettes.  King Mt. Answer, ¶¶ 5, 19 (admitting the first sentence of State Am. Compl., ¶ 74).

29.     These cigarettes are intended for sale in and throughout the United States.  King Mt. Answer, ¶ 19 (admitting the first sentence of State Am. Compl., ¶ 74); King Mt. 3d Supp. Resp. to Interrog. No. 1 (Pl. Ex. 5).

30.     King Mountain was formed and operates under the laws of the Yakama Indian Nation.  King Mt. Answer, ¶ 5; King Mt. Corp. Disclosure Statement ("Corp. Statement") (ECF No. 51).

31.     King Mountain has no parent companies, subsidiaries or affiliates that have issued shares to the public in the United States or abroad.  King Mt. Corp. Statement.

32.     King Mountain maintains its principal place of business and manufacturing at 2000 Fort Simcoe Road, White Swan, Washington, which is located within the Yakama Indian Nation Reservation.  King Mt. Answer, ¶ 5.

33.     King Mountain also maintains a warehouse at ERW Wholesale, which is located at 11157 Old Lakeshore Rd., Irving, New York 14081, an area located within the Seneca Indian Nation Reservation and the State of New York.  *See* KMTA 134 (King Mountain bills of lading to ERW identify the destination address as "ERW Wholesale / King Mountain Warehouse"), 140 (same), 145, 264, 271, 278, 282, 285–87, 292.

**Wheeler (defendant)**

34.     Defendant Delbert Wheeler, Sr. owns and operates King Mountain.  KMTID 448; *King Mountain Tobacco Company, Inc.; Delbert Wheeler, Sr.; and the Confederated Tribes and Bands of the Yakama Indian Nation v. Alcohol and Tobacco Tax and Trade Bureau et al.*, Case No. 2:11-cv-03038-RMP (E.D. Wash.) ("*Wheeler v. TTB*"), First Am. Compl., ¶ 2.51.

35.     Since December 2005, Wheeler has acted as King Mountain's sole owner and president.  King Mt. 1st Supp. Resp. to Pl.'s Interrog. No. 15 (State Depo. Ex. 3); King Mt. Answer, ¶ 7; Deposition of Delbert Wheeler, Sr. at 9, 10, 21, 58.

36.     He has also served on King Mountain's board of directors, since December 2005. King Mt. 1st Supp. Resp. to Pl.'s Interrog. No. 15 (State Depo. Ex. 3) (identifying Wheeler as King Mountain's president); *Philip Morris USA Inc. v. King Mountain Tobacco Company, Inc.; Mountain Tobacco; Delbert L. Wheeler, Sr., and Richard "Kip" Ramsey*, Case No. 2:06-cv-03073-RHW (E.D. Wash.) ("*Philip Morris v. King Mt. / Wheeler*"), Decl. of Richard "Kip"

Ramsey ("*Philip Morris v. King Mt. / Wheeler*"), ¶ 4, Ex. B (King Mt. Articles of Incorporation, noting that King Mountain's president is a member of King Mountain's board of directors).

37.     Since 2006 or 2007, Wheeler has also served as the chairman of King Mountain's board of directors.  Wheeler Depo. at 59.

38.     King Mountain's board of directors reports to King Mountain's sole shareholder, Wheeler.  Wheeler Depo. at 61,

39.     Wheeler is an enrolled member of the Yakama Nation, and resides within the Yakama Indian Nation Reservation.  King Mt. Answer, ¶ 7; KMTA 875.

**King Mountain's business operations, generally**

40.     King Mountain grows, harvests, and cures tobacco on a 160-acre property. *Wheeler v. TTB*, 1st Am. Compl., ¶ 5.24; *Wheeler v. TTB*, Garcia Decl., ¶ 30 (noting that in 2011, King Mountain would be farming approximately 160 acres).

41.     This property, as well as King Mountain's cigarette production facility, is owned by Wheeler.  KMTID 448–49, 660–61; KMTA 974; *Wheeler v. TTB*, 1st Am. Compl., ¶¶ 4.63, 4.77; *Wheeler v. TTB*, Garcia Decl., ¶¶ 38–39 (noting Wheeler's ownership of King Mountain's production facility).

42.     Once King Mountain's tobacco is harvested, King Mountain ships this tobacco to Tennessee where it is then threshed.  *King Mt. Tobacco Co. v. McKenna*, 2013 U.S. Dist. LEXIS 49740, *5 (E.D. Wash. Apr. 5, 2013).

43.     The threshed tobacco is then shipped to North Carolina, where it is then blended with North Carolina grown tobacco purchased from another company.  *King Mt.*, 2013 U.S. Dist. LEXIS 49740, at *5; *see also* KMTID 430.

44.     This blended tobacco is then sent back to King Mountain.  *King Mt.*, 2013 U.S. Dist. LEXIS 49740, at *5; *see also* KMTID 430.

45.     Upon its return, the tobacco is then "completed" by a traditional ceremony—*i.e.*, sprinkled with hand thrashed tobacco and given a prayer—that is conducted by Wheeler and King Mountain employees.  KMTID 210, 430.

46.     The tobacco is then bundled and packaged into King Mountain brand cigarettes. KMTID 430.

47.     Each package or "pack" of King Mountain brand cigarettes contains 20 cigarettes. King Mt. Answer ¶ 16; Black Depo. at 63.

48.     Each carton of cigarettes contains 10 packs of cigarettes.  King Mt. Answer ¶ 16; Black Depo. at 63–64.

49.     And each "case" of cigarettes contains 60 cartons of cigarettes.  Black Depo. at 64.

**King Mountain's marketing and advertising of cigarettes, generally**

50.     To solicit sales of King Mountain's cigarettes, Wheeler and other King Mountain sales representatives made phone calls from their offices on the Yakama Reservation, attended trade shows, and visited customers at their place of business.  Ramsey Decl., ¶ 6; *King Mt. Tobacco Co.*, 2013 U.S. Dist. LEXIS 49740, *6 (advertising cigarettes in multiple states, via tradeshows); Thompson Depo. at 25, 38 (King Mountain customer visits).

