# EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ x

STATE OF NEW YORK,                          :
                                            :
                        Plaintiff,          :
                                            :
              v.                            :   2:12-cv-06276 (JS) (SIL)
                                            :
MOUNTAIN TOBACCO COMPANY,                   :
d/b/a KING MOUNTAIN TOBACCO                  :
COMPANY INC., and DELBERT                   :
WHEELER, Sr.,                               :
                                            :
                        Defendants.         :
‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ x

### DEFENDANT KING MOUNTAIN'S
### LOCAL RULE 56.1 COUNTERSTATEMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendant Mountain Tobacco Company, d/b/a King Mountain Tobacco Company Inc. ("King Mountain"), submits this Counterstatement to Plaintiff's July 30, 2015, Rule 56.1 Statement of Undisputed Material Facts about which there is no genuine issue to be tried.

King Mountain objects to the State of New York's Rule 56.1 Statement, because it is not a "short and concise statement" as required by Local Civil Rule 56.1(a).

King Mountain objects to the State of New York's Rule 56.1 Statement, because in many instances it contains legal argument and not material facts as required by Local Civil Rule 56.1(a).

King Mountain objects to the State of New York's Rule 56.1 Statement, because it contains irrelevant allegations of facts not material to the Causes of Action in the Amended Complaint and thus cannot be denied with a citation to admissible evidence as required by Local

1

Civil Rules 56.1(b) and (d).

King Mountain objects to the State of New York's Rule 56.1 Statement, because it contains allegations not supported by admissible evidence as required by Local Civil Rule 56.1(d).

King Mountain objects to the State of New York's Rule 56.1 Statement, because it contains allegations supported by citations to items that were not the subject of the parties' disclosures and discovery, are not part of the record, and thus cannot be denied with a citation to admissible evidence as required by Local Civil Rules 56.1(b) and (d).

1.   The plaintiff State of New York is a sovereign entity.  State Am. Compl., ¶ 7  (ECF Nos. 6 and 96); King Mt. Answer, ¶ 4 (ECF No. 47).

   **King Mountain's Response:**  Admit.

2.   The State's Amended Complaint alleges that the defendants Mountain Tobacco Company d/b/a King Mountain Tobacco Company, Inc. ("King Mountain") and Delbert Wheeler, Sr. ("Wheeler") sold and shipped—and continue to sell and ship—large quantities of  unstamped and unreported cigarettes into the State of New York.  State Am. Compl., ¶ 1.

   **King Mountain's Response:**  Admit that that is what is alleged in the Amended Complaint; deny the allegation.

3.   Each defendant is alleged to have specifically violated (a) the Contraband  Cigarette Trafficking Act, 18 U.S.C. §§ 2341–46; (b) the Prevent All Cigarette Trafficking Act,  15 U.S.C. §§ 375–78; (c) New York Tax Law sections 471 and 471-e; (d) New York Tax Law  section 480-b; and (e) New York Executive Law § 156-c.  State Am. Compl., ¶¶ 76– 98.

   **King Mountain's Response:**  Admit that that is what is alleged in the Amended Complaint; deny the allegation.

4.   The State has a strong interest in protecting the public health of its citizens.  *See Medtronic v. Lohr*, 518 U.S. 470, 475 (1996) ("States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet  of all persons").

   **King Mountain's Response:**  Irrelevant and deny.

2

5.    Cigarette smoking is the single leading cause of preventable death in the United States, killing over 400,000 people each year.  U.S. Dept. of Health and Human Services, *The Health Consequences of Smoking—50 Years of Progress, A Report of the Surgeon General*  ("Surgeon Gen. Rept."), at 11, 678 (2014) (available at http://www.surgeongeneral.gov/library/reports/50-years-of-progress/).

**King Mountain's Response:**  Irrelevant and deny.

6.    For the millions more living with a smoking-related disease, the health care costs are substantial.  Surgeon Gen. Rept., at 11, 678.

**King Mountain's Response:**  Irrelevant and deny.

7.    In 2012, New Yorkers spent roughly $10 billion annually on health care costs attributable to smoking.  RTI International, 2012 Independent Evaluation Report of the New York Tobacco Control Program ("RTI Rept. 2012"), at 50 (2012) (available at http://www.health.ny.gov/prevention/tobacco_control/reports_brochures_fact-sheets.htm).

**King Mountain's Response:**  Irrelevant and deny.

8.    To combat these harms and protect the public health of its citizens, the State of New York – like the federal government, 49 other states, and District of Columbia – taxes the sale and use of tobacco products, such as cigarettes.  N.Y. Tax Law § 470 *et seq.*; Surgeon Gen. Rept. at 788, 790.

**King Mountain's Response:**  Irrelevant and deny.

9.    And, because higher taxes improve public health (i.e., by decreasing the consumption of tobacco products, especially cigarettes) and increases public revenues, such taxes are a valuable and effective policy lever. Surgeon Gen. Rept. at 788 (citation omitted).

**King Mountain's Response:**  Irrelevant and deny.

10.    Stated differently, raising cigarette prices "is one of the most effective interventions to prevent and reduce cigarette use."  RTI International, 2011 Independent Evaluation Report of the New York Tobacco Control Program, at 40 (2011) (citation omitted) (available at http://www.health.ny.gov/prevention/tobacco_control/reports_brochures_fact-sheets.htm).

**King Mountain's Response:**  Irrelevant and deny.

11.    Given these facts, New York has become "a national leader with respect to tobacco control policies."  RTI Rept. 2012 at 5; *see also* RTI International, 2013 Independent Evaluation Report of the New York Tobacco Control Program, at 2 (2013) (available at http://www.health.ny.gov/prevention/tobacco_control/reports_brochures_fact-sheets.htm).

**King Mountain's Response:**  Irrelevant and deny.

12. In 2012, New York's cigarette excise tax was the highest in the country and nearly $3 more than the national average tax.  RTI Rept. 2012 at 5; RTI Rept. 2013 at 2.

    **King Mountain's Response:**  Irrelevant.

13. But as different levels of state taxation have widened, tax avoidance and evasion practices have increased.  Surgeon Gen. Rept. at 791.

    **King Mountain's Response:**  Irrelevant and deny.

14. Such "illicit trade" practices include "individual cross-border, Internet and untaxed purchases on tribal lands"; small scale organizations bootlegging cigarettes from low tax jurisdictions for resale in high tax jurisdictions; and large-scale organizations engaging in "organized smuggling."  Surgeon Gen. Rept. at 791.

    **King Mountains Response:**  Irrelevant.

15. In whatever form, these illicit trade practices hurt the public health and public fisc. Surgeon Gen. Rept. at 789.

    **King Mountain's Response:**  Irrelevant and deny.

16. In New York, for example, cigarette tax evasion was estimated to cost the State "between $465 million and $610 million per year in lost tax revenue."  RTI Rept. 2012 at 41  (citing RTI Rept. 2011).

    **King Mountain's Response:**  Irrelevant.

17. Article 20 of the New York Tax Law imposes a tax on all cigarettes possessed for sale or use in New York State, except those cigarettes that New York is "without power" to tax. N.Y. Tax Law § 471; *Dep't of Taxation & Fin. of N.Y. v. Milhelm Attea & Bros., Inc.*, 512 U.S.  61, 64 (1994).

    **King Mountain's Response:**  Irrelevant and a purported legal conclusion that does not require a factual response.

18. Under New York Tax Law section 471, all cigarettes are presumed taxable "until the contrary is established."  N.Y. Tax Law § 471(1); *City of New York v. Golden Feather Smoke  Shop, Inc.*, 2013 U.S. Dist. Lexis 47037, *7 (E.D.N.Y., Mar. 29, 2013) ("*Golden Feather*").

    **King Mountain's Response:**  Irrelevant and a purported legal conclusion that does not require a factual response.

19.   The State normally collects this cigarette tax through a system of prepayments where the cost of the tax is passed down the distribution chain. *Golden Feather*, 2013 U.S. Dist. Lexis 47037, at *7.

**King Mountain's Response:**  Irrelevant.

a.   The process begins with State-licensed "stamping agents," usually wholesalers, who buy cigarettes from manufacturers and then pre-pay the State tax by purchasing tax stamps from the State and affixing them to cigarette packages as evidence of payment. *Golden Feather*, 2013 U.S. Dist. Lexis 47037, at *7.

**King Mountain's Response:**  Irrelevant and deny.

b.   This stamping system "mandates that these agents be the only entry point for cigarettes into New York's stream of commerce." *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 158 (2d Cir. 2011).

**King Mountain's Response:**  Irrelevant and deny.

c.   The tax burden is subsequently built into the cost of the cigarettes and thereby passed on to other wholesalers or retailers, such as defendants, and ultimately to the consumer. *See* N.Y. Tax Law § 471(2); *In re N.Y. Assoc. of Convenience Stores v. Urbach*, 92 N.Y.2d 204, 209 (1998).

