UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
STATE OF NEW YORK,

                     Plaintiff,        <u>MEMORANDUM & ORDER</u>
                                       12-CV-6276(JS)(SIL)

     -against-

MOUNTAIN TOBACCO COMPANY, d/b/a
KING MOUNTAIN TOBACCO COMPANY, INC.,

                     Defendant.
----------------------------------------X
APPEARANCES:
Plaintiff:           Christopher K. Leung, Esq.
                    Dana H. Biberman, Esq.
                    NYS Office of the Attorney General
                    120 Broadway, 3rd Floor
                    New York, NY 10271

For Defendant:      Nelson A. Boxer, Esq.
                    Jill C. Barnhart, Esq.
                    Petrillo Klein & Boxer LLP
                    655 3rd Avenue, 22nd Floor
                    New York, NY 10017

                    Kelli J. Keegan, Esq.
                    Randolph Barnhouse, Esq.
                    Johnson Barnhouse & Keegan LLP
                    7424 4th St NW
                    Los Ranchos De Albuq, NM 87107


SEYBERT, District Judge:

      Presently pending before the Court are defendant Mountain Tobacco Company's ("King Mountain") motion for partial summary judgment (Docket Entry 195) and plaintiff State of New York's (the "State") cross motion for summary judgment (Docket

Entries 197 and 198[1]).  For following reasons, the parties' motions are both GRANTED IN PART and DENIED IN PART.

BACKGROUND[2]

King Mountain, a for-profit corporation formed and operating under the laws of the Yakama Indian Nation, manufactures and sells its own brand of cigarettes.  (Pl.'s 56.1 Stmt., Docket Entry 195-5, ¶¶ 28, 30.)[3]  King Mountain's principal place of business is located on the Yakama Indian Nation Reservation.  (Pl.'s 56.1 Stmt. ¶ 32.)  Delbert Wheeler, Sr., an enrolled member of the Yakama Nation, is the sole owner of King Mountain.  (Pl.'s 56.1 Stmt. ¶¶ 35, 39.)

The State alleges that King Mountain has marketed, distributed, and sold its cigarettes in New York since at least

---

[1] The State filed its cross motion for summary judgment at Docket Entry 197. However, the State also filed a motion for leave to electronically file under seal and a motion for summary judgment at Docket Entry 198.  These two docket entries contain the same dispositive motion.

[2] The following material facts are drawn from King Mountain's Local Civil Rule 56.1 Statement and the State's Local Civil Rule 56.1 Counterstatement unless otherwise noted.  Any relevant factual disputes are noted.

[3] As set forth more fully in the transcript of the proceedings held on April 8, 2016, the Court granted King Mountain's motion to strike the State's Local Rule 56.1 Statement dated January 29, 2016 (the "January 56.1 Statement").  (Docket Entry 197-2.) Accordingly, the Court will not consider the January 56.1 Statement, or the portion of the State's memorandum of law that relies upon additional facts set forth in the January 56.1 Statement.

June 1, 2010. (Pl.'s 56.1 Stmt. ¶ 52.) King Mountain denies that allegation, (Def.s' 56.1 Counterstmt., Docket Entry 195-6, ¶ 52), but alleges that it "sells its cigarettes to Indian Nations, and to companies owned by a member of an Indian Nation, that are situated on Indian Nations, some of which are located within the boundaries of the State of New York[,]" (Def.s' Sec. 56.1 Stmt., Docket Entry 195-3, ¶ 13). Nevertheless, King Mountain has conceded that it sold cigarettes to Valvo Candies, an entity that is not owned by an Indian Nation or tribe or a member of an Indian Nation or tribe. (Def.'s Br., Docket Entry 195-1, at 9, n.4.) The State alleges that Valvo Candies is not located on a qualified Indian reservation and is instead located in Silver Creek, Chautauqua County, New York. (Pl.'s 56.1 Stmt. ¶¶ 53(l), 54(a).)[4] It is undisputed that King Mountain has not filed reports or registrations with the New York State Department of Taxation and Finance ("DTF"). (Def.'s Sec. 56.1 Stmt. ¶ 23.)

On November 6, 2012, a New York State investigator purchased one carton of unstamped King Mountain brand cigarettes for twenty-five dollars at a smoke shop located on the Poospatuck Indian Reservation in Mastic, New York. (Def.'s Sec. 56.1 Stmt.

---

[4] King Mountain does not deny that Valvo Candies is not located on a qualified Indian reservation and instead asserts that this allegation is based on evidence not produced in discovery and constitutes a "purported legal conclusion that does not require a factual response." (Def.'s 56.1 Counterstmt. ¶¶ 54(a)-(b).)

¶ 25.) On December 3, 2012, New York State troopers stopped a truck in Clinton County, New York, and seized one hundred and forty cases of unstamped King Mountain brand cigarettes. (Def.'s Sec. 56.1 Stmt. ¶ 26.) The cigarettes were being transported by ERW Wholesale to the Ganienkeh Nation in Altona, New York. (Def.'s Sec. 56.1 Stmt. ¶ 26(a).)

On May 15, 2013, a New York State investigator purchased cartons of unstamped King Mountain brand cigarettes at smoke shops located on the Poospatuck Indian Reservation in Mastic, New York. (Def.'s Sec. 56.1 Stmt. ¶ 27.) On May 16, 2013, a New York State investigator purchased one carton of unstamped King Mountain brand cigarettes for twenty dollars at a smoke shop located on the Cayuga Indian Reservation in Union Springs, New York. (Def.'s Sec. 56.1 Stmt. ¶ 29.) On June 5, 2013, a New York State investigator purchased two cartons of unstamped King Mountain brand cigarettes at smoke shops located on the Poospatuck Indian Reservation. (Def.'s Sec. 56.1 Stmt. ¶ 30.)

A.    The Administrative Proceeding

On December 20, 2012, DTF issued a Notice of Determination against King Mountain in connection with cigarettes seized on December 3, 2012 (the "Notice of Determination"). (Def.'s Sec. 56.1 Stmt. ¶ 26(c).) The Notice of Determination alleged that King Mountain failed to pay $1,259,250.00 in state

taxes pursuant to New York State Tax Law Article 20. (Def.'s Sec. 56.1 Stmt. ¶ 26(c).)

On October 23, 2014, DTF filed a Stipulation of Discontinuance stating that King Mountain owed $0 in tax, penalty, and interest in connection with the Notice of Determination (the "Stipulation of Discontinuance"). (Def.'s Sec. 56.1 Stmt. ¶ 26(d).) On November 19, 2014, the presiding Administrative Law Judge issued an Order decreeing that the State's assessment against King Mountain was cancelled and dismissed with prejudice. (Def.'s Sec. 56.1 Stmt. ¶ 26(e).)

I. The Amended Complaint

The Amended Complaint dated May 21, 2014[5] asserts claims pursuant to the Contraband Cigarette Trafficking Act ("CCTA"), Prevent All Cigarette Trafficking Act ("PACT Act"), New York Tax Law §§ 471, 471-e, and 480-b, and New York Executive Law § 156-c against King Mountain.[6] (Am. Compl., Docket Entry 96.) The State

---

[5] The State initially filed an unsigned Amended Complaint on February 13, 2013. (Docket Entry 6.) The Amended Complaint was subsequently signed and refiled on May 21, 2014. (Docket Entry 96.)

[6] Mountain Tobacco Distributing Company Inc., and Delbert Wheeler, Sr. were also named as defendants in this action. (Am. Compl.) The State voluntarily dismissed Mountain Tobacco Distributing Company Inc. as a defendant pursuant to an Amended Notice of Dismissal, So Ordered on May 9, 2013. (Docket Entry 45.) Mr. Wheeler was terminated as a defendant pursuant to the Court's Memorandum and Order dated January 26, 2016, granting Mr. Wheeler's motion to dismiss. (Docket Entry 193.)

seeks to enjoin King Mountain from making allegedly illegal cigarette sales and shipments into New York and also seeks civil penalties, attorney fees, and costs. (Am. Compl. ¶ 3.)

II. <u>The Pending Motions</u>

On January 29, 2016, King Mountain filed a motion for partial summary judgment and the State filed a cross motion for summary judgment. (Def.'s Mot., Docket Entry 195; Pl.'s Mot., Docket Entry 197.) The State and King Mountain each filed one brief in support of their respective motions and a separate brief in opposition to their adversary's motion. The parties each filed a reply brief, as well as supplemental briefs in response to the Court's Electronic Order dated May 4, 2016. As the parties' briefs are somewhat duplicative, the Court will address the relevant arguments by party, rather than by motion sequence.

A. <u>King Mountain's Position</u>

King Mountain has moved for summary judgment with respect to the State's claims under the CCTA, PACT Act, and New York Tax Law ("NYTL") Sections 471 and 471-e. (<u>See</u> <u>generally</u> Def.'s Br.) King Mountain argues that the State's CCTA claim must fail because, <u>inter</u> <u>alia</u>, it is exempt as an "Indian in Indian country." (Def.'s Br. at 12, 14-16.) King Mountain avers that it is not asserting a sovereign immunity defense and the State's focus on tribal sovereign immunity is, accordingly, irrelevant. (Def.'s Opp. Br., Docket Entry 202, at 3.)