51.     King Mountain also advertises its cigarettes on the Internet, pays its customers (*i.e.*, distributors) and other third parties to market and advertise King Mountain brand cigarettes, and provides credit to King Mountain's customers and distributors.  *King Mt. Tobacco Co.*, 2013 U.S. Dist. LEXIS 49740, *6 (Internet advertising); King Mountain Tobacco Company website, www.kingmountaintobacco.com (Internet advertising); King Mt. Resp. to Req. For Admis. No. 113 (admitting that King Mountain maintains, operates, and is responsible for controlling the content of www.kingmountaintobacco.com); King Mt. Resp. to Req. For Admis. No. 63

(showing payment by King Mountain for the marketing and advertising of King Mountain brand cigarettes on Indian territory, located within the State of New York); KMTA 265–66, 557–60, 676–683 (credit agreements to smoke shops located on Indian reservations, located within the State of New York).  For example—

    a.  In 2006, a King Mountain sales representative approached Wolf Run Wholesale, an Indian smoke shop located on the Cattaraugus (Seneca) Indian Reservation, about selling King Mountain brand cigarettes.  *Philip Morris v. King Mt. / Wheeler*, Decl. of William Parry, ¶ 6.  Since that time (up through at least October 2006), Wolf Run Wholesale began carrying and selling King Mountain brand cigarettes.  *Id.*

    b.  That same year (2006), a King Mountain representative flew from Washington State to New York to visit the Onondaga Nation Smoke Shop and promote King Mountain brand cigarettes.  *Philip Morris v. King Mt. / Wheeler*, Decl. of Virgil Thomas, ¶ 4.  Thereafter, the Onondaga Nation Smoke Shop began carrying King Mountain brand cigarettes.  *Id.*

    c.  In 2011, King Mountain paid Mohawk Marketing—a business sharing the same address as King Mountain customer and distributor, Oie'n:Kwa Trading (76 Geronimo Lane, P.O. Box 975 Akwesasne, New York)—a fee of ██████ for the marketing and distribution of King Mountain cigarettes at 25 stores located on the Akwesasne, St. Regis Mohawk Indian Reservation, as well as two stores located on land occupied by the Ganienkeh.  King Mt. Resp. to Req. For Admis. No. 63; *compare* KMTA 561, 565, 569, 573, and 574 (Oienkwa Trading address) *with* KMTA 570, 572 (Mohawk Marketing address).  This fee was paid to cover

the printing of marketing materials, implementation of signage, product samples, and a giveaway promotion.  King Mt. Resp. to Req. For Admis. No. 63 (also referencing KMTA 570–74).

d.  That same year (2011), King Mountain offered and entered into █████



KMTA 265–66 ████████████████, 557–60 █████████████████████ and 676–683 ████████████ ███████

e.  In April 2012, Yancey Black—a general manager, treasurer, and director for King Mountain—traveled to the Seneca Indian Reservation in New York, and met with King Mountain's customer and distributor ERW Wholesale.  King Mt. First Supp. Resp. to Interrog. No. 7 (identifying trip); King Mountain.  King Mt. 1st Supp. Resp. to Pl.'s Interrog. No. 15 (State Depo. Ex. 3) (identifying Black as a general manager and treasurer); Thompson Depo. at 19 (identifying Black as a director); Ramsey Decl., ¶ 4, Ex. B (identifying King Mountain's treasurer as a director for King Mountain).

f.  In May 2012, King Mountain employees and sales representatives Patrick Shilow and Kevin Luke traveled to the Seneca Nation Reservation.  Black Depo. at 106–07.  The purpose of this visit was to update point of sale posters, banners, shelf decals, and other items stating the price of King Mountain's tobacco products.  Black Depo. at 107–08.

g.  From May 2012 through December 2013, King Mountain paid for ERW Wholesale for promotional items, advertisements, and giveaways in the amount of

███████.  KMTA 819.  King Mountain also provided promotional items to ERW Wholesale—*i.e.*, King Mountain folders, brochures, and pamphlets giving the history of the Yakama and King Mountain.  KMTA 441 (email dated May 25, 2012).

**King Mountain's distributors / customers**

52.  Since at least June 1, 2010, King Mountain has marketed, distributed, and sold its cigarettes in New York, California, Idaho, Oregon, Washington, North Carolina, South Carolina, Montana, Nevada, Kentucky, Virginia, Georgia, Mississippi, New Mexico, Kansas, Oklahoma, North Dakota, Pennsylvania, and Texas.  King Mt. 3d Supp. Resp. to Interrog. No. 1, Ex. A (Pl. Ex. 5); *see* State 1ˢᵗ Set of Interrogs. and Req. For Prod. Docs., at 3 (identifying June 1, 2010 as the beginning of the relevant time period for State Interrog. No. 1).

53.  Within the State of New York, King Mountain used twelve companies to market, distribute, and sell its cigarettes:

a.  AJ's Candy & Tobacco, P.O. Box 187, Gowanda, New York 14070;

b.  ERW Wholesale, 11157 Old Lakeshore Rd., Irving, New York 14081;

c.  Indian Creek, 112 A Poospatuck Lane, Mastic, New York 11950.

d.  Iriquois (or Iroquois) Wholesale, 11157 Old Lakeshore Rd., Irving, New York 14081;

e.  Lakeside Trading, 89 State St., Seneca Falls, New York 13148;

f.  Mohawk Distribution, P.O. Box 508, Hogansburg, New York 13655;

g.  Oienkwa Trading, P.O. Box 975, Akwesasne, New York 13655;

h.  Oneida Wholesale, 223 Genesee St., Oneida, New York 13421;

i.  Onondaga Nation Smoke Shop, P.O. Box 301, Nedrow, New York 13120;

    j.   Poospatuck Trading Company & Smoke Shop, 207 Poospatuck Lane, Mastic, New York 11950;

    k.   Shinnecock Smoke Shop, P.O. Box 5036, Southampton, New York 11969; and

    l.   Valvo Candies, Routes 5 & 20, P.O. Box 271, Silver Creek, New York 14136.