**King Mountain's Response:**  Irrelevant and deny.

d.   The purpose of this system is to prevent the widespread evasion of New York cigarette taxes. *Golden Feather Smoke Shop*, 2013 U.S. Dist. Lexis 47037, at *8 (citing *Milhelm Attea*, 512 U.S. at 75).

**King Mountain's Response:**  Irrelevant and deny.

20.   Due to the unique status of Native American tribes, however, federal and state governments lack authority to tax cigarettes sold to members of Native American tribes for their own consumption. *Golden Feather*, 2013 U.S. Dist. Lexis 47037, at *8.

**King Mountain's Response:**  Admit.

21.   New York is thus "without power" to tax cigarettes to be consumed on the reservation by enrolled tribal members, rendering cigarettes sold for that purpose tax-exempt. *Golden Feather*, 2013 U.S. Dist. Lexis 47037, at *8 (citing *Milhelm Attea*, 512 U.S. at 64).

**King Mountain's Response:**  Admit.

22.   "On-reservation cigarette sales to persons other than reservation Indians, however, are legitimately subject to state taxation." *Golden Feather*, 2013 U.S. Dist. Lexis 47037, at

*8 (quoting *Milhelm Attea*, 512 U.S. at 64).

**King Mountain's Response:** Deny.

23. Since July 1, 2010, the State of New York has imposed an excise tax on each pack of cigarettes, at the rate of $4.35 per package of twenty cigarettes. N.Y. Tax Law § 471(1); 20 N.Y. Comp. Codes R. & Regs. § 74.1(a)(2).

**King Mountain's Response:** Irrelevant and deny.

24. The excise tax is paid when a licensed cigarette stamping agent purchases New York State tax stamps and affixes a stamp to the bottom of each pack of cigarettes sold in New York State as evidence that the state excise tax was paid. N.Y. Tax Law § 471(2); 20 N.Y. Comp. Codes R. & Regs. §§ 74.2(a), 74.3(a)(2)(i); N.Y. State, Dept. of Taxation and Finance, Cigarette and Tobacco Products Tax (available at http://www.tax.ny.gov/bus/cig/cigidx.htm).

**King Mountain's Response:** Irrelevant and deny.

25. Only licensed cigarette agents are authorized to purchase and affix New York State cigarette tax stamps. N.Y. Tax Law § 471; 20 N.Y. Comp. Codes R. & Regs. §§ 74.3(a)(2), 74.2(c); N.Y. State, Dept. of Taxation and Finance, Cigarette and Tobacco Products Tax (available at http://www.tax.ny.gov/bus/cig/cigidx.htm).

**King Mountain's Response:** Irrelevant.

26. Cigarette agent licenses may be issued to certain qualifying wholesalers and retailers; importers, exporters, or manufacturers of cigarettes; and certain other businesses dealing in unstamped cigarettes. N.Y. Tax Law § 472(1); 20 N.Y. Comp. Codes R. & Regs. § 71.1; N.Y. State, Dept. of Taxation and Finance, Cigarette and Tobacco Products Tax (available at http://www.tax.ny.gov/bus/cig/cigidx.htm).

**King Mountain's Response:** Irrelevant.

27. Only licensed wholesale dealers of cigarettes may sell cigarettes to a retail dealer or other person for the purpose or resale. N.Y. Tax Law § 470(8); 20 N.Y. Comp. Codes R. & Regs. §§ 70.2(h)(2), 74.4(b); N.Y. State, Dept. of Taxation and Finance, Cigarette and Tobacco Products Tax (available at http://www.tax.ny.gov/bus/cig/cigidx.htm).

**King Mountain's Response:** Deny.

28. Defendant King Mountain is a for profit corporation that manufactures and sells King Mountain brand cigarettes. King Mt. Answer, ¶¶ 5, 19 (admitting the first sentence of State Am. Compl., ¶ 74).

**King Mountain's Response:** Admit.

29.   These cigarettes are intended for sale in and throughout the United States.  King Mt. Answer, ¶ 19 (admitting the first sentence of State Am. Compl., ¶ 74); King Mt. 3d Supp. Resp. to Interrog. No. 1 (Pl. Ex. 5).

**King Mountain's Response:**  Deny.  King Mountain Answer, ¶19.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

30.   King Mountain was formed and operates under the laws of the Yakama Indian Nation.  King Mt. Answer, ¶ 5; King Mt. Corp. Disclosure Statement ("Corp. Statement") (ECF No. 51).

**King Mountain's Response:**  Admit.

31.   King Mountain has no parent companies, subsidiaries or affiliates that have issued shares to the public in the United States or abroad.  King Mt. Corp. Statement.

**King Mountain's Response:**  Admit.

32.   King Mountain maintains its principal place of business and manufacturing at 2000 Fort Simcoe Road, White Swan, Washington, which is located within the Yakama Indian Nation Reservation.  King Mt. Answer, ¶ 5.

**King Mountain's Response:** Admit.

33.   King Mountain also maintains a warehouse at ERW Wholesale, which is located at 11157 Old Lakeshore Rd., Irving, New York 14081, an area located within the Seneca Indian Nation Reservation and the State of New York.  *See* KMTA 134 (King Mountain bills of lading  to ERW identify the destination address as "ERW Wholesale / King Mountain Warehouse"), 140  (same), 145, 264, 271, 278, 282, 285–87, 292.

**King Mountain's Response:**   Deny.  Black Dep. at 25, 39; Thompson Dep. at 102; Wheeler Dep. at 56.

34.   Defendant Delbert Wheeler, Sr. owns and operates King Mountain.  KMTID 448; *King Mountain Tobacco Company, Inc.; Delbert Wheeler, Sr.; and the Confederated Tribes and Bands of the Yakama Indian Nation v. Alcohol and Tobacco Tax and Trade Bureau et al.*, Case  No. 2:11-cv-03038-RMP (E.D. Wash.) ("*Wheeler v.  TTB*"), First Am. Compl., ¶ 2.51.

**King Mountain's Response:**  Admit.  *Wheeler v. TTB* has not been produced in discovery.

35.   Since December 2005, Wheeler has acted as King Mountain's sole owner and president.  King Mt. 1st Supp. Resp. to Pl.'s Interrog. No. 15 (State Depo. Ex. 3); King Mt. Answer, ¶ 7; Deposition of Delbert Wheeler, Sr. at 9, 10, 21, 58.

**King Mountain's Response:** Admit.

36.   He has also served on King Mountain's board of directors, since December 2005.  King Mt. 1st Supp. Resp. to Pl.'s Interrog. No. 15 (State Depo. Ex. 3) (identifying Wheeler as King Mountain's president); *Philip Morris USA Inc. v. King* Mountain *Tobacco Company, Inc.; Mountain Tobacco; Delbert L. Wheeler, Sr., and Richard "Kip" Ramsey*, Case No. 2:06-cv- 03073-RHW (E.D. Wash.) ("*Philip Morris v. King Mt. / Wheeler*"), Decl. of Richard "Kip" Ramsey ("*Philip Morris v. King Mt. / Wheeler*"), ¶ 4, Ex. B (King Mt. Articles of Incorporation, noting that King Mountain's president is a member of King Mountain's board of directors).

   **King Mountain's Response:** Admit.  A Declaration of Mr. Ramsey has not been produced in discovery.

37.   Since 2006 or 2007, Wheeler has also served as the chairman of King Mountain's board of directors.  Wheeler Depo. at 59.

   **King Mountain's Response:** Admit.

38.   King Mountain's board of directors reports to King Mountain's sole shareholder, Wheeler.  Wheeler Depo. at 61,

   **King Mountain's Response:** Deny.

39.   Wheeler is an enrolled member of the Yakama Nation, and resides within the Yakama Indian Nation Reservation.  King Mt. Answer, ¶ 7; KMTA 875.

   **King Mountain's Response:** Admit.

40.   King Mountain grows, harvests, and cures tobacco on a 160-acre property.  *Wheeler v. TTB*, 1st Am. Compl., ¶ 5.24; *Wheeler v. TTB*, Garcia Decl., ¶ 30 (noting that in 2011, King Mountain would be farming approximately 160 acres).

   **King Mountain's Response:** Admit, with the clarification that the property is held in trust by the United States and is located on the Yakama Nation Reservation.  *Wheeler v. TTB* has not been produced in discovery.  A Declaration of Mr. Garcia has also not been produced in discovery.

41.   This property, as well as King Mountain's cigarette production facility, is owned by Wheeler.  KMTID 448–49, 660–61; KMTA 974; *Wheeler v. TTB*, 1st Am. Compl., ¶¶ 4.63,  4.77; *Wheeler v. TTB*, Garcia Decl., ¶¶ 38–39 (noting Wheeler's ownership of King Mountain's production facility).

   **King Mountain's Response:** Deny.  Wheeler Dep. at 54.  *Wheeler v. TTB* has not been produced in discovery. A Declaration of Mr. Garcia has also not been produced in

discovery.

42.   Once King Mountain's tobacco is harvested, King Mountain ships this tobacco to Tennessee where it is then threshed. *King Mt. Tobacco Co. v. McKenna*, 2013 U.S. Dist. LEXIS 49740, *5 (E.D. Wash. Apr. 5, 2013).