King Mountain alleges that it is entitled to summary judgment on the PACT Act claim because its sale of cigarettes to Native Americans did not take place in "interstate commerce" as defined by the Act. (Def.'s Br. at 17.) King Mountain argues that the PACT Act's definition of "State" does not encompass "Indian Country" and cites to the distinct definitions provided for each term. (Def.'s Opp. Br. at 11.) Although King Mountain concedes that it sold cigarettes to Valvo Candies on one occasion, it alleges that was an isolated sale that predated the effective date of the PACT Act. (Def.'s Br. at 19.)

King Mountain alleges that the State's third cause of action is barred by res judicata based on the prior Tax Proceeding. (Def.'s Br. at 20-25.) With respect to the merits, King Mountain argues that it is not liable under NYTL Sections 471 and 471-e because: (1) it did not possess unstamped cigarettes in New York State; and (2) Section 471 does not impose liability on a lawful out-of-state cigarette manufacturer because it is not an "agent" or "consumer" as defined by the statute. (Def.'s Opp. Br. at 20.) King Mountain alleges that "nothing in the law precludes King Mountain from selling to Indian Nations, who could then sell those cigarettes to licensed-stamping agents." (Def.'s Opp. Br. at 21.)

King Mountain also argues that summary judgment should be denied with respect to the State's fourth and fifth causes of action. (Def.'s Opp. Br. at 22-23.) King Mountain avers that it

did not knowingly violate NYTL Section 480-b because its sales were "Nation to Nation" with one exception. (Def.'s Opp. Br. at 22-23.) King Mountain also argues that the record demonstrates that it affixed the requisite Fire Standard Compliant ("FSC") stamp to its cigarettes. (Def.'s Opp. Br. at 23.)

B.     The State's Position

The State moves for summary judgment on all of its claims. (See generally Pl.'s Br., Docket Entry 197-1.) With respect to the CCTA, the State argues that the "Indian in Indian Country" exemption is not applicable to King Mountain. (Pl.'s Opp. Br., Docket Entry 201, at 6.) Particularly, the State argues that the CCTA's use of the term "Indian" refers to an individual member of a tribe, not an Indian-owned business. (Pl.'s Opp. Br. at 6-7.) Additionally, the State alleges that even if King Mountain is an "Indian in Indian Country," the CCTA exemption still does not apply because that exemption is meant to protect tribal governments and tribal sovereignty. (Pl.'s Opp. Br. at 7-8.)

The State argues that King Mountain's arguments regarding the PACT Act are founded in a misreading of the statute. (Pl.'s Opp. Br. at 12.) The State alleges that the term "state" in the PACT Act does not exclude Indian reservations because pursuant to federal common law, "Indian country is ordinarily considered a part of a state's territory." (Pl.'s Opp. Br. at 12.) The State also avers that King Mountain's interpretation of

the PACT Act would defeat the statutory purpose of defeating remote sellers from selling untaxed cigarettes. (Pl.'s Br. at 28.)

The State alleges that King Mountain is liable under NYTL Sections 471 and 471-e for shipping unstamped cigarettes into New York State. (Pl.'s Br. at 30.) The State also argues that res judicata does not bar its claim because: (1) the underlying facts of the Tax Proceeding do not arise out of the same series of transactions as the underlying facts in this case; (2) the Tax Department and Attorney General are not in privity; and (3) King Mountain waived any res judicata defense by failing to assert it in its Answer. (Pl.'s Opp. Br. at 15-25.) Further, the State avers that the DTF rules provide that a stipulation cannot be used against the parties in another proceeding. The State notes that the Tax Proceeding only addressed cigarettes seized by the State on December 1, 2012. (Pl.'s Br. at 32.)

The State also alleges, with respect to its fourth and fifth claims, that King Mountain failed to file annual certifications in violation of NYTL Section 480-b, and King Mountain has violated the fire prevention certification filing requirement set forth in New York Executive Law Section 156-c. (Pl.'s Br. at 33-34.)

### DISCUSSION

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."
FED. R. CIV. P. 56(a). A genuine factual issue exists where "the
evidence is such that a reasonable jury could return a verdict for
the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 248, 106 S. Ct. 2505, 2510 91 L. Ed 2d 202 (1986). In
determining whether an award of summary judgment is appropriate,
the Court considers the pleadings, deposition testimony,
interrogatory responses, and admissions on file, together with
other firsthand information that includes but is not limited to
affidavits. Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there
are no genuine issues of material fact. Gallo v. Prudential
Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). Once
the movant makes such a showing, the non-movant must proffer
specific facts demonstrating "a genuine issue for trial." Giglio
v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at
*4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation
omitted). Conclusory allegations or denials will not defeat
summary judgment. Id. However, in reviewing the summary judgment
record, "'the court is required to resolve all ambiguities and
draw all permissible factual inferences in favor of the party
against whom summary judgment is sought.'" Sheet Metal Workers'
Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL

6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

I.    Federal Claims

    A.    Contraband Cigarette Trafficking Act

        The CCTA mandates that "[i]t shall be unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes or contraband smokeless tobacco." 18 U.S.C. § 2342(a). "Contraband cigarettes" are defined as 10,000 or more cigarettes that "bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where the cigarettes are found, if the State or local government requires a stamp . . . to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes." 18 U.S.C. § 2341(2). CCTA Sections 2341 and 2342 can be read together to establish the following elements of a CCTA violation: (1) knowingly shipping, transporting, receiving, possessing, selling, distributing, or purchasing (2) in excess of 10,000 cigarettes (3) that are not stamped (4) "under circumstances where state or local cigarette tax law requires the cigarettes to bear such stamps." City of N.Y. v. Golden Feather Smoke Shop, Inc., No. 08-CV-3966, 2009 WL 705815, at *11 (E.D.N.Y. Mar. 16, 2009) (citation omitted).

        A CCTA exemption exists for "Indians in Indian Country." Specifically, Section 2346 provides that "[n]o civil action may be

11

commenced under this paragraph against an Indian tribe or an Indian in Indian country." 18 U.S.C. § 2346(b)(1). See also City of N.Y. v. Milhelm Attea & Bros., Inc., 550 F. Supp. 2d 332, 346 (E.D.N.Y. 2008) (noting that the 2006 amendments to the CCTA "provide that no civil action may be commenced by a state or local government against an Indian tribe or an Indian in Indian country for violations of the CCTA"). "Indian Country" is defined as, inter alia, "all land within the limits of any Indian reservation under the jurisdiction of the United States Government." 18 U.S.C. § 1151(a). The CCTA does not define the term "Indian."

The parties do not dispute that King Mountain is organized under the laws of the Yakama Nation; wholly owned by Mr. Wheeler, a member of the Yakama Nation; and located on the Yakama Indian Reservation. Nevertheless, the State argues that King Mountain is not an "Indian" and, thus, is not entitled to the "Indian in Indian Country" exemption. The Court disagrees.

The principles of corporate "personhood" support the notion that King Mountain is an "Indian" for purposes of the CCTA. In an analogous matter, the Supreme Court held that the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb et. seq., which prohibits the government from "'substantially burden[ing] a person's exercise of religion,'" applies to the activities of closely-held for-profit

corporations.  <u>Burwell v. Hobby Lobby Stores, Inc.</u>, 134 S. Ct. 2751, 2754, 189 L. Ed. 2d 675 (2014) (quoting 42 U.S.C. § 2000bb-1(a); first alteration in original, emphasis supplied).[7]  In <u>Hobby Lobby</u>, for-profit closely-held corporations challenged certain regulations promulgated by the Department of Health and Human Services ("HHS") that required that the corporations provide their employees with health insurance coverage for all FDA-approved contraceptive methods.  The corporations argued that these regulations compromised their religious belief that human life begins at conception because four FDA-approved contraceptives "may operate after the fertilization of an egg."  <u>Id.</u>, 134 S. Ct. at 2764-66.

The Supreme Court looked to the Dictionary Act, 1 U.S.C. Section 1, to determine whether the subject provision of the RFRA--which addresses a "'person's' exercise of religion . . . [but] does not define the term 'person'"--is applicable to for-profit corporations.  <u>Id</u>. at 2768 (quoting 42 U.S.C. ¶ 2000bb-1(a)).  The Court held that there was no evidence of congressional intent to depart from the Dictionary Act's definition of "person," which

_____

[7] The RFRA further provides that "[i]f the Government substantially burdens a person's exercise of religion . . . that person is entitled to an exemption from the rule unless the Government 'demonstrates that application of the burden to the person--(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'"  <u>Hobby Lobby</u>, 134 S. Ct. at 2761 (quoting 42 U.S.C. § 2000bb-1(b)).

"'include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.'" Id. (quoting 1. U.S.C. § 1; alteration in original). In concluding that a federal regulation's restriction on a for-profit closely held corporation is subject to the RFRA, the Court noted that "[a] corporation is simply a form of organization used by human beings to achieve desired ends. . . [and] [w]hen rights, whether constitutional or statutory, are extended to corporations, the purpose is to protect the rights of these people."[8] Id. at 2768, 2774.