King Mt. 3d Supp. Resp. to Interrog. No. 1, Ex. A (Pl. Ex. 5).

54.    These above-identified distributors (except for Valvo Candies) are located on New York State qualified Indian reservations (N.Y. Tax Law § 470(16)), which are located within the boundaries of the State of New York.  Black Depo. at 29; *see also* King Mt. 3d Supp. Resp. to Interrog. No. 1, Ex. A (Pl. Ex. 5).

    a.   Valvo Candies is not located on a New York State qualified Indian reservation, but instead located within the County of Chautauqua, New York.  *See* New York Dept. of State, Entity search results for Valvo Candies, available at http://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_INFORMATION?p_nameid=318792&p_corpid=271406&p_entity_name=valvo%20candies&p_name_type=A&p_search_type=BEGINS&p_srch_results_page=0) and Chautauqua County Dept. of Finance, Parcel Current Tax Liabilities, available at http://app.co.chautauqua.ny.us/cctaxonline/#view/064689-32.00-1-24/current (noting that Valvo Candies owes $6,882.32 in taxes to the County of Chautauqua, New York).

    b.   Valvo Candies' address is 1277 Routes 5 & 20, Silver Creek, New York 14136, which is subject to the State of New York's general jurisdiction.  *See* Valvo's Candies' website, http://www.valvoscandy.com/index.html (last visited July 27, 2015); New York Dept. of State, Entity search results for Valvo Candies,

available at

http://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_INFORMATI
ON?p_nameid=318792&p_corpid=271406&p_entity_name=valvo%20candies&p
_name_type=A&p_search_type=BEGINS&p_srch_results_page=0).

55.     The State of New York has not licensed or registered any of the above-identified

King Mountain distributors (with the exception of Valvo Candies) as a stamping agent or

registered wholesaler of cigarettes.  Decl. of Peter Spitzer, dated ___, 2015, ¶ ____.

56.     None of King Mountain's above-identified distributors (including Valvo

Candies)—

   a. Has purchased New York State cigarette excise tax stamps, and have affixed such

      stamps on such packs of King Mountain cigarettes (Spitzer Decl., ¶ ___);

   b. Has been authorized by the State of New York to prepay the excise tax due on in

      the packs of cigarettes purchased from King Mountain (*id*. ¶ ___);

   c. Is a member of the Yakama Nation (Thompson Depo. at 123);

   d. Is located on the Yakama Indian Reservation (Thompson Depo. at 116; Black

      Depo. at 76–77); or

   e. Receives per capita disbursements from the Yakama Nation (Thompson Depo. at

      125).

**King Mountain's sale and shipment of cigarettes, generally**

57.     Typically, each King Mountain customer (*i.e.*, distributor) would submit an order

for King Mountain's tobacco products by fax, email or phone.  Black Depo. at 74 (email, phone,

and fax); Ramsey Decl., ¶ 6 (phone and fax); *see*, *e.g.*, KMTA 150, 443 (reflecting email orders).

   a. King Mountain receives roughly 90% of its customer orders via fax.  Wheeler

      Depo. at 55.  The remaining 10% of the orders come in via the phone.  *Id*.

  b. Various persons at King Mountain may receive such phone orders, including Wheeler.  *Id.*

58. Once an order was placed with King Mountain, the cigarettes were then loaded onto common carrier or private delivery service trucks.  Black Depo. at 74.

59. Each delivery truck would carry up to ███████████████████████ ███████████.  KMTA 284.

60. For King Mountain's customers in New York, it would take anywhere from five to seven days for the cigarettes to be delivered.  Thompson Depo. at 55; Black Depo. at 75.

61. King Mountain typically pays for the cost of its cigarettes to its New York customers.  Thompson Depo., at 73, 76–77 (identifying King Mountain's general cost for shipping cigarettes to New York as ██████ per carton); Wheeler Depo. at 64, 78.

62. These shipping costs were paid for by King Mountain, at the direction of King Mountain's owner, defendant Delbert Wheeler, Sr.  *See*, *e.g.*, KMTA 580, 592, 599, 605, 619, 626, 632, 638.

63. King Mountain pays approximately $7,500 to ship a full truckload of cigarettes to the State of New York.  Wheeler Depo. at 64.

**No tax stamp affixed; no cigarette excise tax paid**

64. Significantly, King Mountain did not affix any New York State excise tax stamps to any of the packs of cigarettes that it sold and shipped to its distributors located within the State of New York.  Black Depo. at 59, 62, 77–78.

65. King Mountain also did not prepay any New York State excise tax on such packs of cigarettes.  Black Depo. at 62–63, 78.

**King Mountain's sale and shipment of cigarettes into New York**

66.     King Mountain sold the following amounts of cigarettes to AJ's Candy &

Tobacco, located at P.O. Box 187, Gowanda, New York 14070:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|------|----------|-----------------|-------------------|-------------|
| 12/17/2010 | 1-8, 82-84 | | | |
| 08/01/2011 | 463-68 | | | |
| 08/18/2011 | 469-74, 731-34 | | | |
| 11/08/2011 | 475-80, 753-55 | | | |
| 12/13/2011 | 481-86, 767-69 | | | |
| 01/06/2012 | 178-82 | | | |
| 01/12/2012 | 173-77 | | | |
| 01/24/2012 | 183-88, 378-80 | | | |
| 02/07/2012 | 189-94, 385 | | | |
| 02/21/2012 | 195-200, 389-91 | | | |
| 03/06/2012 | 201-07, 392-94 | | | |
| 03/14/2012 | 208-12, 390-400 | | | |
| 03/19/2012 | 213-18, 401-03 | | | |
| 03/21/2012 | 219-25, 404-06 | | | |
| 03/27/2012 | 226-32, 407-09 | | | |
| 04/05/2012 | 233-39, 414-17 | | | |
| 04/17/2012 | 240-44, 418-20 | | | |
| 04/24/2012 | 250-59, 421-23 | | | |
| 05/01/2012 | 245-49, 424-26 | | | |
| **Totals:** | | | | |