**King Mountain's Response:** Admit, as to some of the tobacco that ultimately is contained in King Mountain products. Wheeler Dep. at 54-55. *King Mt. v. McKenna* has not been produced in discovery.

43.   The threshed tobacco is then shipped to North Carolina, where it is then blended with North Carolina grown tobacco purchased from another company. *King Mt.*, 2013 U.S. Dist. LEXIS 49740, at *5; *see also* KMTID 430.

**King Mountain's Response:** Admit, as to some of the tobacco that ultimately is contained in King Mountain products. Wheeler Dep. at 54-55. *Wheeler v. TTB* has not been produced in discovery.

44.   This blended tobacco is then sent back to King Mountain. *King Mt.*, 2013 U.S. Dist. LEXIS 49740, at *5; *see also* KMTID 430

**King Mountain's Response:** Admit, as to some of the tobacco that ultimately is contained in King Mountain products. Wheeler Dep. at 54-55. *Wheeler v. TTB* has not been produced in discovery.

45.   Upon its return, the tobacco is then "completed" by a traditional ceremony—*i.e.*, sprinkled with hand thrashed tobacco and given a prayer—that is conducted by Wheeler and King Mountain employees. KMTID 210, 430.

**King Mountain's Response:** Admit.

46.   The tobacco is then bundled and packaged into King Mountain brand cigarettes. KMTID 430.

**King Mountain's Response:** Deny. KMTID 210, 430.

47.   Each package or "pack" of King Mountain brand cigarettes contains 20 cigarettes. King Mt. Answer ¶ 16; Black Depo. at 63.

**King Mountain's Response:** Admit.

48.   Each carton of cigarettes contains 10 packs of cigarettes. King Mt. Answer ¶ 16; Black Depo. at 63–64.

**King Mountain's Response:** Admit.

49.     And each "case" of cigarettes contains 60 cartons of cigarettes.  Black Depo. at 64.

        **King Mountain's Response:**  Admit.

50.     To solicit sales of King Mountain's cigarettes, Wheeler and other King Mountain sales
        representatives made phone calls from their offices on the Yakama Reservation, attended
        trade shows, and visited customers at their place of business.  Ramsey Decl., ¶ 6; *King
        Mt. Tobacco Co.*, 2013 U.S. Dist. LEXIS 49740, *6 (advertising cigarettes in multiple
        states, via tradeshows); Thompson Depo. at 25, 38 (King Mountain customer visits).

        **King Mountain's Response:**  Admit.  A Declaration of Mr. Ramsey has not been
        produced in discovery.

**51.**     King Mountain also advertises its cigarettes on the Internet, pays its customers (*i.e.*,
        distributors) and other third parties to market and advertise King Mountain brand
        cigarettes, and provides credit to King Mountain's customers and distributors.  *King Mt.
        Tobacco Co.*, 2013 U.S. Dist. LEXIS 49740, *6 (Internet advertising); King Mountain
        Tobacco Company website,  www.kingmountaintobacco.com (Internet advertising); King
        Mt. Resp. to Req. For Admis. No. 113 (admitting that King Mountain maintains, operates,
        and is responsible for controlling the content of www.kingmountaintobacco.com); King
        Mt. Resp. to Req. For Admis. No. 63 (showing payment by King Mountain for the
        marketing and advertising of King Mountain brand cigarettes on Indian territory, located
        within the State of New York); KMTA 265–66, 557–60,  676–683 (credit agreements to
        smoke shops located on Indian reservations, located within the  State of New York).  For
        example—

        a.      In 2006, a King Mountain sales representative approached Wolf Run Wholesale,
                an Indian smoke shop located on the Cattaraugus (Seneca) Indian Reservation,
                about selling King Mountain brand cigarettes.  *Philip Morris v. King Mt. /
                Wheeler*, Decl. of William Parry, ¶ 6.  Since that time (up through at least October
                2006), Wolf Run Wholesale began carrying and selling King Mountain brand
                cigarettes.  *Id.*

                **King Mountain's Response:**  Deny.  A Declaration of William Parry has not been
                produced in discovery.

        b.      That same year (2006), a King Mountain representative flew from Washington
                State to New York to visit the Onondaga Nation Smoke Shop and promote King
                Mountain brand cigarettes.  *Philip Morris v. King Mt. / Wheeler*, Decl. of Virgil
                Thomas, ¶ 4.  Thereafter, the Onondaga Nation Smoke Shop began carrying King
                Mountain brand cigarettes.  *Id.*

                **King Mountain's Response:**  Deny.  A Declaration of Virgil Thomas has not
                been produced in discovery.

        c.      In 2011, King Mountain paid Mohawk Marketing—a business sharing the same

                                                10

address as King Mountain customer and distributor, Oie'n:Kwa Trading (76 Geronimo Lane, P.O. Box 975 Akwesasne, New York)—a fee of ▮▮▮▮▮ for the marketing and distribution of King Mountain cigarettes at 25 stores located on the Akwesasne, St. Regis Mohawk Indian Reservation, as well as two stores located on land occupied by the Ganienkeh.  King Mt. Resp. to Req. For Admis. No. 63; *compare* KMTA 561, 565, 569, 573, and 574 (Oienkwa Trading address) *with* KMTA 570, 572 (Mohawk Marketing address).  This fee was paid to cover the printing of marketing materials, implementation of signage, product samples, and a giveaway promotion.  King Mt. Resp. to Req. For Admis. No. 63 (also referencing KMTA 570–74).

**King Mountain's Response:**  Admit, but only as stated in King Mountain's Response to Request for Admission 63.

d.   That same year (2011), King Mountain offered and entered into ▮▮▮▮▮



KMTA 265–66 ▮▮▮▮▮▮, 557–60 ▮▮▮▮▮▮▮▮, and 676–683 ▮▮▮▮▮

▮▮▮▮▮

**King Mountain's Response:**  Admit that credit applications were submitted to King Mountain by ERW Wholesale, Oie'nKwa Trading (June 2011), Shinnecock Smoke Shop (May 2011), and otherwise deny.  Wheeler Dep. at 81.

e.   In April 2012, Yancey Black—a general manager, treasurer, and director for King Mountain—traveled to the Seneca Indian Reservation in New York, and met with King Mountain's customer and distributor ERW Wholesale.  King Mt. First Supp. Resp. to Interrog. No. 7 (identifying trip); King Mountain.  King Mt. 1st Supp. Resp. to Pl.'s Interrog. No. 15 (State Depo. Ex. 3) (identifying Black as a general manager and treasurer); Thompson Depo. at 19 (identifying Black as a director); Ramsey Decl., ¶ 4, Ex. B (identifying King Mountain's treasurer as a director for King Mountain).

**King Mountain's Response:**  Deny, except admitted that Yancey Black met with Eric White and Dwayne Clark in April 2012.  Black Dep. at 104-05.  A Declaration of Mr. Ramsey has not been produced in discovery.

f.   In May 2012, King Mountain employees and sales representatives Patrick Shilow and Kevin Luke traveled to the Seneca Nation Reservation.  Black Depo. at 106–07. The purpose of this visit was to update point of sale posters, banners, shelf decals, and other items stating the price of King Mountain's tobacco products. Black Depo. at 107–08.

**King Mountain's Response:**  Admit.

g.   From May 2012 through December 2013, King Mountain paid for ERW

Wholesale for promotional items, advertisements, and giveaways in the amount of ▮▮▮▮▮.  KMTA 819.  King Mountain also provided promotional items to ERW Wholesale—*i.e.*, King Mountain folders, brochures, and pamphlets giving the history of the Yakama and King Mountain.  KMTA 441 (email dated May 25, 2012).

**King Mountain's Response:**  Deny.  Thompson Dep. at 16; Wheeler Dep. at 83, 86.

52.  Since at least June 1, 2010, King Mountain has marketed, distributed, and sold its cigarettes in New York, California, Idaho, Oregon, Washington, North Carolina, South Carolina,  Montana, Nevada, Kentucky, Virginia, Georgia, Mississippi, New Mexico, Kansas, Oklahoma, North Dakota, Pennsylvania, and Texas.  King Mt. 3d Supp. Resp. to Interrog. No. 1, Ex. A (Pl.  Ex. 5); *see* State 1st Set of Interrogs. and Req. For Prod. Docs., at 3 (identifying June 1, 2010 as the beginning of the relevant time period for State Interrog. No. 1).

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

53.  Within the State of New York, King Mountain used twelve companies to market, distribute, and sell its cigarettes:

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

a.  AJ's Candy & Tobacco, P.O. Box 187, Gowanda, New York 14070;

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

b.  ERW Wholesale, 11157 Old Lakeshore Rd., Irving, New York 14081;

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

c.  Indian Creek, 112 A Poospatuck Lane, Mastic, New York 11950.