Here, the CCTA neither defines "Indian" nor limits the term "Indian" to individual Native Americans. The State essentially argues that if Congress wanted to include Indian-owned businesses within the purview of the CCTA's "Indian in Indian Country" exemption it would have expressly done so. (Pl.'s Opp. Br. at 6-7.) The State notes that other statutes provide distinct definitions for "Indian" and "Indian-owned business," or define "Indian" as "'a person who is a member of an Indian tribe.'" (See Pl.'s Opp. Br. at 6-7 (quoting 20 U.S.C. § 80q-14(7)).) However, the converse of the State's argument is more persuasive. Congress did not limit the "Indian in Indian Country" exemption to

---

[8] Ultimately, the Hobby Lobby Court held that the contraceptive mandate violated the RFRA as applied to closely-held corporations. Id. at 2785.

individuals.  Further, while the Dictionary Act does not define the term "Indian," that term is akin to the term "person," which, as previously noted, encompasses corporations and companies as well as individuals. 1 U.S.C. § 1.  As King Mountain is organized under the laws of the Yakama Nation, it is an "Indian" just as a corporation organized under the laws of the State of Delaware is a "citizen" of Delaware.

Parenthetically, the "personhood" rights that have been conferred to corporations--i.e., the protections of the First Amendment, see Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010)--lend support to the notion that an Indian-owned corporation organized under Indian law qualifies as an "Indian" for the purposes of the CCTA's "Indian in Indian Country" exemption.

The State's argument that "Congress simply intended this [CCTA] exemption to protect only 'tribal sovereignty' and the limited interests implicated under the doctrine," is founded in a misreading of the statute.  (Pl.'s Br. at 17.)  This District has rejected an attempt to conflate the "Indian in Indian country" exemption with the concept of sovereign immunity, holding that the question of whether a non-party Indian Nation may assert sovereign immunity has no relation to "whether the[ ] defendants fall within the statutory exemption applicable to 'Indian[s] in Indian

country.'"   <u>Golden Feather</u>, 2009 WL 705815, at *12 (second alteration in original).

Further, the State's assertion that the legislative history of the 2006 amendment that included the "Indian in Indian Country" exemption indicates that "Congress' intention in creating this exemption was to protect only 'tribal governments and tribal sovereignty'" is equally misplaced. (Pl.'s Opp. Br. at 9.)

The legislative history of the 2006 amendments to the CCTA indicates that Congress sought to strengthen the statute with modifications that included lowering the violation threshold from 60,000 cigarettes to 10,000 cigarettes in order to prevent criminal organizations and terrorist groups from funding their activities by purchasing cigarettes in a low excise-tax state and selling them in a high excise-tax state.[9]  151 CONG. REC. H6273-04, (daily ed. July 21, 2005) (Statement of Rep. Coble), 2005 WL 1703380, at *H6284.

The legislative history notes that the amendment, as initially drafted, "could have had the unintended effect of targeting tribal governments who are legitimately involved in the retailing of tobacco products."  <u>Id.</u>  However, Congressman Conyers stated that the amendment was modified to include "a provision

_____

[9] Congressman Coble specifically cited Hezbollah operatives who were convicted in 2003 for buying cigarettes in North Carolina, selling them in Michigan, and using the proceeds to fund Hezbollah activities.   151 CONG. REC. H6273-04, at *H6284.

stipulating that enforcement against tribes <u>or in Indian country</u>, as defined in Title 18 Section 1151, will not be authorized by the pending bill has been incorporated." <u>Id.</u> (emphasis supplied). Accordingly, the legislative history indicates that Congress differentiated between enforcement against tribes and enforcement in Indian country and, thus, intended for the exemption to apply in both circumstances. Indeed, that distinction is express in the statute which, again, prohibits the commencement of a civil action by a state against "an Indian tribe <u>or</u> an Indian in Indian country." 18 U.S.C. § 2346(b)(1) (emphasis supplied).

The Court is also unpersuaded by the State's seemingly policy-driven argument that if King Mountain is entitled to the CCTA's "Indian in Indian Country" exemption, the result would be "a new loophole by which other non-New York Native Americans and tribes would flood New York's reservations with enormous quantities of unstamped cigarettes." (Pl.'s Br. at 23.) As noted by King Mountain, the "Indian in Indian country" exemption is only applicable to state enforcement of the CCTA. (Def.'s Opp. Br. at 5.) <u>See also</u> 18 U.S.C. § 2346(b)(1). Thus, the federal government is permitted to enforce the CCTA without regard to whether the action is against an "Indian in Indian country," which renders it unlikely that Indian reservations will be "flooded" with unstamped cigarettes.

Finally, the Court rejects the State's argument that the "Indian in Indian country" exemption does not apply because King Mountain's cigarettes are delivered outside of the Yakama reservation, *i.e.*, to destinations within the boundaries of the State of New York. (Pl.'s Reply Br., Docket Entry 206, at 4-5.) The Court declines to take such a quantum leap. King Mountain is undisputedly located on the Yakama Indian reservation; it is beyond cavil that the Yakama reservation is "land within the limits of any Indian reservation under the jurisdiction of the United States Government" and thus constitutes "Indian country" as defined by the CCTA. 18 U.S.C. § 1151(a). There is nothing in the CCTA to support the State's apparent position that the "Indian in Indian country" exemption is not applicable to cigarette sales to persons or entities outside of a given Indian reservation.

The Court is keenly aware of the significant harms to public health and welfare that result from cigarette smoking and cigarette trafficking. However, the Court is not empowered to legislate; its sole charge is to interpret and apply the CCTA as drafted by Congress. Accordingly, the Court finds that King Mountain is an "Indian" in the context of the CCTA. However, the Court's determination is limited to Indian-owned companies organized under the laws of an Indian Nation or tribe. The Court makes no determination as to whether an Indian-owned corporation organized under state law is an "Indian" pursuant to the CCTA.

Accordingly, King Mountain's motion for summary judgment on the State's CCTA claim is GRANTED based on King Mountain's status as an "Indian in Indian country." The Court need not address the parties' other arguments regarding the applicability of the CCTA to King Mountain.

B.    Prevent All Cigarette Trafficking Act

On March 31, 2010, Congress enacted the PACT Act. PACT Act., Pub. L. No. 111-154, 124 Stat. 1087 (2010). The PACT Act requires that certain filings be made by "[a]ny person who sells, transfers, or ships for profit cigarettes or smokeless tobacco in interstate commerce, whereby such cigarettes or smokeless tobacco are shipped into a State, locality, or Indian country of an Indian tribe taxing the sale or use of cigarettes or smokeless tobacco[.]" 15 U.S.C. § 376(a). The PACT Act defines "interstate commerce" as: (1) "commerce between a State and any place outside the State," (2) "commerce between a State and any Indian country in the State," or (3) "commerce between points in the same State but through any place outside the State or through any Indian country." 15 U.S.C. § 375(9)(A).[10]

---

[10] With respect to the definition of "interstate commerce," the PACT Act further provides that "[a] sale, shipment, or transfer of cigarettes or smokeless tobacco that is made in interstate commerce, as defined in this paragraph, shall be deemed to have been made into the State, place, or locality in which such cigarettes or smokeless tobacco are delivered." 15 U.S.C. § 375(9)(B).

The parties' dispute regarding the PACT Act centers on whether King Mountain cigarettes were shipped in "interstate commerce."  With the exception of one sale to Valvo Candies that is discussed below, the State does not dispute that King Mountain's shipments were made to "Indian country."  (See Pl.'s Br. at 26 (noting that King Mountain delivered cigarettes "to the certain persons largely located on Indian reservations within the State of New York"); Pl.'s 56.1 Stmt. ¶¶ 53(1), 54(a) (asserting that Valvo Candies is not located on a qualified Indian reservation).)  However, the State argues that King Mountain's sales were made in "interstate commerce," as defined by the PACT Act, because "[o]rdinarily, 'an Indian reservation is considered part of the territory of the State.'"  (Pl.'s Br. at 27 (quoting Nevada v. Hicks, 533 U.S. 353, 361-62, 121 S. Ct. 2304, 2311, 150 L. Ed. 2d 398 (2001).)  The Court disagrees.

The PACT Act includes separate definitions for "State" and "Indian country."  "State" is defined as "each of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States."  15 U.S.C. § 375(11).  "Indian Country" is defined as including "all land within the limits of any Indian reservation under the jurisdiction of the United States Government [.]"  15 U.S.C. § 375(7); 18 U.S.C. § 1151.  The notion that a qualified Indian reservation--which falls squarely within the definition of

"Indian Country"--is somehow subsumed within the definition of "state" is belied by a plain reading of the statute.