67.     King Mountain sold the following amounts of cigarettes to ERW Wholesale,

located at 11157 Old Lakeshore Rd., Irving, New York 14081:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|------|----------|-----------------|-------------------|-------------|
| 02/13/2012 | 261-64 | | | |
| 04/19/2012 | 268-71 | | | |
| 05/17/2012 | 272-78 | | | |
| 06/15/2012 | 279-82 | | | |
| 06/20/2012 | 283-87 | | | |
| 07/13/2012 | 288-90 | | | |

16

| Date | | | | | |
|---|---|---|---|---|---|
| 10/11/2012 | 291-296 | | ■ | | ■ |
| 04/11/2013 | 142-45 | | | | |
| 06/12/2013 | 135-41, 784, 855-61 | | ■ | | ■ |
| 06/17/2013 | 129-34, 849-54 | | ■ | | ■ |
| 08/19/2013 | 842-48 | | | | |
| 10/01/2013 | 836-41 | | | | |
| 11/06/2013 | 830-35 | | | | |
| 12/10/2013 | 825-29 | | | | |
| 02/01/2014 | 821-24 | | | | |
| 02/07/2014 | 816-17, 820 | | | | |
| 03/19/2014 | 812-15 | | | | |
| 06/18/2014 | 1017-18 | | | | |
| 07/16/2014 | 1016 | | | | |
| 08/18/2014 | 1019-20 | | | | |
| 12/16/2014 | 1021-24 | | | | |
| **Totals:** | | | ■ | | ■ |

68.     ERW Wholesale also does business as ERW Enterprises.  Compare KMTA 265–66 (identifying ERW Wholesale's address, 11157 Old Lakeshore Road, Irving New York 14081; email handle, @erwenterprises.net; phone number, 716-934-3160; and fax number, 716-934-3177) with KMTA 284 (ERW fax number 716-934-3177) and ERW Enterprises, http://erwenterprises.net/ (identifying identical address, email handle, phone number, fax number as ERW Wholesale; last visited July 30, 2015).

69.     ERW Wholesale (and ERW Enterprises) also does business as Iroquois Wholesale.  Compare KMTA 284 (Iroquois Wholesale purchase order, using ERW Enterprises' and ERW Wholesale's fax number) with KMTA 487–89 (Iroquois Wholesale purchase order and invoice, using ERW Enterprises' and ERW Wholesale's address), KMTA 265–66 (identifying ERW Wholesale's address and fax number).  *See* KMTA 283–87 (sale records and invoices).

70.     King Mountain sold the following amounts of cigarettes to Iroquois Wholesale, 11157 Old Lakeshore Rd., Irving, New York 14081:

| Date | KMTA No. | Cigarette Cases | Cigarette | Amount Paid |
|---|---|---|---|---|

| | | | | Cartons | | |
|---|---|---|---|---|---|---|
| 08/12/2011 | 487-89 | | █ | | █ | █ |
| | Totals: | | █ | | █ | █ |

71.     King Mountain sold the following amounts of cigarettes to Lakeside Trading,

located at 89 State St., Seneca Falls, New York 13148:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|---|---|---|---|---|
| 08/12/2011 | 490-92 | █ | █ | █ |
| | Totals: | █ | █ | █ |

72.     King Mountain sold the following amounts of cigarettes to Mohawk Distribution,

P.O. Box 508, Hogansburg, New York 13655:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|---|---|---|---|---|
| 06/24/2010 | 9 | █ | █ | █ |
| 07/23/2010 | 10 | █ | █ | █ |
| 08/25/2010 | 11 | █ | █ | █ |
| 09/16/2010 | 12 | █ | █ | █ |
| 10/20/2010 | 13 | █ | █ | █ |
| 11/9/2010 | 14 | █ | █ | █ |
| 11/19/2010 | 15 | █ | █ | █ |
| 12/8/2010 | 16-17, 85-87 | █ | █ | █ |
| 1/4/2011 | 493-98, 684-86, 787 | █ | █ | █ |
| 3/25/2011 | 499-503, 690-92 | █ | █ | █ |
| 4/13/2011 | 505-09, 699-702 | █ | █ | █ |
| 5/11/2011 | 511-15, 707-10 | █ | █ | █ |
| 07/22/2011 | 517-21, 722-24 | █ | █ | █ |
| 08/14/2011 | 522-26, 728-30 | █ | █ | █ |
| 09/23/2011 | 528-32, 743-46 | █ | █ | █ |
| 10/18/2011 | 533-38, 747-49 | █ | █ | █ |
| 11/03/2011 | 539-44, 750-52 | █ | █ | █ |
| 11/16/2011 | 545-51, 756-59 | █ | █ | █ |
| 12/08/2011 | 552-56 | █ | █ | █ |
| 01/03/2012 | 297-302, 371-73 | █ | █ | █ |
| 01/16/2012 | 303-09, 374-77 | █ | █ | █ |
| 02/16/2012 | 310-14, 386-88 | █ | █ | █ |
| 03/09/2012 | 315-19, 395-97 | █ | █ | █ |
| 04/02/2012 | 320-24, 410-13 | █ | █ | █ |
| 05/01/2012 | 325-30, 427-29 | █ | █ | █ |

| | | | | | |
|---|---|---|---|---|---|
| **Totals:** | | ███ | | ███ | ███ |

73.    King Mountain sold the following amounts of cigarettes to Oienkwa Trading,

located at P.O. Box 975, Akwesasne, New York 13655:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|---|---|---|---|---|
| 06/22/2011 | 561-64 | █ | | ███ |
| 06/30/2011 | 565-69, 715-18 | █ | ██ | ███ |
| | **Totals:** | █ | ██ | ███ |