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

d.  Iriquois (or Iroquois) Wholesale, 11157 Old Lakeshore Rd., Irving, New York 14081;

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

12

e.    Lakeside Trading, 89 State St., Seneca Falls, New York 13148;

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

f.    Mohawk Distribution, P.O. Box 508, Hogansburg, New York 13655;

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

g.    Oienkwa Trading, P.O. Box 975, Akwesasne, New York 13655;

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

h.    Oneida Wholesale, 223 Genesee St., Oneida, New York 13421;

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

i.    Onondaga Nation Smoke Shop, P.O. Box 301, Nedrow, New York 13120;

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

j.    Poospatuck Trading Company & Smoke Shop, 207 Poospatuck Lane, Mastic, New York 11950;

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

k.    Shinnecock Smoke Shop, P.O. Box 5036, Southampton, New York 11969; and

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

l.    Valvo Candies, Routes 5 & 20, P.O. Box 271, Silver Creek, New York 14136. King Mt. 3d Supp. Resp. to Interrog. No. 1, Ex. A (Pl. Ex. 5).

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

54.    These above-identified distributors (except for Valvo Candies) are located on New York State qualified Indian reservations (N.Y. Tax Law § 470(16)), which are located within the boundaries of the State of New York.  Black Depo. at 29; *see also* King Mt. 3d Supp.

13

Resp. to Interrog. No. 1, Ex. A (Pl. Ex. 5).

**King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

a.      Valvo Candies is not located on a New York State qualified Indian reservation, but instead located within the County of Chautauqua, New York.  *See* New York Dept. of State, Entity search results for Valvo Candies, available at http://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_INFORMATIO N?p_nameid=318792&p_corpid=271406&p_entity_name=valvo%20candies&p_n ame_type=A&p_search_type=BEGINS&p_srch_results_page=0) and Chautauqua County Dept. of Finance, Parcel Current Tax Liabilities, available at http://app.co.chautauqua.ny.us/cctaxonline/#/view/064689-32.00-1-24/current (noting that Valvo Candies owes $6,882.32 in taxes to the County of Chautauqua, New York).

        **King Mountain's Response:**  Citation to purported evidence that has not been produced in discovery and is not part of the record.  A purported legal conclusion that does not require a factual response.

b.      Valvo Candies' address is 1277 Routes 5 & 20, Silver Creek, New York 14136, which is subject to the State of New York's general jurisdiction.  *See* Valvo's Candies' website, http://www.valvoscandy.com/index.html (last visited July 27, 2015); New York Dept. of State, Entity search results for Valvo Candies, available at http://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_INFORMATIO N?p_nameid=318792&p_corpid=271406&p_entity_name=valvo%20candies&p_n ame_type=A&p_search_type=BEGINS&p_srch_results_page=0).

        **King Mountain's Response:**  Citation to purported evidence that has not been produced in discovery and is not part of the record.  A purported legal conclusion that does not require a factual response.

55.    The State of New York has not licensed or registered any of the above-identified  King Mountain distributors (with the exception of Valvo Candies) as a stamping agent or registered wholesaler of cigarettes.  Decl. of Peter Spitzer, dated___, 2015, _____.

    **King Mountain's Response**:  A purported legal conclusion that does not require a factual response.  Citation to purported evidence that has not been produced in discovery and is not part of the record.  In addition, a 2015 Declaration of Peter Spitzer has not been produced in discovery.

**56.**    None of King Mountain's above-identified distributors (including Valvo  Candies)—

a.      Has purchased New York State cigarette excise tax stamps, and have affixed such stamps on such packs of King Mountain cigarettes (Spitzer Decl., ¶__);

**King Mountain's Response:**  Irrelevant and deny. In addition, a 2015 Declaration of Peter Spitzer has not been produced in discovery.

b.  Has been authorized by the State of New York to prepay the excise tax due on in the packs of cigarettes purchased from King Mountain (*id.* ¶);

**King Mountain's Response:**  Irrelevant and deny.

c.  Is a member of the Yakama Nation (Thompson Depo. at 123);

**King Mountain's Response:** Irrelevant and admit.

d.  Is located on the Yakama Indian Reservation (Thompson Depo. at 116; Black Depo. at 76–77); or

**King Mountain's Response:** Irrelevant and admit.

e.  Receives per capita disbursements from the Yakama Nation (Thompson Depo. at 125).

**King Mountain's Response:** Irrelevant and admit.

57.  Typically, each King Mountain customer (*i.e.*, distributor) would submit an order for King Mountain's tobacco products by fax, email or phone. Black Depo. at 74 (email, phone,  and fax); Ramsey Decl., ¶ 6 (phone and fax); *see*, *e.g.*, KMTA 150, 443 (reflecting email orders).

**King Mountain's Response:**  Deny.  Wheeler Dep. at 55.  In addition, a Declaration of Mr. Ramsey has not been produced in discovery.

a.  King Mountain receives roughly 90% of its customer orders via fax.  Wheeler Depo. at 55.  The remaining 10% of the orders come in via the phone.  *Id.*

**King Mountain's Response:**  Admit.

b.  Various persons at King Mountain may receive such phone orders, including Wheeler.  *Id.*

**King Mountain's Response:**  Admit.

58.  Once an order was placed with King Mountain, the cigarettes were then loaded onto common carrier or private delivery service trucks.  Black Depo. At 74.

**King Mountain's Response:**  Deny.  Delivery occurred by common carrier or by mail. Black Dep. at 74; Thompson Dep. at 53-54; *see*, *e.g.*, KMTA 302-03, 356.

15

59.     Each delivery truck would carry up to ███████████████████
        ████████     KMTA 284.

        **King Mountain's Response:**  Deny.  KMTA 284.

60.     For King Mountain's customers in New York, it would take anywhere from five to seven
        days for the cigarettes to be delivered.  Thompson Depo. at 55; Black Depo. at 75.

        **King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at
        46, 48.

61.     King Mountain typically pays for the cost of its cigarettes to its New York customers.
        Thompson Depo., at 73, 76–77 (identifying King Mountain's general cost for shipping
        cigarettes to New York as ██████ per carton); Wheeler Depo. at 64, 78.

        **King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at
        46, 48.

62.     These shipping costs were paid for by King Mountain, at the direction of King
        Mountain's owner, defendant Delbert Wheeler, Sr.  *See, e.g.*, KMTA 580, 592, 599, 605,
        619, 626, 632, 638.

        **King Mountain's Response:**  Deny, but admit that King Mountain in some instances paid
        for the cost of shipping its products, but in some instances did not.  Black Dep., *e.g.*, at 29,
        99; Thompson Dep., *e.g.*, at 46, 48; Wheeler Dep. at 64; KMTA 592. *e.g.*.

63.     King Mountain pays approximately $7,500 to ship a full truckload of cigarettes to the
        State of New York.  Wheeler Depo. at 64.

        **King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at
        46, 48.

64.     Significantly, King Mountain did not affix any New York State excise tax stamps to any
        of the packs of cigarettes that it sold and shipped to its distributors located within the
        State of New York.  Black Depo. at 59, 62, 77–78.

        **King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at
        46, 48.

65.     King Mountain also did not prepay any New York State excise tax on such packs  of
        cigarettes.  Black Depo. at 62–63, 78.

        **King Mountain's Response:**  Deny.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at
        46, 48.

66.   King Mountain sold the following amounts of cigarettes to AJ's Candy & Tobacco, located at P.O. Box 187, Gowanda, New York 14070:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|---|---|---|---|---|
| 12/17/2010 | 1-8, 82-84 | ■ | ■ | ■ |
| 08/01/2011 | 463-68 | ■ | ■ | ■ |
| 08/18/2011 | 469-74, 731-34 | ■ | ■ | ■ |
| 11/08/2011 | 475-80, 753-55 | ■ | ■ | ■ |
| 12/13/2011 | 481-86, 767-69 | ■ | ■ | ■ |
| 01/06/2012 | 178-82 | ■ | ■ | ■ |
| 01/12/2012 | 173-77 | ■ | ■ | ■ |
| 01/24/2012 | 183-88, 378-80 | ■ | ■ | ■ |
| 02/07/2012 | 189-94, 385 | ■ | ■ | ■ |
| 02/21/2012 | 195-200, 389-91 | ■ | ■ | ■ |
| 03/06/2012 | 201-07, 392-94 | ■ | ■ | ■ |
| 03/14/2012 | 208-12, 390-400 | ■ | ■ | ■ |
| 03/19/2012 | 213-18, 401-03 | ■ | ■ | ■ |
| 03/21/2012 | 219-25, 404-06 | ■ | ■ | ■ |
| 03/27/2012 | 226-32, 407-09 | ■ | ■ | ■ |
| 04/05/2012 | 233-39, 414-17 | ■ | ■ | ■ |
| 04/17/2012 | 240-44, 418-20 | ■ | ■ | ■ |
| 04/24/2012 | 250-59, 421-23 | ■ | ■ | ■ |
| 05/01/2012 | 245-49, 424-26 | ■ | ■ | ■ |
| **Totals:** | | ■ | ■ | ■ |