Parenthetically, the Court is not persuaded by the State's argument that Congress did not intend to "change[ ] the common law rule that Indian country is ordinarily considered a part of a state's territory." (Pl.'s Opp. Br. at 12 (citing Hicks, 533 U.S. at 361-62, 121 S. Ct. at 2311; Chemehuevi Indian Tribe v. California Bd. of Equalization, 800 F.2d 1446, 1450 (9th Cir. 1986); State ex. rel. Edmondson v. Native Wholesale Supply, 237 P.3d 199, 208 (Okla. 2010).) The cases cited by the State in support of this notion do not address the PACT Act. Moreover, any purported general rule that Indian reservations are a part of the states in which they are located is not applicable given the PACT Act's distinct definitions of "state," "Indian country," and "interstate commerce."

In light of the undisputed fact that with the exception of the sale to Valvo Candies, all of the King Mountain sales were made from King Mountain's location on the Yakama reservation to Indian reservations within the boundaries of the State of New York, it is clear that these sales do not fall within the PACT Act's definition of "interstate commerce." As previously noted, the PACT Act defines "interstate commerce" as implicating one of three different commerce scenarios. The first two scenarios, "commerce between a State and any place outside the State" and "commerce

between a State and any Indian country in the State," expressly require that one point of commerce be in a "state." 15 U.S.C. § 375(9)(A). As King Mountain's subject sales were from one Indian reservation to other Indian reservations, they do not fall within the first two methods of interstate commerce because the sales did not originate or conclude in a "state." The third interstate commerce scenario is "commerce between points in the same State but through any place outside the State or through any Indian country." Since the subject transactions did not take place in a "state"--and undisputedly did not take place in the same state-- this third scenario also does not apply.

Finally, in a footnote, the State argues that its position is supported by two documents prepared by the Department of Justice's Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). (Pl.'s Opp. Br. at 14-15, n.16.) The first document is correspondence sent from ATF to King Mountain in response to King Mountain's opposition to California's nomination to place King Mountain on the PACT Act non-compliant list (the "ATF Letter"). (ATF Ltr., Pl.'s Opp. Ex. A, Docket Entry 201-2.) The ATF Letter states, in relevant part, that the definition of "interstate commerce" set forth in the PACT Act "encompasses shipments from King Mountain to California, regardless that the final destination in California may be located in Indian Country." (ATF Ltr. at 8.) The second document, in which ATF summarizes comments received in

response to an open letter to tribal leaders regarding the PACT Act and responds to those comments (the "ATF Summary"), states that "as defined by the [PACT Act], intrastate transportation between two separate reservations would be in interstate commerce." (ATF Summary, Pl.'s Opp. Ex. B., Docket Entry 201-3, at 1-2.)

Notably, the State does not argue that ATF's interpretation of the PACT Act as set forth in the ATF Letter and ATF Summary is entitled to deference under Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). King Mountain argues that these documents should not even be afforded respect pursuant to Skidmore v. Swift & Co., 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944). (Def.'s Reply Br., Docket Entry 205, at 5.) The Court agrees.

Pursuant to Skidmore, the Court affords respect to an informal agency interpretation "'depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" De La Mota v. U.S. Dep't of Educ., 412 F.3d 71, 78-80 (2d Cir. 2005) (alteration in original) (quoting Skidmore, 323 U.S. at 140, 65 S. Ct. at 164). The Second Circuit has held that an agency position adopted during the course of litigation "lack[s]

the thoroughness required for _Skidmore_ respect." _De La Mota_, 412 F.3d at 80.

Here, the ATF Letter is akin to a document prepared during the course of litigation. (_See_ _also_ Def.'s Reply Br. at 5 (characterizing the ATF Letter as a "litigation-related pronouncement[ ]").) The ATF Letter states that after the State of California informed it that King Mountain should be added to the PACT Act "non-compliant list," ATF offered King Mountain the opportunity to submit a response. (ATF Ltr. at 1.) The ATF Letter responds to King Mountain's position and sets forth the basis for ATF's determination that King Mountain failed to comply with the PACT Act. (_See_ _generally_ ATF Ltr.) The Court finds that the ATF Letter is essentially an advocacy piece that lacks the requisite thoroughness for _Skidmore_ respect.

Similarly, the ATF Summary fails to warrant _Skidmore_ respect based on its lack of demonstrated validity. ATF's salient response in the ATF Summary--that "intrastate transportation between two separate reservations would be in interstate commerce"--does not include any substantiation or evidence of ATF's rationale. (ATF Summary at 1-2.) _See_ _Boykin v. KeyCorp_, 521 F.3d 202, 208-209 (2d Cir. 2008) ("We have explained that the 'validity' inquiry looks to whether an agency interpretation is 'well-reasoned, substantiated, and logical.'") (quoting _De La Mota_, 412 F.3d at 80). Additionally, this document expressly

contemplates further review and consideration regarding ATF's position. The ATF Summary states that "[i]n the near future, ATF will issue an Interpretive Rule that will set forth the Bureau's views on the [PACT] Act's requirements . . . [c]omments received on or before the closing date. . . will be carefully considered and revisions to the rule will be made if they are determined to be appropriate." (ATF Summary at 1.) Accordingly, the Court declines to afford <u>Skidmore</u> respect to the ATF Letter or ATF Summary.

### 1. <u>Valvo Candies</u>

As previously noted, King Mountain concedes that Valvo Candies is not owned by an Indian Nation or a member of an Indian Nation. (Def.'s Br. at 9, n.4.) While King Mountain has not expressly conceded that Valvo Candies is not located on an Indian reservation, it has neither alleged that Valvo Candies is located on an Indian reservation nor produced evidence refuting the State's claim that Valvo Candies is located in Silver Creek, Chautauqua County, New York. (<u>See</u> Pl.'s 56.1 Stmt. ¶¶ 53(l), 54(a).) Indeed, by arguing that its sale to Valvo Candies predated the PACT Act's effective date, <u>see</u> Def.'s Br. at 19, King Mountain implicitly concedes that the sale to Valvo Candies took place between the Yakama Nation reservation and the State of New York--namely, "a State and any place outside the State"--and thus occurred in

"interstate commerce" as defined by the PACT Act. See 15 U.S.C. § 375(9)(A).

The PACT Act provides that "not later than the 10th day of each calendar month," any entity shipping cigarettes in smokeless tobacco in interstate commerce shall "file with the tobacco tax administrator of the State into which such shipment is made, a memorandum or a copy of the invoice covering each and every shipment of cigarettes or smokeless tobacco made during the previous calendar month into the state. . . ." 15 U.S.C. § 376(a)(2). See also 15 U.S.C. § 375(10) ("The term 'person' means an individual, corporation, company, association, firm, partnership, society . . . .") The effective date of the PACT Act was June 29, 2010. See PL 111-154, 124 Stat. 1087 (Mar. 31, 2010) ("this Act shall take effect on the date that is 90 days after the date of enactment of this Act"). Accordingly, the first filing date was July 10, 2010, at which time entities shipping tobacco in interstate commerce were required to file a memorandum or invoice copy for each shipment that took place during June 2010.

King Mountain alleges that the Valvo Candies shipment occurred in May 2010 and the State conceded this fact in its brief. (Pl.'s Opp. Br. at 15, n.17 ("[t]hus, because the PACT Act's reporting requirements took effect in June 2010, King Mountain was required to report its May 2010 shipment of cigarettes to Valvo

Candies").)[11]  However, at oral argument, the State argued that the shipment to Valvo Candies occurred on June 29, 2010, and is thus subject to the PACT Act's reporting requirements.

The Court finds that there are genuine issues of material fact as to whether King Mountain was required to make PACT Act filings in connection with its 2010 shipment to Valvo Candies. The only documentary evidence produced by either party with respect to this sale is an invoice dated June 29, 2010 that references a "paid" date of May 20, 2010 and a "ship" date of June 29, 2010. (See Def.'s Mot. Ex. 19, Docket Entry 195-21.)  Neither party has produced any additional documentary evidence that would definitively establish the shipment date of this sale to Valvo Candies.

Accordingly, King Mountain's motion for summary judgment regarding the PACT Act claim is GRANTED IN PART and DENIED IN PART and the State's motion for summary judgment is DENIED.  With respect to King Mountain's motion, the Court DENIES summary

---

[11] Parenthetically, the Amended Complaint asserts both that King Mountain has "knowingly shipped, transported, transferred, sold and distributed large quantities of unstamped and unreported cigarettes to on-reservation wholesalers in New York State" and that King Mountain "sell[s], transfer[s], and otherwise ship[s] such cigarettes to tribal wholesalers and/or retailers in New York State for profit."  (Am. Compl. ¶¶ 56, 81.)  The Amended Complaint does not assert that King Mountain sold cigarettes to a company located outside of an Indian reservation or a company that is not Indian-owned.

judgment regarding the 2010 sale to Valvo Candies and GRANTS summary judgment to King Mountain as to the balance of the State's PACT Act claim.