74.    King Mountain sold the following amounts of cigarettes to Oneida Wholesale,

located at 223 Genesee St., Oneida, New York 13421:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|---|---|---|---|---|
| 06/12/2010 | 18-19, 101-102 | █ | █ | ██ |
| 08/11/2010 | 21 | █ | █ | ██ |
| 11/10/2010 | 26 | █ | █ | ██ |
| 11/15/2010 | 27*[1] | ██ | ██ | ███ |
| 11/19/2010 | 28* | ██ | ██ | ███ |
| 12/1/2010 | 29-30 and 33, 88-90[2] | ██ | ██ | |
| 12/14/2010 | 31-32 and 33, 91-93 | ██ | ██ | ███ |
| 12/21/2010 | 34-35, 97-100 | █ | ██ | ███ |
| 1/19/2011 | 577-83, 770-71 | █ | ██ | ███ |
| 2/15/2011 | 584-87, 687-89 | █ | ██ | ███ |
| 3/28/2011 | 589-95, 693-95 | █ | ██ | ███ |
| 4/11/2011 | 596-601, 696-98 | ██ | ██ | ███ |

---

[1] Hereinafter, * notes those invoices that have "New Sales" listed under "Item Code" instead of a specific product.  Because the State only requested those records which reflect cigarette sales (Pl.'s 1st Set of Interrogs. and Req. For Prod. Docs., Req. For Prod. No. 8), it is presumed that these invoices reflect such sales.  As a result, the cartons and cases is determined by taking the amount paid on the invoice and dividing it by ███ per carton (the per carton price listed in other invoices that are close in time) to determine the total number of cartons.  The number of cartons is then divided by 60 to determine the number of cases.

[2] For this invoice, no price per unit or total amount paid is provided, therefore the amount paid listed in the chart was determined by multiplying the 9,600 cartons by the per carton price of ███

19

| Date | KMTA No. | | | | | |
|------|----------|--|--|--|--|--|
| 4/29/2011 | 602-07, 703-06 | | ██ | | ██ | | ███ |
| 06/13/2011 | 608-15, 711-14 | | ██ | | ██ | | ███ |
| **Totals:** | | | ██ | | ██ | | ███ |

75.     King Mountain sold the following amounts of cigarettes to Onondaga Nation

Smoke Shop, P.O. Box 301, Nedrow, New York 13120:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|------|----------|-----------------|-------------------|-------------|
| 07/14/2010 | 36-43, 103-104 | ██ | ██ | ███ |
| 08/10/2010 | 44-51, 107-108 | ██ | ██ | ███ |
| 09/03/2010 | 52-60, 109-110 | ██ | ██ | ███ |
| 10/28/2010 | 61-69, 113-114 | ██ | ██ | ███ |
| 11/4/2010 | 70-75 | ██ | ██ | ███ |
| 11/15/2010 | 77* | ██ | ██ | ███ |
| 11/15/2010 | 78* | ██ | ██ | ███ |
| 02/18/2011 | 588, 642-47, 772-73 | ██ | ██ | ███ |
| 05/10/2011 | 648-53, 774-75 | ██ | ██ | ███ |
| 08/14/2011 | 654-62, 778-79 | ██ | ██ | ███ |
| 10/24/2011 | 663-68, 780-81 | ██ | ██ | ███ |
| 02/07/2012 | 346-51, 384 | ██ | ██ | ███ |
| 02/20/2012 | 352-57 | ██ | ██ | ███ |
| 05/21/2012 | 358-63 | ██ | ██ | ███ |
| 07/25/2012 | 364-70 | ██ | ██ | ███ |
| 03/06/2013 | 121-28 | ██ | ██ | ███ |
| 07/02/2013 | 115-120, 792-97 | ██ | ██ | ███ |
| 10/16/2013 | 798-803 | ██ | ██ | ███ |
| 02/17/2014 | 804-11 | ██ | ██ | ███ |
| 09/12/2014 | 1014-15 | ██ | ██ | ███ |
| **Totals:** | | ██ | ██ | ███ |

76.     King Mountain sold the following amounts of cigarettes to Shinnecock Smoke

Shop, located at P.O. Box 5036, Southampton, New York 11969:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|------|----------|-----------------|-------------------|-------------|
| 06/3/2011 | 669-72, 776-77, 789 | ██ | | ███ |
| 10/21/2011 | 791 | ██ | ██ | ███ |
| 10/21/2011 | 790 | ██ | ██ | ███ |
| **Totals:** | | ██ | ██ | ███ |

77.     King Mountain sold the following amounts of cigarettes to Valvo Candies, located at Routes 5 & 20, P.O. Box 271, Silver Creek, New York 14136:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|------|----------|-----------------|-------------------|-------------|
| 06/29/2010 | 79 | ███ | ███ | ███ |
| **Totals:** | | ███ | ███ | ███ |

78.     For these ███ cartons (or ███ packs) of cigarettes, sold and delivered by King Mountain (between June 1, 2010 and December 31, 2014) to companies located within the State of New York, King Mountain received roughly ███. *See* ¶¶ 66–77, above.

79.     King Mountain's cigarette sales and deliveries to ERW Wholesale and the Onondaga Nation Smoke Shop are continuing today.  *See* Thompson Depo. at 16, 129; Wheeler Depo. at 63–64.

**The quantity of cigarettes sold and delivered suggests cigarettes destined for non-Indians.**

80.     The quantity of cigarettes that King Mountain sold and delivered to the above-identified companies located within the State of New York, far exceeds the "probable demand" for cigarettes on each New York qualified Indian reservation, where such companies are respectively located.  *Compare* ¶¶ 66–77, above, *with* 20 N.Y. Comp. Codes R. & Regs. § 74.6(e)(1).