**King Mountain's Response:** Deny. *Inter alia*, Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48; KMTA 2600.

67.   King Mountain sold the following amounts of cigarettes to ERW Wholesale, located at 11157 Old Lakeshore Rd., Irving, New York 14081:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|---|---|---|---|---|
| 02/13/2012 | 261-64 | ■ | ■ | ■ |
| 04/19/2012 | 268-71 | ■ | ■ | ■ |
| 05/17/2012 | 272-78 | ■ | ■ | ■ |
| 06/15/2012 | 279-82 | ■ | ■ | ■ |
| 06/20/2012 | 283-87 | ■ | ■ | ■ |
| 07/13/2012 | 288-90 | ■ | ■ | ■ |
| 10/11/2012 | 291-296 | ■ | ■ | ■ |
| 04/11/2013 | 142-45 | ■ | ■ | ■ |
| 06/12/2013 | 135-41, 784, 855-61 | ■ | ■ | ■ |

| | | | | |
|---|---|---|---|---|
| 06/17/2013 | 129-34, 849-54 | ■ | ■ | ■ |
| 08/19/2013 | 842-48 | ■ | ■ | ■ |
| 10/01/2013 | 836-41 | ■ | ■ | ■ |
| 11/06/2013 | 830-35 | ■ | ■ | ■ |
| 12/10/2013 | 825-29 | ■ | ■ | ■ |
| 02/01/2014 | 821-24 | ■ | ■ | ■ |
| 02/07/2014 | 816-17, 820 | ■ | ■ | ■ |
| 03/19/2014 | 812-15 | ■ | ■ | ■ |
| 06/18/2014 | 1017-18 | ■ | ■ | ■ |
| 07/16/2014 | 1016 | ■ | ■ | ■ |
| 08/18/2014 | 1019-20 | ■ | ■ | ■ |
| 12/16/2014 | 1021-24 | ■ | ■ | ■ |
| | **Totals:** | ■ | ■ | ■ |

**King Mountain's Response:** Deny. *Inter alia*, Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48; KMTA 272-78 and KMTA 816-20.

68.  ERW Wholesale also does business as ERW Enterprises. Compare KMTA 265–66 (identifying ERW Wholesale's address, 11157 Old Lakeshore Road, Irving New York 14081; email handle, @erwenterprises.net; phone number, 716-934-3160; and fax number, 716-934-3177) with KMTA 284 (ERW fax number 716-934-3177) and ERW Enterprises, http://erwenterprises.net/ (identifying identical address, email handle, phone number, fax number as ERW Wholesale; last visited July 30, 2015).

   **King Mountain's Response:** Deny, as most of the cited KMTA productions are not ERW business records.

69.  ERW Wholesale (and ERW Enterprises) also does business as Iroquois Wholesale. Compare KMTA 284 (Iroquois Wholesale purchase order, using ERW Enterprises' and ERW Wholesale's fax number) with KMTA 487–89 (Iroquois Wholesale purchase order and invoice, using ERW Enterprises' and ERW Wholesale's address), KMTA 265–66 (identifying ERW Wholesale's address and fax number). *See* KMTA 283–87 (sale records and invoices).

   **King Mountain's Response:** Deny, as most of the cited KMTA productions are not ERW business records.

70.  King Mountain sold the following amounts of cigarettes to Iroquois Wholesale, 11157 Old Lakeshore Rd., Irving, New York 14081:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|---|---|---|---|---|
| 08/12/2011 | 487-89 | ■ | ■ | ■ |
| | **Totals:** | ■ | ■ | ■ |

**King Mountain's Response:** Deny. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

71. King Mountain sold the following amounts of cigarettes to Lakeside Trading, located at 89 State St., Seneca Falls, New York 13148:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|---|---|---|---|---|
| 08/12/2011 | 490-92 | ██ | ██ | ████ |
| | **Totals:** | ██ | ██ | ████ |

**King Mountain's Response:** Deny. *Inter alia*, Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48; KMTA 490-92.

72. King Mountain sold the following amounts of cigarettes to Mohawk Distribution, P.O. Box 508, Hogansburg, New York 13655:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|---|---|---|---|---|
| 06/24/2010 | 9 | ██ | ██ | ████ |
| 07/23/2010 | 10 | ██ | ██ | ████ |
| 08/25/2010 | 11 | ██ | ██ | ████ |
| 09/16/2010 | 12 | ██ | ██ | ████ |
| 10/20/2010 | 13 | ██ | ██ | ████ |
| 11/9/2010 | 14 | ██ | ██ | ████ |
| 11/19/2010 | 15 | ██ | ██ | ████ |
| 12/8/2010 | 16-17, 85-87 | ██ | ██ | ████ |
| 1/4/2011 | 493-98, 684-86, 787 | ██ | ██ | ████0 |
| 3/25/2011 | 499-503, 690-92 | ██ | ██ | ████ |
| 4/13/2011 | 505-09, 699-702 | ██ | ██ | ████ |
| 5/11/2011 | 511-15, 707-10 | ██ | ██ | ████ |
| 07/22/2011 | 517-21, 722-24 | ██ | ██ | ████ |
| 08/14/2011 | 522-26, 728-30 | ██ | ██ | ████ |
| 09/23/2011 | 528-32, 743-46 | ██ | ██ | ████ |
| 10/18/2011 | 533-38, 747-49 | ██ | ██ | ████ |
| 11/03/2011 | 539-44, 750-52 | ██ | ██ | ████ |
| 11/16/2011 | 545-51, 756-59 | ██ | ██ | ████ |
| 12/08/2011 | 552-56 | ██ | ██ | ████ |
| 01/03/2012 | 297-302, 371-73 | ██ | ██ | ████ |
| 01/16/2012 | 303-09, 374-77 | ██ | ██ | ████ |
| 02/16/2012 | 310-14, 386-88 | ██ | ██ | ████ |
| 03/09/2012 | 315-19, 395-97 | ██ | ██ | ████ |
| 04/02/2012 | 320-24, 410-13 | ██ | ██ | ████ |

| 05/01/2012 | 325-30, 427-29 | ██ | ██ | ███ |
| | **Totals:** | ██ | ██ | ███ |

**King Mountain's Response:** Deny. *Inter alia*, Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48; KMTA 10, 303-09, 374-77, 499-503, 522-26, 690-92, and 728-30.

73. King Mountain sold the following amounts of cigarettes to Oienkwa Trading, located at P.O. Box 975, Akwesasne, New York 13655:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|---|---|---|---|---|
| 06/22/2011 | 561-64 | █ | | ███ |
| 06/30/2011 | 565-69, 715-18 | █ | ██ | ███ |
| | **Totals:** | █ | ██ | ███ |

**King Mountain's Response:** Deny. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

74. King Mountain sold the following amounts of cigarettes to Oneida Wholesale, located at 223 Genesee St., Oneida, New York 13421:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|---|---|---|---|---|
| 06/12/2010 | 18-19, 101-102 | █ | █ | ███ |
| 08/11/2010 | 21 | █ | █ | ███ |
| 11/10/2010 | 26 | █ | ██ | ███ |
| 11/15/2010 | 27* | ██ | ██ | ███ |
| 11/19/2010 | 28* | █ | █ | ███ |
| 12/1/2010 | 29-30 and 33, 88-90 | █ | ██ | ███ |
| 12/14/2010 | 31-32 and 33, 91-93 | █ | ██ | ███ |
| 12/21/2010 | 34-35, 97-100 | █ | ██ | ███ |
| 1/19/2011 | 577-83, 770-71 | █ | ██ | ███ |
| 2/15/2011 | 584-87, 687-89 | █ | ██ | ███ |
| 3/28/2011 | 589-95, 693-95 | █ | ██ | ███ |
| 4/11/2011 | 596-601, 696-98 | █ | ██ | ███ |
| 4/29/2011 | 602-07, 703-06 | █ | ██ | ███ |
| 06/13/2011 | 608-15, 711-14 | █ | ██ | ███ |
| | **Totals:** | ██ | ██ | ███ |

**King Mountain's Response:** Deny. *Inter alia*, Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48; KMTA 18-19, 27-30, 33, 88-90, 101-02, 577-83, 770-71.

75. King Mountain sold the following amounts of cigarettes to Onondaga Nation Smoke

20

Shop, P.O. Box 301, Nedrow, New York 13120:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|---|---|---|---|---|
| 07/14/2010 | 36-43, 103-104 | ■ | ■ | ■ |
| 08/10/2010 | 44-51, 107-108 | ■ | ■ | ■ |
| 09/03/2010 | 52-60, 109-110 | ■ | ■ | ■ |
| 10/28/2010 | 61-69, 113-114 | ■ | ■ | ■ |
| 11/4/2010 | 70-75 | ■ | ■ | ■ |
| 11/15/2010 | 77* | ■ | ■ | ■ |
| 11/15/2010 | 78* | ■ | ■ | ■ |
| 02/18/2011 | 588, 642-47, 772-73 | ■ | ■ | ■ |
| 05/10/2011 | 648-53, 774-75 | ■ | ■ | ■ |
| 08/14/2011 | 654-62, 778-79 | ■ | ■ | ■ |
| 10/24/2011 | 663-68, 780-81 | ■ | ■ | ■ |
| 02/07/2012 | 346-51, 384 | ■ | ■ | ■ |
| 02/20/2012 | 352-57 | ■ | ■ | ■ |
| 05/21/2012 | 358-63 | ■ | ■ | ■ |
| 07/25/2012 | 364-70 | ■ | ■ | ■ |
| 03/06/2013 | 121-28 | ■ | ■ | ■ |
| 07/02/2013 | 115-120, 792-97 | ■ | ■ | ■ |
| 10/16/2013 | 798-803 | ■ | ■ | ■ |
| 02/17/2014 | 804-11 | ■ | ■ | ■ |
| 09/12/2014 | 1014-15 | ■ | ■ | ■ |
| **Totals:** | | ■ | ■ | ■ |

**King Mountain's Response:** Deny. *Inter alia*, Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48; KMTA 654-62 and 778-79.