## II. State Claims

### A. New York Tax Law §§ 471 and 471-e

The State argues that King Mountain waived its res judicata defense by failing to amend its Answer to plead res judicata as an affirmative defense. (Pl.'s Br. at 32-33.) However, it is within this Court's discretion to entertain a res judicata defense asserted in a motion for summary judgment by construing the motion as a motion to amend the answer. Cowan v. Ernest Codelia, P.C., No. 98-CV-5548, 2001 WL 856606, at *5 (S.D.N.Y. Jul. 30, 2001). See also Schwind v. EW & Assocs., Inc., 357 F. Supp. 2d 691, 698 (S.D.N.Y. 2005) (Noting that the Second Circuit has held that the district court may consider an affirmative defense asserted for the first time on a summary judgment motion "so long as the plaintiff has had an opportunity to respond.") (internal quotation marks and citations omitted). Indeed, "[c]ourts have been especially flexible where the defense of res judicata was not available at the pleading stage because the other action had not yet been concluded." Cowan, 2001 WL 856606 at *5 (citations omitted).

Here, it is undisputed that King Mountain's res judicata defense was not available at the pleading stage because the Tax

Proceeding did not conclude until November 2014, well after the filing of King Mountain's Answer and the completion of discovery. (See Def.'s Opp. Br. at 14.) The State has been on notice of King Mountain's res judicata defense since at least October 27, 2015, when King Mountain requested leave to move for summary judgment based, in part, on its argument that the State's third cause of action is precluded by res judicata. (Def.'s Ltr., Docket Entry 173.) Moreover, the extensive briefing on the parties' summary judgment motions has provided the State with ample opportunity to respond to King Mountain's res judicata argument.

The Court is not persuaded by the State's argument, in a footnote, that King Mountain's request to amend its Answer to include a res judicata defense must be denied based on "undue delay or dilatory motive in failing to raise this affirmative defense sooner." (Pl.'s Reply Br. at 9, n.8.) Again, it is beyond cavil that the Tax Proceeding concluded after King Mountain's Answer was filed and at a point when this action had already been pending for years. The State has not established that King Mountain's delay in asserting a res judicata defense was founded in bad faith. Moreover, the State cannot demonstrate prejudice when it has been on notice of King Mountain's asserted defense prior to the filing of the parties' dispositive motions. Accordingly, the Court GRANTS King Mountain leave to amend its Answer to assert a res judicata

affirmative defense with respect to the third cause of action in the Amended Complaint.

### 1. Res Judicata

The doctrine of res judicata provides that "'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action,' not just those that were actually litigated." Caldwell v. Gutman, Mintz, Baker & Sonnenfeldt, P.C., 701 F. Supp. 2d 340, 351 (E.D.N.Y. 2010) (quoting Flaherty v. Lang, 199 F.3d 607, 612 (2d Cir. 1999)). "A federal court must give the same preclusive effect to a state court decision as a state court would give it." Cowan, 2001 WL 856606, at *6. Accordingly, the "binding effect" of the Stipulation of Discontinuance filed in the Tax Proceeding is governed by New York law. Id. at *4.

In New York, res judicata is applicable where there is: "(1) a final, prior adjudication on the merits, (2) that involved the party against whom res judicata is to be invoked, and (3) the claims involved in the current case were, or could have been, raised in the prior case." Marcelin v. Cortes-Vazquez, No. 09-CV-2303, 2010 WL 5665037, at *3 (E.D.N.Y. Dec. 9, 2010), report and recommendation adopted, 2011 WL 346682 (E.D.N.Y. Jan. 28, 2011) (citations omitted).

### a. Final Adjudication on the Merits

The State argues that pursuant to DTF rules, the Stipulation of Discontinuance does not have any binding effect on a subsequent proceeding. (Pl.'s Br. at 32 ("'A stipulation and the admissions therein shall be binding and have effect only in the pending proceeding and not for any other purpose, and cannot be used against any of the parties thereto in any other proceeding.'" (quoting 20 N.Y.C.R.R. 3000.11(e)).) <u>First</u>, the Court notes that the State's cited statutory provision addresses "[s]tipulations for hearing," in which the parties stipulate to "all facts not privileged which are relevant to the pending controversy." 20 N.Y.C.R.R. 3000.11(1)(i). This provision does not address the binding effect of a final stipulation of discontinuance. <u>Second</u>, "a stipulation of discontinuance 'with prejudice' is afforded res judicata effect and will bar litigation of the discontinued causes of action." <u>Pawling Lake Prop. Owners Ass'n, Inc. v. Greiner</u>, 72 A.D.3d 665, 667, 897 N.Y.S.2d 729 (2d Dep't 2010) (citation omitted). While, as addressed <u>infra</u>, whether the State is bound by the Stipulation of Discontinuance is a separate inquiry, the Court finds that the Stipulation of Discontinuance constitutes a final adjudication on the merits.

b. <u>Privity</u>

"A judgment on the merits in a prior action is binding not only on the parties to that action, but on those in privity with them." <u>City of N.Y. v. Beretta U.S.A. Corp.</u>, 315 F. Supp. 2d

256, 265 (E.D.N.Y. 2004) (citation omitted).  Privity is an "amorphous concept" that requires a determination on a case-by-case basis.  Id. (quoting Juan C. v. Cortines, 89 N.Y.2d 659, 667, 679 N.E.2d 1061, 1065, 657 N.Y.S. 2d 581 (N.Y. 1997)).  In general, privity requires that "the connection between the parties must be such that the interest of the nonparty can be said to have been represented in the prior proceeding."  Green v. Santa Fe Indus., Inc., 70 N.Y.2d 244, 253, 514 N.E.2d 105, 108, 519 N.Y.S.2d 793 (N.Y. 1987).

In analyzing whether privity between two government agencies exists for purposes of collateral estoppel, the New York State Court of Appeals has looked to the Restatement Second of Judgments, which provides that:

> If the second action involves an agency or official whose functions and responsibilities are so distinct from those of the agency or official in the first action that applying preclusion would interfere with the proper allocation of authority between them, the earlier judgment should not be given preclusive effect in the second action.

Cortines, 89 N.Y.2d at 669, 679 N.E.2d at 1066 (quoting Restatement (Second) of Judgments § 36, cmt. f).  Accordingly, in certain situations, a final decision on the merits that binds one government agency may not bind a different government agency.  Berretta, 315 F. Supp. 2d at 266 (holding that New York City was not in privity with New York State).  This District has

noted that "New York courts have largely refused to find two functionally independent governmental entities in privity with each other for purposes of preclusion." Id. (collecting cases). But see People ex. rel. Dowdy v. Smith, 48 N.Y.2d 477, 482, 399 N.E.2d 894, 896, 423 N.Y.S.2d 862 (N.Y. 1979) ("[T]he People as prosecutors in the criminal action stood in sufficient relationship with the Division of Parole in the parole proceeding to meet the requirements of the [collateral estoppel] doctrine in this respect.")

The Beretta Court cited four cases in which New York courts found that governmental entities were not in privity for collateral estoppel purposes. Beretta, 315 F. Supp. 2d at 267 (citing Brown v. City of N.Y., 60 N.Y.2d 897, 458 N.E.2d 1250, 470 N.Y.S.2d 573 (N.Y. 1983); Saccoccio v. Lange, 194 A.D.2d 794, 599 N.Y.S.2d 306 (2d Dep't 1993); Doe v. City of Mount Vernon, 156 A.D.2d 329, 547 N.Y.S.2d 272 (2d Dep't 1989); People v. Morgan, 111 A.D.2d 771, 490 N.Y.S.2d 30 (2d Dep't 1985). With the exception of Morgan, each of these cases addressed the effect of a prior criminal proceeding on a subsequent civil matter and held that the application of collateral estoppel was not warranted based on the lack of privity between the district attorney in the prior criminal proceeding and the city or county defendants in the civil matter. In Morgan, the Appellate Division, Second Department held that the prosecution of a criminal assault charge was not precluded

by the determination of a prior administrative proceeding before the New York City Housing Authority. <u>Morgan</u>, 111 A.D.2d at 772.

Here, the Court is not persuaded by the State's argument that DTF's "sole charge" of collecting tax revenues and the Attorney General's broader mission and authority weighs against a finding of privity between these two agencies. (Pl.'s Opp. Br. at 22.) A district attorney is not empowered to address the civil claims that a City or County may assert. Conversely, DTF and the Attorney General clearly have overlapping authority with respect to civil claims as DTF commenced an administrative proceeding to obtain alleged taxes owed by King Mountain under Article 20 of the NYTL and the Attorney General commenced this proceeding asserting claims under Article 20 of the NYTL. Moreover, unlike the previously noted cases cited by the <u>Beretta</u> Court, the prior proceeding at issue in this matter was not a criminal case.

Additionally, the State's attempt to distinguish this matter from <u>State of N.Y. v. Seaport Manor A.C.F.</u>, 19 A.D.3d 609, 797 N.Y.S.2d 538 (2d Dep't 2005), is misplaced. (Pl.'s Opp. Br. at 24, n.25.) In <u>Seaport Manor</u>, the Attorney General and Commissioner of the Department of Health ("DOH") commenced an action alleging that an adult care facility engaged in fraudulent and deceptive business practices. The adult home's alleged violations were the subject of two earlier DOH administrative enforcement proceedings that were both discontinued with prejudice

pursuant to stipulations of settlement. Id. at 610. The Appellate Division, Second Department affirmed the trial court's dismissal of the first four claims to the extent that they were based on violations that occurred prior to the execution of the second stipulation of settlement in the earlier DOH proceeding, holding that "the underlying facts and statutory scheme establish that the Attorney General, who was not a party to the prior enforcement proceedings, was in privity with the DOH." Id.