81.     The "probable demand" for cigarettes by Indians located on a New York qualified Indian reservation, is set forth by 20 N.Y. Comp. Codes R. & Regs. § 74.6(e)(1), re-stated here in relevant part:

| Indian Nation/Tribe | New York State population (2000 census) | Cigarette Pack Amount (Packs / 3-month period) |
|---------------------|------------------------------------------|------------------------------------------------|

| Cayuga | 947 | 20,100 |
| Oneida | 1,473 | 31,200 |
| Onondaga | 2,866 | 60,600 |
| Seneca | 7,967 | 168,600 |
| Shinnecock | 1,915 | 40,500 |
| St. Regis Mohawk | 13,784 | 291,600 |

82.    A comparison of the probable demand with King Mountain's sales records shows that King Mountain's sale and shipment of cigarettes to companies located on New York Indian reservations well exceeded the probable demand for such cigarettes by qualified New York Indian reservation members.  For example—

a.  The Oneida Indian Nation has an annual probable demand for 124,800 packs of cigarettes.  *See* 20 N.Y. Comp. Codes R. & Regs. § 74.6.

   i.  In 2010, however, King Mountain sold and delivered ▮▮▮ packs of cigarettes to Oneida Wholesale—*i.e.*, an amount over ▮ times the estimated probable demand for the Oneida Indian Nation.  *See* ¶ 74, above.

   ii.  In 2011, King Mountain sold and delivered ▮▮▮ packs of cigarettes to the same company—*i.e.*, an amount ▮▮ times larger than the estimated probable demand.  *See id*.

b.  The Shinnecock Indian Nation has an annual probable demand for 162,000 packs (or 16,200 cartons) of cigarettes.  *See* 20 N.Y. Comp. Codes R. & Regs. § 74.6. But over a 5-month period in 2011, King Mountain sold and delivered ▮▮▮ packs (or ▮▮ cartons) of cigarettes to the Shinnecock Smoke Shop—*i.e.*, an amount over ▮ times the estimated probable demand for the entire Shinnecock Indian Nation.  *See* ¶ 76, above.

22

c.  The St. Regis Mohawk Indian Nation has a quarterly (3-month) probable demand for 291,600 packs of cigarettes.  20 N.Y. Comp. Codes R. & Regs. § 74.6.  Over a 3-month period beginning on September 1, 2010, King Mountain sold and delivered ███ packs of cigarettes to Mohawk Distribution—*i.e.*, an amount ██ over the estimated probable demand for the St. Regis Mohawk Indian Nation.  *See* ¶ 72, above.

d.  The Cayuga Indian Nation has a quarterly (3-month) probable demand for 20,100 packs of cigarettes.  *See* 20 N.Y. Comp. Codes R. & Regs. § 74.6.  But with a single shipment in 2011, King Mountain sold and delivered ███ packs of cigarettes to Lakeside Trading—*i.e.*, an amount over ██ times the quarterly probable demand for the Cayuga Indian Nation.  *See* ¶ 71, above.

e.  The Seneca Indian Nation has an annual probable demand for 674,400 packs of cigarettes.  *See* 20 N.Y. Comp. Codes R. & Regs. § 74.6.

   i.  In 2012, however, King Mountain sold and delivered ████ packs of cigarettes to ERW Wholesale; ███ packs of cigarettes to AJ's Candy & Tobacco; and ██ packs of cigarettes to Iroquois Wholesale—*i.e.*, an amount over ██ times the Seneca Indian Nation's estimated probable demand.  *See* ¶¶ 66–70, above.

   ii.  In 2013, King Mountain sold and delivered ████ packs of cigarettes to ERW Wholesale—*i.e.*, an amount over ██ times the Seneca Indian Nation's estimated probable demand.  *See* ¶ 67, above.

    iii.  In 2014, King Mountain sold and delivered ███████ packs of cigarettes to ERW Wholesale—*i.e.*, an amount over ███ times the Seneca Indian Nation's estimated probable demand.  *See* ¶ 67, above.

f.  The Onondaga Indian Nation has an annual probable demand for 242,400 packs of cigarettes.  *See* 20 N.Y. Comp. Codes R. & Regs. § 74.6.

    i.  In 2010, however, King Mountain sold and delivered ███████ packs of cigarettes to the Onondaga Nation Smoke Shop—an amount over ███ times the estimated probable demand for the Onondaga Indian Nation.  *See* ¶ 75, above.

    ii.  In 2011, King Mountain sold and delivered ███████ packs of cigarettes to the Onondaga Nation Smoke Shop—an amount over ███ times the Onondaga Indian Nation's estimated probable demand.  *Id.*

    iii.  In 2012, King Mountain sold and delivered ███████ packs of cigarettes to the Onondaga Nation Smoke Shop—an amount over ███ times the Onondaga Indian Nation's estimated probable demand.  *Id.*

    iv.  In 2013, King Mountain sold and delivered ███████ packs of cigarettes to the Onondaga Nation Smoke Shop—an amount over ███ times the Onondaga Indian Nation's estimated probable demand.  *Id.*

    v.  In 2014, King Mountain with only two shipments sold and delivered ███████ packs of cigarettes to the Onondaga Nation Smoke Shop—an amount over ███ times the Indian Nation's estimated probable demand.  *Id.*

83.    King Mountain's explanation for why the number of cigarettes King Mountain has shipped, transported, and sold into each New York qualified reservation exceeds the probable demand for such cigarettes is that "the State of New York does not have the power to regulate trade on Indian reservations."  King Mt. Resp. to Pl.'s 2d Set of Interrog. No. 12 (Pl. Ex. 4).

84.    In any case, King Mountain did not limit or seek to control where its cigarettes could be marketed, advertised, promoted, distributed, or sold by each distributor, except to indicate that—

    a.  King Mountain brand cigarettes were to be sold within Indian Country in New York; and

    b.  Beginning on January 31, 2012, distributors could not sell, distribute or provide unstamped King Mountain cigarettes for sale on the Poospatuck Indian Reservation.