76.   King Mountain sold the following amounts of cigarettes to Shinnecock Smoke Shop, located at P.O. Box 5036, Southampton, New York 11969:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|---|---|---|---|---|
| 06/3/2011 | 669-72, 776-77, 789 | ■ | ■ | ■ |
| 10/21/2011 | 791 | ■ | ■ | ■ |
| 10/21/2011 | 790 | ■ | ■ | ■ |
| **Totals:** | | ■ | ■ | ■ |

**King Mountain's Response:** Deny. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

21

77.    King Mountain sold the following amounts of cigarettes to Valvo Candies, located at Routes 5 & 20, P.O. Box 271, Silver Creek, New York 14136:

| Date | KMTA No. | Cigarette Cases | Cigarette Cartons | Amount Paid |
|---|---|---|---|---|
| 06/29/2010 | 79 | ■ | ■ | ■ |
| | Totals: | ■ | ■ | ■ |

**King Mountain's Response:** Deny. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

78.    For these ■ cartons (or ■ packs) of cigarettes, sold and delivered by King Mountain (between June 1, 2010 and December 31, 2014) to companies located within the State of New York, King Mountain received roughly ■. *See* ¶¶ 66–77, above.

**King Mountain's Response:** Deny. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

79.    King Mountain's cigarette sales and deliveries to ERW Wholesale and the Onondaga Nation Smoke Shop are continuing today. See Thompson Depo. at 16, 129; Wheeler Depo. at 63–64.

**King Mountain's Response:** Admit, but only as to the date of Mr. Thompson's deposition. Thompson Dep. at 16.

80.    The quantity of cigarettes that King Mountain sold and delivered to the above-identified companies located within the State of New York, far exceeds the "probable demand" for cigarettes on each New York qualified Indian reservation, where such companies are respectively located. *Compare* ¶¶ 66–77, above, *with* 20 N.Y. Comp. Codes R. & Regs. § 74.6(e)(1).

**King Mountain's Response:** Irrelevant and deny.

81.    The "probable demand" for cigarettes by Indians located on a New York qualified Indian reservation, is set forth by 20 N.Y. Comp. Codes R. & Regs. § 74.6(e)(1), re-stated here in relevant part:

| Indian Nation/Tribe | New York State population (2000 census) | Cigarette Pack Amount (Packs / 3-month period) |
|---|---|---|
| Cayuga | 947 | 20,100 |
| Oneida | 1,473 | 31,200 |
| Onondaga | 2,866 | 60,600 |
| Seneca | 7,967 | 168,600 |
| Shinnecock | 1,915 | 40,500 |

| St. Regis Mohawk | 13,784 | 291,600 |
|---|---|---|

**King Mountain's Response:** Irrelevant, deny, and a purported legal conclusion that does not require a factual response.

82.   A comparison of the probable demand with King Mountain's sales records shows that King Mountain's sale and shipment of cigarettes to companies located on New York Indian reservations well exceeded the probable demand for such cigarettes by qualified New York Indian reservation members.  For example—

**King Mountain's Response:** Irrelevant, deny, and a purported legal conclusion that does not require a factual response.

a.   The Oneida Indian Nation has an annual probable demand for 124,800 packs of cigarettes. *See* 20 N.Y. Comp. Codes R. & Regs. § 74.6.

**King Mountain's Response:** Irrelevant, deny, and a purported legal conclusion that does not require a factual response.

i.   In 2010, however, King Mountain sold and delivered ▮▮▮▮ packs of cigarettes to Oneida Wholesale—*i.e.*, an amount over ▮ times the estimated probable demand for the Oneida Indian Nation. *See* ¶ 74, above.

**King Mountain's Response:** Irrelevant, deny, and a purported legal conclusion that does not require a factual response.

ii.   In 2011, King Mountain sold and delivered ▮▮▮▮ packs of cigarettes to the same company—*i.e.*, an amount ▮▮ times larger than the estimated probable demand. *See id.*

**King Mountain's Response:** Irrelevant, deny, and a purported legal conclusion that does not require a factual response.

b.   The Shinnecock Indian Nation has an annual probable demand for 162,000 packs (or 16,200 cartons) of cigarettes. *See* 20 N.Y. Comp. Codes R. & Regs. § 74.6. But over a 5-month period in 2011, King Mountain sold and delivered ▮▮▮▮ packs (or ▮▮▮▮ cartons) of cigarettes to the Shinnecock Smoke Shop—*i.e.*, an amount over ▮ times the estimated probable demand for the entire Shinnecock Indian Nation. *See* ¶ 76, above.

**King Mountain's Response:** Irrelevant, deny, and a purported legal conclusion that does not require a factual response.

c.   The St. Regis Mohawk Indian Nation has a quarterly (3-month) probable demand for 291,600 packs of cigarettes. 20 N.Y. Comp. Codes R. & Regs. § 74.6.  Over a 3-month period beginning on September 1, 2010, King Mountain sold and

delivered ██████ packs of cigarettes to Mohawk Distribution—*i.e.*, an amount ██ over the estimated probable demand for the St. Regis Mohawk Indian Nation. *See* ¶ 72, above.

**King Mountain's Response:** Irrelevant, deny, and a purported legal conclusion that does not require a factual response.

d.    The Cayuga Indian Nation has a quarterly (3-month) probable demand for 20,100 packs of cigarettes. *See* 20 N.Y. Comp. Codes R. & Regs. § 74.6. But with a single shipment in 2011, King Mountain sold and delivered ██████ packs of cigarettes to Lakeside Trading—*i.e.*, an amount over ██ times the quarterly probable demand for the Cayuga Indian Nation. *See* ¶ 71, above.

**King Mountain's Response:** Irrelevant, deny and a purported legal conclusion that does not require a factual response.

e.    The Seneca Indian Nation has an annual probable demand for 674,400 packs of cigarettes. *See* 20 N.Y. Comp. Codes R. & Regs. § 74.6.

**King Mountain's Response:** Irrelevant, deny and a purported legal conclusion that does not require a factual response.

i.    In 2012, however, King Mountain sold and delivered ██████ packs of cigarettes to ERW Wholesale; ██████ packs of cigarettes to AJ's Candy & Tobacco; and ████ packs of cigarettes to Iroquois Wholesale—*i.e.*, an amount over ██ times the Seneca Indian Nation's estimated probable demand. *See* ¶¶ 66–70, above.

**King Mountain's Response:** Irrelevant, deny and a purported legal conclusion that does not require a factual response.

ii.    In 2013, King Mountain sold and delivered ██████ packs of cigarettes to ERW Wholesale—*i.e.*, an amount over ██ times the Seneca Indian Nation's estimated probable demand. *See* ¶ 67, above.

**King Mountain's Response:** Irrelevant, deny and a purported legal conclusion that does not require a factual response.

iii.    In 2014, King Mountain sold and delivered ██████ packs of cigarettes to ERW Wholesale—*i.e.*, an amount over ██ times the Seneca Indian Nation's estimated probable demand. *See* ¶ 67, above.

**King Mountain's Response:** Irrelevant, deny and a purported legal conclusion that does not require a factual response.

f.    The Onondaga Indian Nation has an annual probable demand for 242,400 packs

of cigarettes. *See* 20 N.Y. Comp. Codes R. & Regs. § 74.6.

**King Mountain's Response:** Irrelevant, deny and a purported legal conclusion that does not require a factual response.

i.   In 2010, however, King Mountain sold and delivered ███ packs of cigarettes to the Onondaga Nation Smoke Shop—an amount over █ times the estimated probable demand for the Onondaga Indian Nation. *See* ¶ 75, above.