The State alleges that Seaport Manor is not analogous because in the case at bar, the Attorney General's participation was not "initiated" by DTF and the Attorney General instead "independently initiated this action under a 'public interest' determination." (Pl.'s Opp. Br. at 24, n.25.) However, the fact that DTF is not named as a co-plaintiff in this action does not eradicate the privity between these two governmental entities. As previously noted, both the DTF and Attorney General filed claims under Article 20 of the NYTL--albeit seeking different relief under different legal theories. Moreover, it cannot be said that the Attorney General's responsibility for, inter alia, "prosecut[ing] and defend[ing] all actions and proceedings in which the State is interested," New York Executive Law § 63, is so distinct from the responsibilities of DTF that the application of claim preclusion would disrupt the allocation of authority between them. See Cortinez, 89 N.Y. 2d at 669.

Additionally, the Court is not persuaded that the Tax Proceeding did not permit the Attorney General to "enjoy[ ] a vicarious day in court." (Pl.'s Opp. Br. at 23 (quoting <u>Delamater v. Schweiker</u>, 721 F.2d 50, 54 (2d Cir. 1983)).) Courts have not hesitated to deem a claim barred by res judicata "'[w]hen an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate.'" <u>U.S. v. Town of Bolton Landing, N.Y.</u>, 946 F. Supp. 162, 167 (N.D.N.Y. 1996) (quoting <u>U.S. v. Utah Constr. & Mining Co.</u>, 384 U.S. 394, 422, 86 S. Ct. 1545, 1560, 16 L. Ed. 2d 642 (1966). The Second Circuit has held, in the context of collateral estoppel, that an administrative determination cannot be the basis for preclusion unless it was an "adjudicative decision," in which the agency decided to grant or deny a privilege "using procedures substantially similar to those employed by the courts." <u>Metromedia Co. v. Fugazy</u>, 983 F.2d 350, 366 (2d Cir. 1992), <u>abrogated on other grounds as recognized by Yung v. Lee</u>, 432 F.3d 142, 147-48 (2d Cir. 2005). <u>Compare</u> <u>Delamater</u>, 721 F.2d at 53 (holding that res judicata was not applicable to a prior Social Security Administration benefits determination where "[t]here was no hearing, no testimony, no subpoenaed evidence, no argument, no opportunity to test any contention by confrontation") <u>with</u> <u>Bolton Landing</u>, 946 F. Supp. at 169 ("[a]lthough the parties did not call

witnesses, the full participation of the parties, the briefing, the oral testimony, the submission of the affidavits, and the substantial documentary support upon which the [administrative] determination largely rests demonstrate that the parties had an adequate opportunity to litigate the issues").

Here, DTF issued a Notice of Determination stating that an audit revealed that King Mountain owed $1,259,250 in taxes. (Def.'s Mot. Ex. 13, Docket Entry 195-15.) In response, King Mountain filed a Petition for Redetermination of Deficiency, which was answered by DTF. (Pl.'s Opp. Ex. C, Docket Entry 203-1; Def.'s Mot. Ex. 14, Docket Entry 195-16.) King Mountain's Petition was presided over by an Administrative Law Judge (the "ALJ") who conducted at least one pre-hearing conference call with DTF and King Mountain. (Def.'s Mot. Ex. 15, Docket Entry 195-17.) While DTF and King Mountain ultimately settled rather than proceeding to a hearing, the ALJ issued an Order of Discontinuance which stated that the DTF's assessment was cancelled and discontinued with prejudice. (Def.'s Mot. Ex. 17, Docket Entry 195-19.) The Court finds that the proceedings before the ALJ provided DTF and King Mountain with a "full and fair opportunity to litigate their claims" such as to constitute an adjudicatory process and that the Order of Discontinuance "is analogous to a withdrawal with prejudice entered into during the course of litigation in a court of law." Hughes v. Lillian Goldman Family, LLC, 153 F. Supp. 2d

435, 448-49 (S.D.N.Y. 2001) (Holding that certain claims were barred by res judicata based on a conciliation agreement settling the plaintiff's New York State Department of Human Rights complaint.).

Finally, the State's argument that it did not have a "vicarious day in court" because the administrative rules do not provide for discovery procedures as set forth in the CPLR and "[t]hus, the Tax Department had no means for testing King Mountain's petition allegations," is not persuasive. (Pl.'s Opp. Br. at 23.) The previously noted case law does not mandate that relevant administrative proceeding implement identical procedures to those employed by the courts but merely that the relevant procedures are "substantially similar." See Metromedia Co., 983 F.2d at 366.

### c. Claims Raised in the Prior Case

New York employs a transactional approach in which a later claim is precluded if it "aris[es] out of the same factual grouping as an earlier litigated claim even if the later claim is based on legal theories or seeks dissimilar or additional relief." Marcelin, 2010 WL 5665037, at *3 (internal quotation marks and citation omitted). Pursuant to this approach, "parties are prevented 'from raising in a subsequent proceeding any claim they could have raised in the prior one, where all of the claims arise from the same underlying transaction.'" Falardo v. N.Y.

City Police Dep't, 566 F. Supp. 2d 283, 285-86 (S.D.N.Y. 2008) (quoting Schulz v. Williams, 44 F.3d 48, 53 (2d Cir. 1994)).

In determining the "factual grouping" that should be considered a "transaction" the Court analyzes "how 'the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether . . . their treatment as a unit conforms to the parties' expectations or business understandings or usage.'" Union St. Tower, LLC v. Richmond, 84 A.D.3d 784, 785 (2d Dep't 2011) (quoting Smith v. Russel Sage Coll., 54 N.Y. 2d 185, 192-93 (N.Y. 1981) (ellipsis in original)). This doctrine is not to be mechanically employed as the Court's analysis "requires consideration of the realities of litigation." Hughes, 153 F. Supp. at 447 (internal quotation marks and citations omitted).

It is well-settled that the doctrine of res judicata cannot be avoided by "splitting" a claim into multiple lawsuits "based on different legal theories (with different evidence 'necessary' to each suit)." Waldman v. Village of Kiryas Joel, 207 F.3d 105, 110 (2d Cir. 2000) (alteration in original; citation omitted). Indeed, "the facts essential to the barred second suit need not be the same as the facts that were necessary to the first suit" and it suffices that "'the facts essential to the second were [already] present in the first.'" Id. at 110-11 (internal quotation marks and citation omitted; alteration in original).

As previously noted, the Amended Complaint asserts a claim under NYTL Sections 471 and 471-e and alleges that King Mountain violated and continues to violate these provisions by "possessing cigarettes for sale in New York State . . . upon which no state excise tax has been paid, and the packages of which have no tax stamps affixed" and by "failing to ship their unstamped cigarettes from outside New York directly to a New York-licensed stamping agent so that excise tax can be paid and tax stamps properly affixed." (Am. Compl. ¶¶ 87-88.) Specifically, the Amended Complaint details the November 6, 2012, purchase of unstamped King Mountain cigarettes by a State investigator (the "November 6th Purchase") as well as the December 3, 2012, discovery of unstamped King Mountain cigarettes by the state police (the "December 3rd Inspection").[12] (Am. Compl. ¶¶ 61-65, 67.)

The Court finds that the December 3rd Inspection arises out of the same factual grouping as the facts underlying the Tax Proceeding. DTF's Notice of Determination states, in relevant

---

[12] While the State alleges that "none of the cigarettes at issue in this case were seized by the State Police or any other state agency," (Pl.'s Opp. Br. at 18), the record does not contain specific information as to the particular cigarettes seized on December 3, 2012, and the Court is unable to definitively conclude that the seized cigarettes are excluded from the extensive list of cigarette sales set forth in the State's 56.1 Statement. (Pl.'s 56.1 Stmt. ¶¶ 66-79.) Accordingly, in an abundance of caution, the Court will determine whether any claim regarding the cigarettes seized on December 3, 2012, is barred by res judicata.

part, "[o]n 12/03/12, you were found to be in possession and/or control of unstamped or unlawfully stamped cigarettes, and/or untaxed tobacco products. Therefore, penalty is imposed under Article 20 of the New York State Tax Law."[13] (Def.'s Mot. Ex. 13, at 3.) Thus, the Tax Proceeding resolved the State's claim that King Mountain was liable under the NYTL for possession of the unstamped cigarettes discovered in the December 3rd Inspection. The State's claim that King Mountain violated Article 20 by failing to ship their cigarettes to a licensed stamping agent could have been raised in the Tax Proceeding with respect to the cigarettes discovered during the December 3rd Inspection. Accordingly, the State's cause of action under Sections 471 and 471-e is barred by res judicata to the extent that it addresses the unstamped cigarettes discovered during the December 3rd Inspection.