King Mt. 1st Supp. Resp. to Pl.'s 1st Set of Interrog. Nos. 2, 4 (Pl. Ex. 6); KMTA 160–65; Thompson Depo. at 69 (only instruction was that King Mountain cigarettes were to be sold in Indian Country within that particular geographical area).

85.    King Mountain furthermore did not limit, or consider limiting, who might consume or use its cigarettes.  Thompson Depo. at 70; Wheeler Depo. at 65.

**King Mountain has not filed or made the required certifications, registrations, or reports**

86.    In accordance with the PACT Act provisions 15 U.S.C. § 376(a)(1)–(2), King Mountain has not filed any reports, or registered, with the New York State Department of Taxation and Finance.  King Mt. Answer, ¶ 18; King Mt. Resp. to Req. For Admis. No 5 (admitting that "King Mountain has not filed reports nor registrations with the New York State

Department of Taxation and Finance under the PACT Act"); Declaration of Peter Spitzer, ¶ 5 (dated Feb. 21, 2013; ECF No. 16).

87. In accordance with New York Tax Law section 480-b, King Mountain has not certified, or filed any such certifications (*e.g.*, with the Commission of the New York State Department of Taxation and Finance, the Office of the Attorney General, or any New York-licensed stamping agent), that King Mountain is either a participating manufacturer under the 1998 Tobacco Master Settlement Agreement, or is otherwise in full compliance with New York Public Health Law § 1399-pp(2) by having deposited the required amount of escrow per cigarette sold in the state. King Mt. Answer, ¶ 20 (admitting that King Mountain had not filed certifications as referenced by State Am. Compl. ¶¶ 75 and 92); Spitzer Decl., ¶ 6.

88. In accordance with New York Tax Law section 480-b, King Mountain has not submitted to the Commissioner of the New York State Department of Taxation and Finance, a list of cigarette brands that King Mountain sells for consumption in the State of New York, as required by New York Tax. Law § 480-b. King Mt. Resp. to Req. For Admis. No. 4 (admitting that "King Mountain has not filed certifications with the New York State Department of Taxation and Finance reporting the number and brands of its cigarettes sold in New York under N.Y. Tax Law § 480-b and N.Y. Public Health Law § 1399-pp"); Spitzer Decl., ¶ 7.

89. In accordance with New York Executive Law section 156-c, King Mountain "has not certified in writing to the New York State Office of Fire Prevention and Control that its cigarettes meet the performance standards prescribed by the Office of Fire Prevention and Control[.]" King Mt. Answer, ¶ 15; King Mt. Resp. to Req. For Admis. No. 6.

**King Mountain is not an Indian**

90. The Yakama Code Indian Nation Law and Order Code defines an "Indian" as "(A) An enrolled member of the Yakama Nation; or (B) A member by enrollment or custom of

26

any federally recognized tribe in the United States and its territories; or (C) Any resident of the Reservation who is considered an Indian by the traditions, customs, culture and mores of the Yakama Nation." Yakama Code § 2.01.07(1).

91.     King Mountain is not an enrolled member of the Yakama Nation.  Thompson Depo. at 116; Black Depo. at 116, 117.

92.     King Mountain does not have an enrollment card from the Yakama Nation. Thompson Depo. at 117–19.

93.     This is because the Yakama Nation only issues enrollment cards to individuals (*i.e.*, persons, and not corporate entities) that are at least one quarter blood Yakama Indian, who successfully complete the application process, and are later approved by the governing Yakama enrollment committee.  Thompson Depo. at 116–18.

94.     Businesses licensed by the Yakama Nation, such as King Mountain, are not considered enrolled members of the Yakama Nation.  Thompson Depo. at 119; *see also* Black Depo. at 116, 117.

**King Mountain is not an arm of the Yakama Indian Nation**

95.     The Yakama Nation does not own or operate King Mountain.  King Mt. Answer, ¶ 5; *see also* KMTID 448 (noting that Wheeler owns and operates King Mountain); *Wheeler v. TTB*, 1st Am. Compl., ¶ 2.51 (same).

96.     The Yakama Nation is not a party to this lawsuit.  State Am. Compl., *generally*.

97.     The Yakama Nation did not establish King Mountain.  King Mt. Resp. to Req. For Admis. No. 98.

98.     The Yakama Nation is not the legal owner of King Mountain's business properties (*e.g.*, cigarette manufacturing equipment, buildings, trade names, etc.).  King Mt. Resp. to Req. For Admis. No. 93.

99.     The Yakama Nation's Tribal Council and General Council do not manage King Mountain's business decisions or activities.  King Mt. Resp. to Req. For Admis. No. 95.

100.     The Yakama Nation's Tribal Council and General Council do not control, and do not exercise control over, King Mountain's administrative and accounting activities.  King Mt. Resp. to Req. For Admis. No. 94.

101.     The Yakama Nation's Tribal Council and General Council lack the unrestricted power to dismiss members of King Mountain's governing body.  King Mt. Resp. to Req. For Admis. No. 97.

   a.    The Yakama Nation's General Council is composed of all Yakama Nation enrolled members, and is akin to being a U.S. voter.  Thompson Depo. at 122; Black Depo. at 119 (every enrolled member is a part of the General Council).

   b.    The Yakama Nation's General Council votes on the election of the Tribal Council, which is the governing body responsible for establishing policy and preserving Treaty rights.  Thompson Depo. at 122; KMTID 253, 254.

102.     King Mountain is not an official trial enterprise or enterprise or official tribal program of the Yakama Nation.  King Mt. Resp. to Req. For Admis. No. 84 (Pl. Ex. 7).

103.     King Mountain does not act as a division or arm of the Yakama Nation.  King Mt. Resp. to Req. For Admis. No. 85.

104.     King Mountain does not act on behalf of the Yakama Nation in managing King Mountain's business activities.  King Mt. Resp. to Req. For Admis. No. 92.

105.     King Mountain's profits go to the owner of King Mountain and not the Yakama Nation.  King Mt. Resp. to Req. For Admis. No. 97.