**King Mountain's Response:** Irrelevant, deny and a purported legal conclusion that does not require a factual response.

ii.  In 2011, King Mountain sold and delivered ███ packs of cigarettes to the Onondaga Nation Smoke Shop—an amount over █ times the Onondaga Indian Nation's estimated probable demand. *Id.*

**King Mountain's Response:** Irrelevant, deny and a purported legal conclusion that does not require a factual response.

iii. In 2012, King Mountain sold and delivered ███ packs of cigarettes to the Onondaga Nation Smoke Shop—an amount over █ times the Onondaga Indian Nation's estimated probable demand. *Id.*

**King Mountain's Response:** Irrelevant, deny and a purported legal conclusion that does not require a factual response.

iv.  In 2013, King Mountain sold and delivered ███ packs of cigarettes to the Onondaga Nation Smoke Shop—an amount over █ times the Onondaga Indian Nation's estimated probable demand. *Id.*

**King Mountain's Response:** Irrelevant, deny and a purported legal conclusion that does not require a factual response.

v.   In 2014, King Mountain with only two shipments sold and delivered ███ packs of cigarettes to the Onondaga Nation Smoke Shop—an amount over ███ times the Indian Nation's estimated probable demand. *Id.*

**King Mountain's Response:** Irrelevant, deny and a purported legal conclusion that does not require a factual response.

83.  King Mountain's explanation for why the number of cigarettes King Mountain has shipped, transported, and sold into each New York qualified reservation exceeds the probable demand for such cigarettes is that "the State of New York does not have the power to regulate trade on Indian reservations." King Mt. Resp. to Pl.'s 2d Set of Interrog. No. 12 (Pl. Ex. 4).

**King Mountain's Response:** A purported legal argument and conclusion, which does not require a factual response.

84. In any case, King Mountain did not limit or seek to control where its cigarettes could be marketed, advertised, promoted, distributed, or sold by each distributor, except to indicate that—

    a.     King Mountain brand cigarettes were to be sold within Indian Country in New York; and

            **King Mountain's Response:** No citation to evidence, which does not require a factual response.

    b.     Beginning on January 31, 2012, distributors could not sell, distribute or provide unstamped King Mountain cigarettes for sale on the Poospatuck Indian Reservation. King Mt. 1st Supp. Resp. to Pl.'s 1st Set of Interrog. Nos. 2, 4 (Pl. Ex. 6); KMTA 160–65; Thompson Depo. at 69 (only instruction was that King Mountain cigarettes were to be sold in Indian Country within that particular geographical area).

            **King Mountain's Response:** Admit, but deny the State's use of, and limitation by the use of, the noun "distributors," and deny the characterization of Mr. Thompson's testimony. *See* KMTA 160-72; Thompson Dep. at 69; Wheeler Dep. at 65.

85. King Mountain furthermore did not limit, or consider limiting, who might consume or use its cigarettes. Thompson Depo. at 70; Wheeler Depo. at 65.

**King Mountain's Response:** Admit that King Mountain has no involvement with the consumers of its cigarettes. Thompson Dep. at 68-70; Wheeler Dep. at 65-66.

86. In accordance with the PACT Act provisions 15 U.S.C. § 376(a)(1)–(2), King Mountain has not filed any reports, or registered, with the New York State Department of Taxation and Finance. King Mt. Answer, ¶ 18; King Mt. Resp. to Req. For Admis. No 5 (admitting that "King Mountain has not filed reports nor registrations with the New York State Department of Taxation and Finance under the PACT Act"); Declaration of Peter Spitzer, ¶ 5 (dated Feb. 21, 2013; ECF No. 16).

**King Mountain's Response:** An alleged legal argument and conclusion, which does not require a factual response.

87. In accordance with New York Tax Law section 480-b, King Mountain has not certified, or filed any such certifications (*e.g.*, with the Commission of the New York State Department of Taxation and Finance, the Office of the Attorney General, or any New York- licensed stamping agent), that King Mountain is either a participating manufacturer under the 1998 Tobacco Master Settlement Agreement, or is otherwise in

full compliance with New York  Public Health Law § 1399-pp(2) by having deposited the required amount of escrow per cigarette sold in the state.  King Mt. Answer, ¶ 20 (admitting that King Mountain had not filed  certifications as referenced by State Am. Compl. ¶¶ 75 and 92); Spitzer Decl., ¶ 6.

**King Mountain's Response:**  An alleged legal argument and conclusion, which does not require a factual response.

88.   In accordance with New York Tax Law section 480-b, King Mountain has not submitted to the Commissioner of the New York State Department of Taxation and Finance, a list of cigarette brands that King Mountain sells for consumption in the State of New York, as required by New York Tax. Law § 480-b.  King Mt. Resp. to Req. For Admis. No. 4 (admitting  that "King Mountain has not filed certifications with the New York State Department of Taxation and Finance reporting the number and brands of its cigarettes sold in New York under N.Y. Tax Law § 480-b and N.Y. Public Health Law § 1399-pp"); Spitzer Decl., ¶ 7

**King Mountain's Response:**  An alleged legal argument and conclusion, which does not require a factual response.

89.   In accordance with New York Executive Law section 156-c, King Mountain "has not certified in writing to the New York State Office of Fire Prevention and Control that its cigarettes meet the performance standards prescribed by the Office of Fire Prevention and Control[.]"  King Mt. Answer, ¶ 15; King Mt. Resp. to Req. For Admis. No. 6.

**King Mountain's Response:**  An alleged legal argument and conclusion, which does not require a factual response.

90.   The Yakama Code Indian Nation Law and Order Code defines an "Indian" as "(A) An enrolled member of the Yakama Nation; or (B) A member by enrollment or custom of any federally recognized tribe in the United States and its territories; or (C) Any resident of the Reservation who is considered an Indian by the traditions, customs, culture and mores of the Yakama Nation."  Yakama Code § 2.01.07(1).

**King Mountain's Response:**  The Yakama Indian Law and Order Code speak for themselves.

91.   King Mountain is not an enrolled member of the Yakama Nation.  Thompson  Depo. at 116; Black Depo. at 116, 117.

**King Mountain's Response:**  Deny.  Wheeler Dep. at 149.

92.   King Mountain does not have an enrollment card from the Yakama Nation.  Thompson Depo. at 117–19.

**King Mountain's Response:**  Deny.  Wheeler Dep. at 149.

93.   This is because the Yakama Nation only issues enrollment cards to individuals (*i.e.*, persons, and not corporate entities) that are at least one quarter blood Yakama Indian, who successfully complete the application process, and are later approved by the governing Yakama enrollment committee.  Thompson Depo. at 116–18.

**King Mountain's Response:**  Deny.  Wheeler Dep. at 149.

94.   Businesses licensed by the Yakama Nation, such as King Mountain, are not considered enrolled members of the Yakama Nation.  Thompson Depo. at 119; *see also* Black Depo. at 116, 117.

**King Mountain's Response:**  Deny.  Wheeler Dep. at 149.

95.   The Yakama Nation does not own or operate King Mountain.  King Mt. Answer, ¶ 5; *see also* KMTID 448 (noting that Wheeler owns and operates King Mountain); *Wheeler v. TTB*, 1ˢᵗ Am. Compl., ¶ 2.51 (same).

**King Mountain's Response:**  Irrelevant and admit.

96.   The Yakama Nation is not a party to this lawsuit.  State Am. Compl., *generally*.

**King Mountain's Response:**  Irrelevant and admit.

97.   The Yakama Nation did not establish King Mountain.  King Mt. Resp. to Req. For Admis. No. 98.

**King Mountain's Response:**  Deny.  Wheeler  Dep. at 21.

98.   The Yakama Nation is not the legal owner of King Mountain's business properties (*e.g.*, cigarette manufacturing equipment, buildings, trade names, etc.).  King Mt. Resp. to Req. For Admis. No. 93.

**King Mountain's Response:**  Irrelevant and admit, except for those properties held in trust by the United States and located on the Yakama Nation Reservation.

99.   The Yakama Nation's Tribal Council and General Council do not manage King Mountain's business decisions or activities.  King Mt. Resp. to Req. For Admis. No. 95.

**King Mountain's Response:**  The Yakama Indian Law and Order Code speak for themselves.

100.   The Yakama Nation's Tribal Council and General Council do not control, and do not exercise control over, King Mountain's administrative and accounting activities.  King Mt. Resp. to Req. For Admis. No. 94.

**King Mountain's Response:**  The Yakama Indian Law and Order Code speak for

themselves.

101.   The Yakama Nation's Tribal Council and General Council lack the unrestricted power to dismiss members of King Mountain's governing body.  King Mt. Resp. to Req. For Admis. No. 97.

**King Mountain's Response:**  The Yakama Indian Law and Order Code speak for themselves.

   a.   The Yakama Nation's General Council is composed of all Yakama Nation enrolled members, and is akin to being a U.S. voter.  Thompson Depo. at 122; Black Depo. at 119 (every enrolled member is a part of the General Council).

   **King Mountain's Response:**  The Yakama Indian Law and Order Code speak for themselves.

   b.   The Yakama Nation's General Council votes on the election of the Tribal Council, which is the governing body responsible for establishing policy and preserving Treaty rights.  Thompson Depo. at 122; KMTID 253, 254.

   **King Mountain's Response:**  The Yakama Indian Law and Order Code speak for themselves.

102.   King Mountain is not an official tribal enterprise or enterprise or official tribal program of the Yakama Nation.  King Mt. Resp. to Req. For Admis. No. 84 (Pl. Ex. 7).