Whether the cigarettes implicated in the November 6th Purchase are barred by res judicata presents a closer issue. There appears to be no dispute that the November 6th Purchase was not addressed in the Tax Proceeding. Instead, King Mountain argues that all of the State's claims under Article 20—including its claims regarding the November 6th Purchase--are precluded because they could have been raised in the Tax Proceeding. (Def.'s Opp. Br. at 13-14.) However, the Court declines to characterize the

---

[13] The Court notes that Article 20 of the New York State Tax Law includes Sections 471 and 471-e.

Tax Proceeding as an umbrella that encompasses all claims regarding untaxed cigarettes prior to December 2012. The November 6th Purchase arises out of a different underlying factual transaction than the December 3rd Inspection--namely, the purchase of unstamped cigarettes at a smoke shop on the Poospatuck Reservation in Suffolk County rather than the search and seizure of a truck of unstamped cigarettes in Clinton County. Accordingly, the State's third claim is not barred to the extent it addresses the November 6th Purchase.

    2. Merits

As previously noted, the Amended Complaint alleges that King Mountain has "violated, and continue[s] to violate, New York Tax Law §§ 471 and 471-e by possessing cigarettes for sale in New York State . . . upon which no state excise tax has been paid, and the packages of which have no tax stamps affixed."[14] (Am. Compl. ¶ 87.) The Amended Complaint also alleges that King Mountain violated Section 471 by "failing to ship their unstamped cigarettes from outside New York directly to a New York-licensed stamping agent so that the excise tax can be paid and tax stamps properly affixed." (Am. Compl. ¶ 88.) The Court will address each alleged violation of Section 471 in turn.

---

[14] The Court notes that the State is not requesting that King Mountain satisfy the taxes allegedly owed with respect to these cigarette shipments. (Am. Compl. at 25-26.)

## a. Possession of Cigarettes for Sale

Section 471 provides that "[t]here is hereby imposed and shall be paid a tax on all cigarettes <u>possessed</u> in the state by any person for sale[.]"  N.Y. Tax L. § 471(1) (emphasis supplied). There is a presumption that all cigarettes in New York State are subject to tax and the "person in possession thereof" bears the burden of establishing that any cigarettes are not taxable.  <u>Id.</u> Article 20 of the NYTL does not define the term "possession."  <u>See</u> N.Y. Tax L. § 470.  NYTL Section 471-e establishes an "Indian tax exemption coupon system" regarding the purchase of tax exempt cigarettes by Indian nations or tribes for members' personal consumption.  N.Y. Tax L. ¶ 471.e.

The State does not allege that King Mountain physically possessed unstamped cigarettes in New York State.  It is undisputed that King Mountain utilized a common carrier to transport its cigarettes to Indian reservations and/or Indian-owned businesses in New York State.  (Pl.'s 56.1 Counterstmt., Docket Entry 195-4 ¶ 14.)  However, the State argues that an out-of-state manufacturer such as King Mountain "possesses" the cigarettes that its common carrier transports within New York State, relying on <u>Harder's Express, Inc. v. State Tax Comm.</u>, 70 A.D.2d 1010, 1011 (3d Dep't 1979), <u>aff'd</u>, 50 N.Y.2d 1050.  (Pl.'s Supp. Br., Docket Entry 213, at 8.)  The Court disagrees.

As previously noted, Article 20 of the New York Tax Law does not define the term "possession." "Well-established principles of construction dictate that statutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there." U.S. v. Sabhnani, 599 F.3d 215, 255 (2d Cir. 2010) (internal quotation marks and citation omitted). "Possession" is defined as "the act of having or taking into control" or "control or occupancy of property without regard to ownership." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th Ed. 2006). It is undisputed that King Mountain did not exercise control over the King Mountain brand cigarettes that entered New York State; the common carrier exercised control over the King Mountain cigarettes it was transporting in New York State. Thus, King Mountain was not in "possession" of cigarettes as contemplated by Section 471.

The State's reliance on the Appellate Division, Third Department's decision in Harder's Express is misplaced.[15] In that case, after unstamped cigarettes were stolen from a common carrier prior to delivery, the State Tax Commission demanded that the

_____

[15] King Mountain argues that the Court should not consider the State's argument regarding Harder's Express as it was raised for the first time on reply. (Def.'s Supp. Br., Docket Entry 212, at 4.) However, the Court finds that the State's argument regarding Harder's Express relates to its initial argument asserted in its moving brief that King Mountain was in "possession" of cigarettes pursuant to Section 471.

common carrier pay the cigarette tax and an assessment. _Harder's_ _Express_, 70 A.D.2d at 1010. The Third Department rejected the State Tax Commission's argument that the theft of the cigarettes constituted a sale as defined by the NYTL, which thereby required the common carrier to pay a tax based on its possession of the unstamped cigarettes. _Id._ The court concluded that: (1) a "mere change of physical custody" is not a "sale" of cigarettes, and (2) a common carrier only possesses cigarettes "for the purpose of facilitating a sale." _Id._ at 1011. The Court held that Article 20 of the Tax Law was not applicable to the "transfer of cigarettes by theft." _Id._

The State argues that since a common carrier does not "possess" cigarettes for sale pursuant to _Harder's Express_, it follows that the cigarettes remained in King Mountain's "possession" while the common carrier was transporting them into New York State. (Pl.'s Reply Br. at 6.) The Court declines to adopt the State's creative inversion of the _Harder's Express_ holding. The fact that a common carrier does not "possess" cigarettes under Section 471 does not automatically result in the manufacturer maintaining "possession" during the transportation process.

The Court is also not persuaded by the State's reliance on 20 N.Y.C.R.R. Section 74.3, which provides that cigarettes may be introduced into New York State without the presumption that a

taxable event occurred where the cigarettes are transported by common carrier, stored in a bonded or public warehouse, and exclusively sold to licensed cigarette agents. 20 N.Y.C.R.R. § 74.3(a)(1). That provision also states that "[d]ealers and manufacturers, other than agents, in possession of unstamped packages of cigarettes . . . may be held liable for the cigarette tax and for violation of the Tax Law and this Title." <u>Id.</u> This statute echoes Section 471 in that manufacturers are liable for taxes to the extent they are in "possession" of unstamped cigarettes. Once again, the Court declines to go beyond the plain meaning of the word "possession" and expand it so that a manufacturer is in "possession" of cigarettes transported by common carrier.

In the absence of express direction from the New York State legislature, the Court will not rewrite Section 471 and expand the definition of "possession" to encompass an out-of-state manufacturer utilizing a common carrier to transport cigarettes within New York State. Accordingly, King Mountain is not liable for cigarette taxes pursuant to Section 471.

b. <u>Failure to Ship Unstamped Cigarettes to Agent</u>

King Mountain concedes that: (1) it it is a "wholesale dealer,"[16] as defined by Section 471, (2) it is not a licensed

---

[16] "Wholesale dealer" is defined as "[a]ny person who (a) sells cigarettes or tobacco products to retail dealers or other

stamping agent,[17] and (3) it "did not sell its cigarettes to stamping agents licensed by the State of New York (because it sold cigarettes directly to Indian tribes and companies owned by members of Indian tribes)." (Def.'s Opp. Br. at 20.) While Section 471 permits the sale of unstamped cigarettes to licensed stamping agents who provide certifications that the cigarettes will not be resold in violation of Article 20, New York Tax Law § 471(4)(a)-(b), it requires that "[a]ll cigarettes sold by agents and wholesalers to Indian nations or tribes or reservation cigarette sellers located on an Indian reservation must bear a tax stamp," N.Y. Tax Law § 471(2). Thus, King Mountain violated Section 471 by admittedly failing to sell its unstamped cigarettes to licensed stamping agents. See City of N.Y. v. Golden Feather Smoke Shop, Inc., No. 08-CV-3966, 2013 WL 3187049, at *27 (E.D.N.Y. Jun. 20, 2013) (Noting that agents are meant to be the sole point of entry for cigarettes and "[a]s a result, reservation retailers should theoretically no longer be able to obtain unstamped cigarettes.").

---

persons for purposes of resale, or (b) owns, operates or maintains one or more cigarette or tobacco product vending machines in, at or upon premises owned or occupied by another person, or (c) sells cigarettes or tobacco products to an Indian nation or to a reservation cigarette seller on a qualified reservation. N.Y. Tax Law § 470(8).

[17] "Agent" is defined as "[a]ny person licensed by the commissioner of taxation and finance to purchase and affix adhesive or meter stamps on packages or cigarettes under this article." N.Y. Tax Law § 470(11).

Accordingly, the State's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The State's motion is GRANTED with respect to its claim that King Mountain violated Section 471 by selling unstamped cigarettes directly to Indian nations or tribes and/or reservation cigarette sellers or entities that are not licensed stamping agents. The State's motion is DENIED with respect to its claim that King Mountain is liable under Section 471 for its "possession" of cigarettes.

The Court notes that the Amended Complaint does not expressly specify the relief that the State is seeking with respect to its third cause of action. (See generally Am. Compl. at 25-26.) The Court will address the issue of the particular relief the State is seeking in connection with the third cause of action after the completion of the trial in this matter.