**King Mountain's total sales and percentage of total sales to New York distributors**

106.   Per King Mountain's filed and draft federal tax returns, King Mountain's total gross receipts or sales for the years 2010 through 2014 are as follows:

    a.   For 2010, King Mountain's filed tax return reports ███████ in total sales. KMTA 1159.

    b.   For 2011, King Mountain's filed tax return reports ███████ in total sales. KMTA 1158.

    c.   For 2012, King Mountain's draft and as yet unfiled tax return identifies ███████ in total sales.  KMTA 1157.

    d.   For 2013, King Mountain's draft and as yet unfiled tax return identifies ███████ in total sales.  KMTA 1156.

    e.   For 2014, King Mountain's draft and as yet unfiled tax return identifies ███████ in total sales.  KMTA 1155.

107.   As of May 4, 2015, King Mountain has not set a target date for the filing of its 2012, 2013, or 2014 tax returns.  Declaration of Christopher K. Leung Dec., Ex. ___ (email from King Mountain's counsel, Kelli J. Keegan, dated May 4, 2015).

108.   King Mountain's sales to its New York distributors also vary by year.  For example, King Mountain's produced invoices and shipping records show that—

    a.   For 2010, King Mountain had ███████ in sales to New York distributors (*see* ¶¶ 66, 72, 74–75, 77, above);

    b.   For 2011, King Mountain had ███████ in sales to New York (*see* ¶¶ 66, 70–76, above);

    c.   For 2012, King Mountain had ███████ in sales to New York distributors (*see* ¶¶ 66, 67, 72, 75, above);

d.  For 2013, King Mountain had ▓▓▓▓▓▓ in sales to New York distributors (*see* ¶¶ 67, 75, above); and

e.  For 2014, King Mountain had ▓▓▓▓▓▓ in sales to New York distributors (*see* ¶¶ 67, 75, above).

f.  But because King Mountain does not possess formal document retention or destruction policies, these above record invoice totals may in fact short change the true extent of King Mountain's sales in New York:

   i.  King Mountain does not have a document retention or destruction policy. Thompson Depo. at 12; King Mt. Resp. to Pl. 2d Set of Interrogs. No. 14.

   ii.  King Mountain's documents are instead retained or destroyed, depending on the personal judgment of King Mountain's employees.  Thompson Depo. at 12.

109.   Accordingly, when seeking to determine the rough percentage of King Mountain's sales attributable to its New York distributors,

a.  In 2010, King Mountain's New York sales comprised roughly 14.28 % of its total sales.  This percentage was determined as follows: ▓▓▓▓▓▓ in 2010 sales to New York distributors, *see* ¶ 108(a), above) / (▓▓▓▓▓▓ in total 2010 sales, KMTA 1159) = ▓▓▓▓ .

b.  In 2011, King Mountain's New York sales comprised roughly 18.07 % of its total sales.  KMTA 1161.

   i.  This percentage provided by King Mountain (KMTA 1161) was used because King Mountain's produced invoices and shipping records appeared to show a shortfall.

    ii.  King Mountain's produced invoices and shipping records show

        ████████████ in sales to New York distributors.  *See* ¶ 108(b), above.

    iii.  Applying King Mountain's provided percentage, however, ((18.07 %,

        KMTA 1161) x (████████ in total 2011 sales, KMTA 1158)) results in

        a New York sales figure of █████████—a difference of roughly

        ██████.

    iv.  This difference may be explained by the result of lost or destroyed

        invoices or shipping records.

c.  In 2012, King Mountain's New York sales comprised roughly 26.90 % of its total

    sales.  This percentage was determined as follows: (██████████ in 2012 sales to

    New York distributors, *see* ¶ 108(c), above) / (████████ in total 2012 sales,

    KMTA 1157) = ███████

d.  In 2013, King Mountain's New York sales comprised roughly 20.41 % of its total

    sales.  This percentage was determined as follows: (██████████ in 2013 sales to

    New York distributors, *see* ¶ 108(d), above) / (████████ in total 2013 sales,

    KMTA 1156) = ███████

e.  In 2014, King Mountain's New York sales comprised roughly 24.49 % of its total

    sales.  KMTA 1155.

    i.  This percentage provided by King Mountain (KMTA 1161) was used

        because King Mountain's produced invoices and shipping records

        appeared to show a shortfall.

    ii.  King Mountain's produced invoices and shipping records show

        ████████████ in sales to New York distributors.  *See* ¶ 108(e), above.

    iii.  Applying King Mountain's provided percentage, however, (

KMTA 1161) x (███████████ in total 2014 sales, KMTA 1155)) results in

a New York sales figure of ███████████—a difference of roughly

███████████

    iv.  This difference may be explained by the result of lost or destroyed

invoices or shipping records.

110.    Accordingly, the following figures should be considered King Mountain's total

sales of cigarettes into New York for each identified year:

    a.  For 2010, King Mountain had ███████████ in sales to New York distributors (*see*

¶ 108(a), above);

    b.  For 2011, King Mountain had ███████████ in sales to New York (*see* ¶

109(b)(i)–(iv), above);

    c.  For 2012, King Mountain had ███████████ in sales to New York distributors (*see*

¶ 108(c), above);

    d.  For 2013, King Mountain had ███████████ in sales to New York distributors (*see*

¶¶ 108(d), above); and

    e.  For 2014, King Mountain had ███████████ in sales to New York distributors

(*see* ¶¶ 109(e)(i)–(iv), above).

Dated:   New York, New York
       July 30, 2015

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By: _Christopher Leung_

Christopher K. Leung
Dana Biberman
  Chief, Tobacco Compliance Bureau
Assistant Attorneys General
120 Broadway, 3rd Floor
New York, New York 10271
Tel.: 212-416-6389
Fax.: 212-416-8877
Christopher.Leung@ag.ny.gov
Dana.Biberman@ag.ny.gov

*Attorneys for Plaintiff State of New York*

33