**King Mountain's Response:**  The Yakama Indian Law and Order Code speak for themselves.

103.   King Mountain does not act as a division or arm of the Yakama Nation.  King Mt. Resp. to Req. For Admis. No. 85.

**King Mountain's Response:**  The Yakama Indian Law and Order Code speak for themselves.

104.   King Mountain does not act on behalf of the Yakama Nation in managing King Mountain's business activities.  King Mt. Resp. to Req. For Admis. No. 92.

**King Mountain's Response:**  The Yakama Indian Law and Order Code speak for themselves.

105.   King Mountain's profits go to the owner of King Mountain and not the Yakama Nation.  King Mt. Resp. to Req. For Admis. No. 97.

**King Mountain's Response:**  Admit to some extent, deny to some extent.  Thompson Dep. at 81-82.

29

106.   Per King Mountain's filed and draft federal tax returns, King Mountain's total gross receipts or sales for the years 2010 through 2014 are as follows:

    a.    For 2010, King Mountain's filed tax return reports ▆▆▆▆▆▆ in total sales. KMTA 1159.

        **King Mountain's Response:**  Admit, regarding gross receipts or sales.

    b.    For 2011, King Mountain's filed tax return reports ▆▆▆▆▆▆ in total sales. KMTA 1158.

        **King Mountain's Response:**  Admit, regarding gross receipts or sales.

    c.    For 2012, King Mountain's draft and as yet unfiled tax return identifies ▆▆▆▆▆ in total sales.  KMTA 1157.

        **King Mountain's Response:**  Admit, regarding gross receipts or sales.

    d.    For 2013, King Mountain's draft and as yet unfiled tax return identifies ▆▆▆▆▆ in total sales.  KMTA 1156.

        **King Mountain's Response:**  Admit, regarding gross receipts or sales.

    e.    For 2014, King Mountain's draft and as yet unfiled tax return identifies ▆▆▆▆▆ in total sales.  KMTA 1155.

        **King Mountain's Response:**  Admit, regarding gross receipts or sales.

107.   As of May 4, 2015, King Mountain has not set a target date for the filing of its 2012, 2013, or 2014 tax returns.  Declaration of Christopher K. Leung Dec., Ex._(email from King Mountain's counsel, Kelli J. Keegan, dated May 4, 2015).

    **King Mountain's Response:**  Admit.

**108.**   King Mountain's sales to its New York distributors also vary by year.  For example, King Mountain's produced invoices and shipping records show that—

    a.    For 2010, King Mountain had ▆▆▆▆▆ in sales to New York distributors (*see* ¶¶ 66, 72, 74–75, 77, above);

        **King Mountain's Response:**  Deny, and an alleged legal argument and conclusion, which does not require a factual response.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

    b.    For 2011, King Mountain had ▆▆▆▆▆ in sales to New York (*see* ¶¶ 66, 70–

76, above);

**King Mountain's Response:** Deny, and an alleged legal argument and conclusion, which does not require a factual response.

c.     For 2012, King Mountain had ▮▮▮▮▮▮ in sales to New York distributors (*see* ¶¶ 66, 67, 72, 75, above);

**King Mountain's Response:** Deny, and an alleged legal argument and conclusion, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

d.     For 2013, King Mountain had ▮▮▮▮▮▮ in sales to New York distributors (*see* ¶¶ 67, 75, above); and

**King Mountain's Response:** Deny, and an alleged legal argument and conclusion, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

e.     For 2014, King Mountain had ▮▮▮▮▮▮ in sales to New York distributors (*see* ¶¶ 67, 75, above).

**King Mountain's Response:** Deny, and an alleged legal argument and conclusion, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

f.     But because King Mountain does not possess formal document retention or destruction policies, these above record invoice totals may in fact short change the true extent of King Mountain's sales in New York:

**King Mountain's Response:** Deny, and an alleged legal argument and conclusion, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

g.     King Mountain does not have a document retention or destruction policy. Thompson Depo. at 12; King Mt. Resp. to Pl. 2d Set of Interrogs. No. 14.

**King Mountain's Response:** Admit.

h.     King Mountain's documents are instead retained or destroyed, depending on the personal judgment of King Mountain's employees. Thompson Depo. at 12.

**King Mountain's Response:** Admit.

**109.**   Accordingly, when seeking to determine the rough percentage of King Mountain's sales attributable to its New York distributors,

a.   In 2010, King Mountain's New York sales comprised roughly 14.28 % of its total sales. This percentage was determined as follows: (█████████ in 2010 sales to New York distributors, *see* ¶ 108(a), above) / (█████████ in total 2010 sales, KMTA 1159) = █████.

**King Mountain's Response:** Deny, and an argument, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

b.   In 2011, King Mountain's New York sales comprised roughly 18.07 % of its total sales. KMTA 1161.

**King Mountain's Response:** Deny, and an argument, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

    i.   This percentage provided by King Mountain (KMTA 1161) was used because King Mountain's produced invoices and shipping records appeared to show a shortfall.

    **King Mountain's Response:** Deny, and an argument, which does not require a factual response.

    ii.   King Mountain's produced invoices and shipping records show █████████ in sales to New York distributors. *See* ¶ 108(b), above.

    **King Mountain's Response:** Deny, and an argument, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

    iii.   Applying King Mountain's provided percentage, however, (18.07%, KMTA 1161) x (█████████ in total 2011 sales, KMTA 1158)) results in a New York sales figure of █████████—a difference of roughly ███████

    **King Mountain's Response:** Deny, and an argument, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

    iv.   This difference may be explained by the result of lost or destroyed invoices or shipping records.

    **King Mountain's Response:** Deny, and an argument, which does not require a factual response.

c.   In 2012, King Mountain's New York sales comprised roughly 26.90% of its total sales. This percentage was determined as follows: (█████████ in 2012 sales to New York distributors, *see* ¶ 108(c), above) / (█████████ in total 2012 sales, KMTA 1157) = █████

**King Mountain's Response:** Deny, and an argument, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

d.  In 2013, King Mountain's New York sales comprised roughly 20.41% of its total sales. This percentage was determined as follows: ▮▮▮▮ in 2013 sales to New York distributors, *see* ¶ 108(d), above) / (▮▮▮▮ in total 2013 sales, KMTA 1156) = ▮▮▮▮

    **King Mountain's Response:** Deny, and an argument, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

e.  In 2014, King Mountain's New York sales comprised roughly 24.49% of its total sales. KMTA 1155.

    **King Mountain's Response:** Deny, and an argument, which does not require a response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

    i.  This percentage provided by King Mountain (KMTA 1161) was used because King Mountain's produced invoices and shipping records appeared to show a shortfall.

        **King Mountain's Response:** Deny, and an argument, which does not require a factual response.

    ii.  King Mountain's produced invoices and shipping records show ▮▮▮▮ in sales to New York distributors. *See* ¶ 108(e), above.

        **King Mountain's Response:** Deny. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

    iii.  Applying King Mountain's provided percentage, however, (▮▮▮▮, KMTA 1161) x (▮▮▮▮ in total 2014 sales, KMTA 1155) results in a New York sales figure of ▮▮▮▮—a difference of roughly ▮▮▮▮.

        **King Mountain's Response:** Deny, and an argument, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

    iv.  This difference may be explained by the result of lost or destroyed invoices or shipping records.

        **King Mountain's Response:** Deny, and an argument, which does not require a factual response.

**110.**  Accordingly, the following figures should be considered King Mountain's total sales of cigarettes into New York for each identified year:

a.      For 2010, King Mountain had  in sales to New York distributors (*see* ¶ 108(a), above);

**King Mountain's Response:** Deny, and an argument, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

b.      For 2011, King Mountain had ▮▮▮▮▮ in sales to New York (*see* ¶ 109(b)(i)–(iv), above);

**King Mountain's Response:** Deny, and an argument, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

c.      For 2012, King Mountain had ▮▮▮▮▮ in sales to New York distributors (*see* ¶ 108(c), above);

**King Mountain's Response:** Deny. and an argument, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

d.      For 2013, King Mountain had ▮▮▮▮▮ in sales to New York distributors (*see* ¶¶ 108(d), above); and

**King Mountain's Response:** Deny. and an argument, which does not require a factual response. Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

34

e.    For 2014, King Mountain had ███████ in sales to New York distributors (*see* ¶¶ 109(e)(i)–(iv), above).

**King Mountain's Response:**  Deny. and an argument, which does not require a factual response.  Black Dep., *e.g.*, at 29, 99; Thompson Dep., *e.g.*, at 46, 48.

Dated: September 11, 2015                    Respectfully Submitted,

Nelson A. Boxer
Petrillo Klein & Boxer LLP
655 Third Avenue
22nd Floor
New York, NY 10017
(212) 370-0338
nboxer@pkbllp.com

Randolph H. Barnhouse
Kelli J. Keegan
Johnson Barnhouse & Keegan LLP
7424 4th Street NW
Los Ranchos de Albuquerque, NM 87107
(505) 842-6123
dbarnhouse@luebbenlaw.com
kkeegan@luebbenlaw.com

*Counsel for Defendant King Mountain Tobacco Co. Inc.*

35