B. New York Tax Law § 480-b

New York Tax Law Section 480-b provides, in relevant part that:

> Every tobacco product manufacturer . . . whose cigarettes are sold for consumption in this state shall annually certify under penalty of perjury that, as of the date of such certification, such tobacco product manufacturer: (a) is a participating manufacturer as defined in [the Public Health Law]; or (b) is in full compliance with [Public Health Law Section 1399-pp(2)] . . .

N.Y. Tax L. § 480-b(1). Additionally, the submission of such certification by tobacco product manufacturers "shall be

accompanied by a list setting forth each of the cigarette brands of such tobacco product manufacturer sold for consumption in New York state." N.Y. Tax L. § 480-b(1). The New York Public Health Law defines "tobacco product manufacturer" as including an entity that "manufactur[es] cigarettes anywhere that such manufacturer intends to be sold in the United States[.]" N.Y. Pub. Health L. § 1399-oo(9)(a). Public Health Law Section 1399-pp(2) provides that any tobacco manufacturer selling cigarettes to consumers in New York State must either: (1) become a participating manufacturer pursuant to the Master Settlement Agreement[18]; or (2) place a proscribed amount of funds per unit sold into a qualified escrow fund each year. N.Y. Pub. Health L. § 1399-pp(2)(a).

The State alleges that King Mountain has failed to provide the certifications required under Section 480-b and "has not joined the 1998 Tobacco Master Settlement Agreement, and has not otherwise complied with the State's escrow requirements." (Pl.'s Br. at 34.) In support, the State submits the Declaration of Peter Spitzer dated February 21, 2013, ("Spitzer Decl.")

---

[18] In November 1998, four cigarette manufacturers settled litigation with states that included New York by entering into a Master Settlement Agreement in which "[i]n return for releases from liability, these manufacturers agreed to make substantial annual payments to compensate the states for health care expenses incurred in the past and expected to be incurred in the future as a result of their populations' smoking-related ailments." Freedom Holdings, Inc. v. Cuomo, 624 F.3d 38, 42 (2d Cir. 2010).

originally submitted in support of the State's application for a preliminary injunction. (Pl.'s Mot. Ex. 33, Docket Entry 197-40.) Mr. Spitzer, an Excise Tax Technician with DTF, asserts that a search of the agency's records revealed that King Mountain did not certify "that it is either a participating manufacturer under the MSA and has generally performed its obligations thereunder, or is in full compliance with New York Public Health Law § 1399-pp(2) by having deposited the required amount of escrow per cigarette sold in the state." (Spitzer Decl. ¶¶ 1, 6.) Mr. Spitzer also avers that DTF records reveal that King Mountain did not submit a list of the cigarette brands it sells in New York State pursuant to Section 480-b(1). (Spitzer Decl. ¶ 7.) Further, King Mountain admits in its Answer that it has not filed certifications or a list of the cigarette brands it sells in New York State pursuant to Section 480-b. (See Am. Compl. ¶¶ 75, 92; Ans., Docket Entry 47, ¶ 20.)

In opposition, King Mountain argues that "there is no evidence in the record that King Mountain knowingly violated New York Tax Law § 480-b, because King Mountain only engaged in Nation-to-Nation sales within the boundaries of New York State." (Def.'s Opp. Br. at 22.) King Mountain avers that it only sold cigarettes to Indian Nations and Indian-owned companies with a "single exception;" the Court Assumes this "single exception" is its sale to Valvo Candies in which it sold to a non-Native American owned

corporation. (Def.'s Opp. Br. at 22-23.) Notably, King Mountain does not proffer any proof that it complied with Section 480-b.

First, King Mountain concedes that it made its infamous sale to Valvo Candies, a New York State company that is not owned by an Indian Nation or tribe or a member of an Indian Nation or tribe. Accordingly, King Mountain is a "tobacco product manufacturer . . . whose cigarettes are sold for consumption in this state," and was required to comply with Section 480-b. Second, there is no exception in Section 480-b for cigarette sales to Indian Nations or Indian-owned companies located on qualified reservations. Unlike the PACT Act, which, as previously noted, includes definitions of "state," "Indian country," and "interstate commerce," neither Section 480-b nor the definitions set forth in NYTL Section 470 define the term "state." The Court declines to hold that Section 480-b is inapplicable to cigarettes sales to Indian Nations and/or Indian-owned companies located on reservations in the absence of any statutory support for the creation of such an exception. Accordingly, the State's motion for summary judgment is GRANTED with respect to its claim under Section 480-b.

C.   New York Executive Law § 156-c

1.   Failure to File Certifications

New York Executive Law Section 156-c ("Section 156-c") provides that "no cigarettes shall be sold or offered for sale in

this state unless the manufacturer thereof has certified in writing to the office of fire prevention and control that such cigarettes meet the performance standards prescribed by the office of fire prevention and control pursuant to subdivision two of this section." N.Y. EXEC. L. § 156-c(3). The State argues that King Mountain has failed to certify in writing to the New York State Office of Fire Prevention and Control that its cigarettes meet the relevant performance standards. (Pl.'s Br. at 34.) King Mountain has failed to respond to this argument or proffer any evidence that it has submitted the requisite certifications. (See Def.'s Opp. Br. at 22-23.)

King Mountain admitted that it has not submitted such certifications in its Responses to Plaintiff's First Request for Admissions under Rule 36 dated November 20, 2013. (Pl.'s Mot. Ex. 18, Docket Entry 197-25, ¶ 6.) To the extent that King Mountain's opposition brief could be construed as asserting that it need not file certifications because it does not sell cigarettes in New York State based on its "Nation to Nation" sales, Section 156-c contains no such exception. Accordingly, the State's motion for summary judgment is GRANTED with respect to its claim that King Mountain failed to file certifications in violation of Section 156-c.

## 2. "FSC" Labeling

Section 156-c also provides that "[n]o cigarettes shall be distributed, sold or offered for sale in this state unless the manufacturer has placed on each individual package the letters 'FSC' which signifies Fire Standards Compliant." N.Y. EXEC. L. § 156-c(6). It is unclear whether the State has abandoned an additional aspect of its Section 156-c claim--that King Mountain has failed to affix the required Fire Standards Compliant mark on its packaging--based on its failure to include such argument in its moving brief. (See Am. Compl. ¶ 96 ("Defendant King Mountain has similarly failed to place the required 'FSC' (Fire Standards Compliant) mark on the packages of cigarettes it manufactures which are distributed, sold, or offered for sale in New York."); Pl.'s Br. at 34.) In any event, the Court finds that King Mountain has raised genuine issues of material fact as to whether it affixed the letters "FSC" to its cigarettes in accordance with Section 156-c. King Mountain has produced a photograph of a box of its cigarettes that contains the letters "FSC" on its packaging. (Def.'s Opp. Ex. A, Docket Entry 202-2.) Additionally, King Mountain cites to the deposition testimony of State Investigator Andrew Scala in which Mr. Scala states that the letters "FSC" on the King Mountain package of cigarettes signifies compliance with the relevant state fire safety code requirement. (Def.'s Mot. Ex. 10, Docket Entry 195-12, 83:4-84:14.)

While the Court concurs with the State that King Mountain has not established that it meets the "fire-safe" standards specific to New York, (see Pl.'s Reply Br. at 10), the submission of evidence of a King Mountain cigarette box bearing the letters "FSC" raises issues of fact as to whether King Mountain complied with the packaging requirements set forth in Section 156-c(6). Parenthetically, the Court notes that the Amended Complaint only asserts that King Mountain failed to file the requisite certifications and failed to place the required "FSC" mark on its packaging; it does not allege that King Mountain Cigarettes do not meet fire-safe standards. (See generally Am. Compl. ¶¶ 94-98.) Accordingly, summary judgment is DENIED with respect to the State's claim that King Mountain failed to affix the fire safety compliant mark to its cigarettes in violation of Section 156-c.

## CONCLUSION

For the foregoing reasons, King Mountain's motion for summary judgment (Docket Entry 195) is GRANTED IN PART AND DENIED IN PART and the State's motion for summary judgment (Docket Entries 197 and 198) is GRANTED IN PART AND DENIED IN PART. Summary judgment is GRANTED in favor of King Mountain on the State's first claim under the CCTA. Summary judgment on the second claim under the PACT Act is DENIED regarding the 2010 sale to Valvo Candies and GRANTED in favor of King Mountain as to the balance of the State's PACT Act claim. With respect to the State's third claim

under NYTL Sections 471 and 471-e, summary judgment is GRANTED in favor of King Mountain regarding King Mountain's alleged possession of unstamped cigarettes in New York State and GRANTED in favor of the State regarding King Mountain's failure to sell its unstamped cigarettes to licensed stamping agents.  Summary judgment is GRANTED in favor of the State on its fourth claim pursuant to Section 480-b.  With respect to the State's fifth claim, summary judgment is GRANTED in favor of the State regarding its claim that King Mountain failed to file certifications pursuant to New York Executive Law Section 156-c and DENIED as to its claim that King Mountain failed to affix the Fire Standards Compliant mark to its cigarette packages.


                                        SO ORDERED.


                                        /s/ JOANNA SEYBERT_____
                                        Joanna Seybert, U.S.D.J.

DATED:      July _21_, 2016
            Central Islip, New York