FILED

NOV 22 2019

YAKIMA COUNTY CLERK

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR YAKIMA COUNTY

KING MOUNTAIN TOBACCO COMPANY,
INC.,

        Plaintiff,

    v.

KAMIAKIN WHEELER, KANIM JAMES,
and LONE WARRIOR HOLDINGS, INC.

        Defendants.

Case No. 19 2 0 4 3 0 9 3 9

COMPLAINT

COMPLAINT

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

## I.  INTRODUCTION

1.1     Plaintiff, King Mountain Tobacco Company, Inc. ("King Mountain"), employed Defendants Kamiakin Wheeler ("Kamiakin Wheeler") and Kanim James ("James") to further King Mountain's business.   Instead of doing so, Kamiakin Wheeler and James used King Mountain as their personal piggybank.  During their employment with King Mountain, Kamiakin Wheeler and James were also taking steps to compete with King Mountain—through Defendant Lone Warrior Holdings, Inc. ("Lone Warrior")—by leveraging King Mountain's business for Defendants' benefit.

1.2     Kamiakin Wheeler and James committed outright theft from King Mountain, stealing millions in cigarettes from King Mountain and selling them for their own personal gain. Kamiakin Wheeler and James even used King Mountain cigarettes to trade for a machine to manufacture cigarettes, which is now being used by Lone Warrior to compete with King Mountain. Kamiakin Wheeler and James, while employees, also acted against the interest of King Mountain, by (among other things) registering trademarks in the name of Lone Warrior that are now being used to compete against King Mountain.

1.3     Defendants have breached their fiduciary duty to their employer, breached their employment contracts, tortuously interfered with King Mountain's contracts and prospective business relationships, stole from King Mountain, and unjustly enriched themselves at the expense of King Mountain.

1.4     Defendants should not be permitted to gain at the expense of King Mountain. Therefore, King Mountain brings the instant complaint to recoup funds for stolen property, obtain compensation for its lost business relationships, and obtain the property that Defendants acquired using goods that belonged to King Mountain.

COMPLAINT - 2 -

## II.   PARTIES

2.1   Plaintiff King Mountain is a corporation formed and organized under the laws of the Yakama Indian Nation. It is also registered to do business in Washington as a foreign corporation. King Mountain has its principal place of business within the Yakama Indian Reservation at 2000 Fort Simcoe Road in White Swan, Washington 98952.

2.2   Defendant Kamiakin Wheeler is a former employee of King Mountain Tobacco. He lives at 1180 North White Swan Road, White Swan, WA 98952.

2.3   Defendant James is also a former employee of King Mountain. He lives at 3330 Harrah Road, Harrah, WA 98933.

2.4   Defendant Lone Warrior is a corporation formed and organized under the laws of the Yakama Indian Nation. Lone Warrior is also registered as a foreign corporation with the state of Washington.  Its president and incorporator is Kamiakin Wheeler. According to state filings, it is located at 2600 Business Parkway, Suite 300, Yakima WA 98903.

## III.   JURISDICTION AND VENUE

3.1   Section 8 of the Employment Contracts entered into between (i) King Mountain and (ii) Kamiakin Wheeler and James provided that

> This Agreement shall be construed and enforced in accordance with the laws of the State of Washington and any disputes under this Agreement shall be brought in the courts of the State of Washington. Jurisdiction for resolution of any claims arising from this Agreement shall be vested exclusively in the courts of the State of Washington.

Kamiakin Wheeler's Employment Contract is attached as Exhibit 1, and James's Employment Contract is attached as Exhibit 2.

3.2   In addition, the amount in controversy of this action exceeds $3,000. Therefore, jurisdiction is proper in this Court. *See* Wash. Const. Art. IV § 6; RCW § 2.08.010

COMPLAINT - 3 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

1    3.3    Venue is proper in this Court because one or more of the Defendants resides in

2  Yakima County. RCW 4.12.025(1).

3                        **IV.    FACTUAL ALLEGATIONS**

4    4.1    Delbert Wheeler Sr ("Delbert") was a highly successful businessman who (among

5  other businesses) founded King Mountain, a fuel distribution company, convenience stores, a

6  gravel pit, and various farming operations. All of these businesses are located on and operate

7  within the Yakama Reservation.

8    4.2    Delbert and his wife Trina Ann Wheeler ("Trina") co-owned the businesses, and

9  Trina helped Delbert start, establish, build, and operate many of the businesses. Delbert and

10  Trina were financially limited when they started, but through their hard work were able to grow

11  and develop their businesses.

12    4.3    Relevant to this action are the events regarding King Mountain. It was

13  incorporated in November 2005 as a Yakama Nation business and was registered as a foreign

14  corporation with Washington state in November 2005. Delbert and Trina were the incorporators

15  and owners of King Mountain.

16    4.4    Sadly, Delbert passed away on June 30, 2016. He was survived by Trina and

17  thirteen children, including Terryanna Wheeler ("Terryanna") and Kamiakin Wheeler.

18    4.5    When Delbert passed away in 2016, Kamiakin Wheeler was vice-president and

19  James was secretary and treasurer of King Mountain. Kamiakin Wheeler and James were also

20  directors.

21    4.6    After Delbert's death, Trina and Terryanna were eventually appointed co-

22  administrators of his estate.

23    4.7    Kamiakin Wheeler, unsatisfied with his distribution (or lack thereof) and the

COMPLAINT - 4 -

1   appointment of his mother and younger sister as co-administrators, sought to challenge the

2   distribution of the estate in Yakama Nation Court. That challenge was rejected by the Yakama

3   Nation Court, and Delbert's estate was distributed in large part to Trina.

4       4.8    Despite Kamiakin Wheeler's objections to the distribution of Delbert's estate, he

5   and James were permitted to run King Mountain's day-to-day operations. They were also

6   permitted to remain as King Mountain's officers and directors.

7       4.9    However (as detailed more fully below), after approximately eighteen months of

8   Kamiakin Wheeler's and James's leadership of the company, King Mountain hired a

9   restructuring company. In connection with doing so, Kamiakin Wheeler and Kanin were

10   removed as officers and directors of King Mountain. They remained King Mountain employees.

11   **A.**    **King Mountain Seeks To Expand Its Business To California With Diamond
    Mountain Manufacturing**

12   

13       4.10    Cigarette and tobacco-product manufacturing is a highly regulated industry.

14   Multiple government agencies, including the U.S. Food and Drug Administration ("FDA") and

15   the Alcohol and Tobacco Tax and Trade Bureau ("TTB"), have numerous requirements that must

16   be followed to sell tobacco products.

17       4.11    One of King Mountain's advantages is that it owns "Predicate Blends" of tobacco

18   that can be used in cigarettes. The FDA prohibits cigarette companies from creating new tobacco

19   blends that can be used in cigarettes absent approval of the FDA. However, entities with pre-

20   existing tobacco blends were "grandfathered" into regulatory approval ("Predicate Blend") and,

21   therefore, can much more easily obtain regulatory approval to sell new cigarettes with their

22   preexisting Predicate Blends.

23       4.12    Another King Mountain advantage is, depending on the method of sale, that it is

COMPLAINT - 5 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

1   not subject to certain taxes associated with the sale of cigarettes. Other Native American-owned

2   businesses also may not be subject to these taxes.

3       4.13    King Mountain wanted to expand its business by using these two advantages. In

4   or around the spring of 2017, King Mountain started negotiations with Diamond Mountain

5   Manufacturing, LLC ("Diamond Mountain"), a tribal business operating under the auspices of

6   the Susanville Indian Racheria Corporation ("SIRCO"). Diamond Mountain (like SIRCO) is

7   located in or around Susanville, California.

8       4.14    King Mountain sought to license its Predicate Blends to Diamond Mountain, who

9   would resell the cigarettes and pay King Mountain a royalty for doing so. King Mountain

10  anticipated that this relationship would be highly profitable. And because this was a licensing

11  arrangement, all of this money would accrue as profits to King Mountain.

12      4.15    As part of those negotiations, Kamiakin Wheeler and James used information

13  confidential and/or proprietary to King Mountain regarding its relationship with Diamond

14  Mountain, such as:

15      a.      How King Mountain licensed its Predicate Blends of tobacco to Diamond

16              Mountain;

17      b.      Services King Mountain would need to perform to get Diamond Mountain's

18              operation up and running;

19      c.      Assistance with finding Diamond Mountain equipment;

20      d.      King Mountain's branding strategy to support Diamond Mountain's cigarette

21              sales;

22      e.      Expansion opportunities that would allow King Mountain to sell its products in

23              other states;

COMPLAINT - 6 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

1   f.   The structure King Mountain would use with Diamond Mountain so that the deal

2        would be most effective for King Mountain;

3   g.   King Mountain's practices for both accounting and for complying with various

4        governmental reporting obligations; and

5   h.   King Mountain's pricing strategy for cigarette sales and the royalty payment.

6   All of this information exchange gave King Mountain—and, by extension, Kamiakin Wheeler

7   and James—insight into how best to structure an arrangement with Diamond Mountain.

8        4.16    As part of these efforts, Diamond Mountain needed to obtain the use of machines

9   to manufacture cigarettes. Even used machines can cost hundreds of thousands of dollars.

10  Kamiakin Wheeler and James assisted Diamond Mountain with those efforts by sourcing the

11  necessary cigarette manufacturing machines.

12       4.17    Kamiakin Wheeler and James traded for the cigarette manufacturing machines by

13  providing a delivery of King Mountain cigarettes. No purchase orders, invoices, bill of Lading,

14  or other documentation was provided with the King Mountain cigarettes shipped out in exchange

15  for the manufacturing machines.

16       4.18    After using King Mountain cigarettes to purchase the cigarette manufacturing

17  machines, Kamiakin Wheeler and James did not make King Mountain owner of those machines.

18  Instead, Kamiakin Wheeler and James had Lone Warrior lease the cigarette manufacturing

19  machines to Diamond Mountain.

20       4.19    In September 2017, Kamiakin Wheeler considered trademarking the "Mountain

21  Heritage" brand for the sales with Diamond Mountain. But instead of registering the intellectual

22  property in the name of King Mountain (who would be entering into the deal with Diamond

23  Mountain), Kamiakin Wheeler wanted the trademark to be owned by Lone Warrior, which he

COMPLAINT - 7 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

1    incorporated that same month.

2        4.20    Thereafter, James and Kamiakin Wheeler continued to help Diamond Mountain to

3    develop the "Mountain Heritage" brand and otherwise develop the business relationship between

4    King Mountain and Diamond Mountain.

5        4.21    King Mountain also considered a "Chieftain" brand of cigarettes that would be

6    sold with Diamond Mountain.  As described in more detail below, Kamiakin Wheeler eventually

7    registered the Chieftain trademark in the name of Lone Warrior.

8        4.22    At or around the time of the trademark searches by Kamiakin Wheeler and James,

9    Dolph Barnhouse at Barnhouse Keegan Solimon & West (located in New Mexico), King

10   Mountain's then-lawyer (who was also representing Diamond Mountain in that transaction),

11   researched a number of potential trademarks for King Mountain, including Mountain Heritage,

12   Rainier, and Chieftain.

13   **B.    King Mountain Seeks To Expand Its Business To New York With Jacobs Tobacco Company**

14

15       4.23    In furtherance of King Mountain's expansion plans, King Mountain entered

16   negotiations with Jacobs Tobacco Company ("Jacobs") in or around October 2017.  Those

17   negotiations carried on into 2018.

18       4.24    Jacobs has its principal place of business in New York state, where King

19   Mountain had previously made sales of its own cigarettes on Indian reservations.

20       4.25    To set up the deal, Jacobs provided material for the deal, such as its federal

21   tobacco license details and packaging information so that King Mountain could create a cigarette

22   box for Jacobs. James and other King Mountain employees travelled to New York to meet with

23   Jacobs representatives.

COMPLAINT - 8 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

1       4.26   Under the proposed agreement, Jacobs would manufacture King Mountain's

2   cigarettes in New York and use King Mountain's proprietary information (such as trademarks

3   and Predicate Blends, etc.). Jacobs would then sell King Mountain cigarettes in New York state.

4       4.27   King Mountain also considered a licensing deal with Jacobs, similar to the

5   arrangement King Mountain had with Diamond Mountain. Jacobs would then sell its own

6   branded cigarettes, using King Mountain's tobacco.

7       4.28   By May-June 2018, negotiations had progressed far enough that King Mountain

8   was drafting a license agreement and negotiating with Jacobs for a potential deal in New York.

9   King Mountain was even obtaining mockups for potential cigarette packaging.

10   **C.**    **Kamiakin Wheeler and James Take Steps To Misappropriate King Mountain's Business Despite Signing New Employment Contracts**

11

12       4.29   After a year-and-a-half of management by Kamiakin Wheeler and James, King

13   Mountain retained Global Ventures, Inc. in January 2018 to serve as Chief Restructuring Officer

14   ("CRO").

15       4.30   At or around the same time Global Ventures was retained as CRO, on January 16,

16   2018, Kamiakin Wheeler and James were removed from their positions as officers and directors

17   at King Mountain.

18       4.31   They were replaced by Trina (appointed as President), Terryanna (appointed as

19   Vice-President), and Gordon Boyd (appointed as secretary and treasurer), who is affiliated with

20   Global Ventures. Trina, Terryanna, and Gordon Boyd were the only King Mountain directors.

21       4.32   Kamiakin Wheeler objected immediately to his and James's removal as officers

22   and directors of King Mountain. On January 17, 2018, Kamiakin Wheeler sought a restraining

23   order in Yakama Nation Courts to prevent these actions. That motion was denied.

COMPLAINT - 9 -

1    4.33    Despite the challenge to their removal as officer and directors (which ultimately

2  failed), Kamiakin Wheeler and James were permitted to and did remain employees of King

3  Mountain.  They ultimately executed employment contracts.

4    4.34    Kamiakin Wheeler became Chief of Marketing Operations, who would (i) work to

5  retain and expand sales, and (ii) coordinate and interface between King Mountain and its

6  customers. James became Operations and Sales Director, who would (i) work with sales, product

7  and departmental managers to develop new markets and new business opportunities that

8  complement existing King Mountain operations, and (ii) assist in operational matters. Kamiakin

9  Wheeler and James signed employment contracts for these jobs.

10    4.35    Kamiakin Wheeler received a monthly salary of nearly $11,500, and James

11  received a monthly salary of nearly $9,200.  Each was also entitled to a profit-improvement

12  bonus.

13    4.36    Kamiakin Wheeler's and James's employment contracts were otherwise

14  substantially similar. Section 4 of each contract provided, in pertinent part, that:

15    Employee will be at work substantially on a full-time basis. He will work to the
     best of his abilities to be a contributing company team member. Employee will be
16    truthful in all aspects of his communications with officers, directors, and
     shareholders of the Companies; and will not breach any fiduciary duties he owes
17    as an Employee to the Companies.

18    4.37    Section 5, labeled "**Confidentiality**," stated that:

19    The Employee acknowledges that in the course of performing and fulfilling his
     duties, he may have access to and be entrusted with confidential information
20    concerning the present and contemplated financial status and activities of the
     Companies. The Employee acknowledges and agrees that such information
21    constitutes a proprietary right of the Companies, which the Employee is required
     to protect. The Employee shall not reveal confidential information of the
22    Companies unless: (a) the Employee's job duties require the Employee to reveal
     such information and such information is only revealed to the extent necessary for
23    the Employee to perform his job duties; or (b) is specifically authorized by the

COMPLAINT - 10 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

corporate officers of King Mountain. The Employee's duty to protect this confidential information shall survive the termination of this Agreement.

4.38    Section 7.4 addressed termination with cause and provided, in pertinent part, that:

The Companies may only terminate this Agreement with cause and upon written notice to Employee, and may do so with no further liability to Employee of any kind. "Cause" includes any of the following that occurs on or after the Effective Date…significant and material conflict of interest, serious and material impropriety or breach of fiduciary duty owed to the Companies, misappropriation of any money or other assets or property of the Companies, willful violation of reasonable, specific and lawful directions of King Mountain's CEO or equivalent corporate officer ….

4.39    Although they were retained as employees, Kamiakin Wheeler and James took further actions adverse to King Mountain.

4.40    For example, King Mountain and Diamond Mountain were working together on a "Chieftain" brand of cigarettes. But on or around January 30, 2018, Lone Warrior—not King Mountain—filed registrations with the U.S. Patent and Trademark Office for trademarks over the word "CHIEFTAN" and a related design:



Lone Warrior sought these trademarks for "tobacco products, namely cigarettes, cigars, and smokeless tobacco."

4.41    Neither Kamiakin Wheeler nor James disclosed the trademark registrations of "CHIEFTAN" and the related design made by Lone Warrior to anyone at King Mountain.

---

COMPLAINT - 11 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

1

2

   **D.**   **Theft of King Mountain Cigarettes By Kamiakin Wheeler and James**

3       4.42    After Kamiakin Wheeler and James were removed as officers and directors of

4    King Mountain, they stole cigarettes from King Mountain to enrich themselves.

5       4.43    In early 2018, Kamiakin Wheeler and James had King Mountain employees ship

6    out approximately 1400 cases of cigarettes. (Each case contains 60 cartons and each carton

7    contains 10 packs, so 1400 cases represents 840,000 packs of cigarettes). Kamiakin Wheeler and

8    James's decision to ship out 1400 cases of cigarettes effectively wiped out King Mountain's

9    inventory of certain types of King Mountain cigarette products.

10      4.44    Approximately 400 cases of cigarettes were placed on a rental truck. These

11   cigarette packs were unstamped, which means they did not contain the tax stamps indicating they

12   were to be sold on Native American land (such as Yakama Nation land). Therefore, these

13   cigarettes could be sold on the open market.

14      4.45    However, King Mountain would have to pay additional taxes and comply with

15   regulatory requirements for selling unstamped cigarettes on the open market. But neither was

16   done in relation to the 400 cases of unstamped cigarettes.

17      4.46    In addition, no invoices, order forms, purchase orders, bills of Lading, or similar

18   documentation were provided with the shipments of these cigarettes.

19      4.47    The remaining 1000 cases of cigarettes stolen by Kamiakin Wheeler and James

20   had packs with Yakama nation tax stamps. These cigarettes were shipped on multiple trucks.

21   Again, no invoices, order forms, purchase orders, bills of lading, or similar documentation were

22   provided with the shipment of these cigarettes.

23      4.48    The value of these 1400 cases is over $2 million.

COMPLAINT - 12 -                                    BAKER & HOSTETLER LLP
                                                    999 Third Avenue, Suite 3600
                                                    Seattle, WA 98104-4040
                                                    Telephone: (206) 332-1380

1       4.49   Kamiakin Wheeler, James, or Lone Warrior never remitted this money to King

2   Mountain.

3       4.50   King Mountain cigarettes have now been located in tribal locations in New York

4   state, including at tobacco stores located in upstate New York and on Long Island. King

5   Mountain, though, has not sold cigarettes to stores in New York for years.

6       **E.**   **<u>King Mountain Formalizes Its Relationship With Diamond Mountain</u>**

7
8       4.51   On or around March 23, 2018, King Mountain and Diamond Mountain entered

into three agreements relating to the sale of tobacco.

9       4.52   First, King Mountain and Diamond Mountain entered into a "Tobacco Product

10  License Agreement," whereby Diamond Mountain agreed to pay King Mountain a set amount

11  for each carton of cigarettes Diamond Mountain sold.

12      4.53   Second, King Mountain and Diamond Mountain entered into a "Contract

13  Manufacturing Agreement" whereby King Mountain agreed to manufacture certain products for

14  Diamond Mountain at a set price.

15      4.54   Third, King Mountain and Diamond Mountain entered into a "Consulting

16  Agreement" whereby King Mountain would provide services for a fee to Diamond Mountain.

17      **F.**   **<u>Kamiakin Wheeler and James Take Further Steps To Misappropriate King Mountain's Business</u>**

18
19      4.55   Kamiakin and James continued to take actions adverse to King Mountain during

20  their period of employment with the company.

21      4.56   On or around May 1, 2018, Kamiakin Wheeler sought additional trademarks for

22  the words "Yakama," "Rainier," and "Kamiakin" through his company, Lone Warrior.

23

---

COMPLAINT - 13 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

4.57     On or around May 22, 2018, Kamiakin Wheeler sought a trademark for an image of Mount Rainier (a well-known Washington state mountain that used to be located on Yakama nation land) using his company, Lone Warrior:



4.58     These four trademarks pertained to "tobacco products, namely cigarettes, cigars, and smokeless tobacco."

4.59     Neither Kamiakin Wheeler nor James, despite being King Mountain employees, ever made any disclosure to anyone at King Mountain regarding these trademark registrations.

4.60     At or around this time, James and Kamiakin Wheeler were meeting with representatives of other Indian tribes to launch further deals for King Mountain. In the course of these discussions, James and Kamiakin Wheeler had access to King Mountain's confidential and proprietary information.

4.61     For example, James and Kamiakin Wheeler were exploring a potential deal for King Mountain with Jacobs during May-June 2018 to expand King Mountain's business to New York state.

**G.     Kamiakin Wheeler and James Are Terminated From Their Employment**

4.62     On or around July 24, 2018, Global Ventures was fired and Gordon Boyd resigned his positions with King Mountain. Kamiakin Wheeler and James remained King Mountain employees.

---

COMPLAINT - 14 -

4.63    Jay Thompson ("Thompson") was placed in charge of King Mountain by Trina. Thompson was made Chief Executive Officer and Vice-President of the King Mountain Board of Directors.

4.64    Thompson is a Certified Public Accountant, with experience at a number of public accounting firms. He had also worked for a number of years for the Yakama nation with Yakama Nation Land Enterprise as both its General Manager and its Chief Financial Officer/Operations Manager. In addition, Thompson had worked previously for Wheeler Enterprises from 2013-14, the entity which oversaw nearly all of Delbert's and Trina's business enterprise.

4.65    According to King Mountain's records (including Federally-required stamps that are placed on cigarette packaging), at least 700 cases of cigarettes (and possibly more) were unaccounted for at King Mountain from 2016 through January 2018.

4.66    The value of approximately 700 cases would be around $1 million.

4.67    In addition, Kamiakin Wheeler was responsible for signing Federally-mandated forms from 2016 through January 2018. Those forms did not report properly the information required.

4.68    As a result of these and other failures, King Mountain was placed at risk of further repercussions from the Federal government.

4.69    King Mountain's new regime, however, amended its Federal reporting to correct these deficiencies.

4.70    These actions by Kamiakin Wheeler and James, along with others, placed King Mountain at risk. These actions, along with others, also met the definition for termination with cause under their employment contracts.

COMPLAINT - 15 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

1    4.71    On August 20, 2018, Kamiakin Wheeler and James were terminated with cause
2    from their employment at King Mountain.

3    4.72    To date, Kamiakin Wheeler and James have not raised any objections with King
4    Mountain as a result of their for-cause termination.

5    4.73    Instead of addressing their termination, Kamiakin Wheeler's attorney sent an
6    email to various attorneys that had previously worked for Trina. That email threatened Trina and
7    Thompson with various unsubstantiated allegations, such as misreporting of cigarettes, alleged
8    King Mountain purchases, and various statements or declarations by Thompson regarding
9    cigarette sales.

10   4.74    Attached to the email was a copy of an alleged "memorandum" that supposedly
11   detailed "Jay's knowledge of $4.5 million dollars in cash that has not been properly accounted
12   for or reported," all of which was buried somewhere. $1.5 million of these funds were earmarked
13   for Trina only, with the remaining $3 million only known to some "employee" who "will come
14   forward when the time comes" to give the money to King Mountain.

15   4.75    According to the email, this "memorandum was discovered in Jay's desk and
16   contains Jay's handwriting." The copy of the memorandum, however, does not contain
17   Thompson's handwriting.

18   4.76    As of the date of this Complaint, 2019, Kamiakin Wheeler is still representing on
19   his social media page that he is Chief Executive Office of King Mountain. King Mountain has
20   even received phone calls from purported business associates of Kamiakin Wheeler who have
21   sought to speak with him.

22

23

---

COMPLAINT - 16 -

**H.** **Defendants Continued Business Dealings With Diamond Mountain and Jacobs**

4.77   Almost immediately after their termination, Kamiakin Wheeler and James began conducting business with Diamond Mountain and Jacobs, now doing so for their own personal gain.

4.78   In September 2018, Kamiakin Wheeler and James were already meeting and working with Diamond Mountain to further their own business and that of Lone Warrior. Kamiakin Wheeler and James have even hired away King Mountain employees, and Kamiakin Wheeler and James used these former employees to further their efforts at Diamond Mountain.

4.79   At the time Kamiakin Wheeler and James were terminated from their employment, King Mountain was receiving monthly royalty payments of approximately $100,000 from Diamond Mountain. Those payments slowly dissipated from September 2018 until now, with Diamond Mountain now paying no royalty because it is not selling products containing King Mountain's tobacco. Diamond Mountain also refuses to manufacture more cigarettes for which King Mountain could receive a royalty or purchase additional cigarettes from King Mountain that could be sold for a royalty.

4.80   Defendants are assisting, facilitating, or otherwise affiliated with Diamond Mountain's operation, and Lone Warrior has a contract with Diamond Mountain.

4.81   Upon information and belief, Diamond Mountain is still selling approximately the same amount of cigarettes it was before even though Diamond Mountain no longer uses King Mountain's Predicate Blends.

4.82   Defendants retained King Mountain's former counsel, Dolph Barnhouse at Barnhouse Keegan Solimon & West (located in New Mexico), to negotiate with Diamond

COMPLAINT - 17 -

Mountain. Barnhouse Keegan was intimately involved with King Mountain's original negotiations with Diamond Mountain, helping to structure the relationship between King Mountain and Diamond Mountain. Barnhouse Keegan now lists Lone Warrior Holdings as a representative client of its firm.

4.83    In September 2018, Defendants were also negotiating with Jacobs Tobacco to sell its tobacco products under the "Mountain Heritage" brand. This was the same brand that King Mountain (with the assistance of its then employees, Kamiakin Wheeler and James) was selling to Diamond Mountain during the summer of 2018.

4.84    Defendants are now selling tobacco products in New York state under the "Rainier" brand label and "Yakama" brand label, both of which Lone Warrior sought trademark protection for while Kamiakin Wheeler and James worked as employees for King Mountain Tobacco. These brands also use other marks that Lone Warrior sought trademark protection for while Kamiakin Wheeler and James were employed by King Mountain.

4.85    Defendants' advertisements for the sales use phrases such as "The King is Back" and "The King of the Mountain Has Returned." Both of these phrases attempt to use the marks and goodwill of King Mountain to further Defendants' interests. In addition, shops that sell "Rainier" and "Yakama" cigarettes are informing consumers that these brands are replacements for King Mountain cigarettes.

## V.    FIRST CAUSE OF ACTION

### (BREACH OF EMPLOYEE FIDUCIARY DUTY)

5.1    King Mountain repeats and realleges the other paragraphs of this Complaint as if they were set forth fully herein.

5.2    As detailed above, Kamiakin Wheeler and James were employees of King

COMPLAINT - 18 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

1  Mountain.

2      5.3     By both contract and under Washington-state law, Kamiakin Wheeler and James

3  had fiduciary duties to their employer, King Mountain.

4      5.4     During the period of their employment, Kamiakin Wheeler and James breached

5  their fiduciary duty to King Mountain by, among other actions: (1) seeking trademark protection

6  for products that would compete with King Mountain; (2) stealing King Mountain cigarettes; and

7  (3) engaging in business contacts with third parties to further their (*i.e.*, Kamiakin Wheeler's and

8  James's) business interests at the expense of King Mountain's business interests.

9      5.5     These actions have injured King Mountain. King Mountain property was stolen,

10  costing the business approximately $2 million (if not more).

11      5.6     Not satisfied with just stealing outright from its employer, Kamiakin Wheeler and

12  James have now usurped King Mountain's business. King Mountain's business with Diamond

13  Mountain has all but ceased, costing King Mountain approximately $100,000 per month in

14  revenue it was earning.

15      5.7     Kamiakin Wheeler's and James's actions also cost King Mountain business in

16  New York state, which could have earned King Mountain even more.

17      5.8     Therefore, Kamiakin Wheeler and James are liable for the breach of their

18  fiduciary duty to their employer, King Mountain.

19          **VI.    SECOND CAUSE OF ACTION**

20              **(BREACH OF CONTRACT)**

21      6.1     King Mountain repeats and realleges the other paragraphs of this Complaint as if

22  they were set forth fully herein.

23      6.2     Pursuant to their employment contracts, Kamiakin Wheeler and James had a

---

COMPLAINT - 19 -

1  fiduciary duty to their employer that, as set forth in Count I, they breached which caused King

2  Mountain damage.

3      6.3      In addition, Kamiakin Wheeler and James obtained confidential information

4  during the course of their employment, including King Mountain's sale strategy, potential

5  business dealings, and pricing.

6      6.4      Armed with this information, Kamiakin Wheeler and James have now used it to

7  usurp King Mountain's business dealings with Diamond Mountain and Jacobs. Kamiakin

8  Wheeler and James are also using this information to solicit other business from existing King

9  Mountain customers. Kamiakin Wheeler and James have also usurped the trademarks that they

10  were researching while in the employ of King Mountain.

11      6.5      These additional contractual breaches have damaged King Mountain.

12      6.6      In addition to the above breaches of contract, Kamiakin Wheeler has a separate

13  breach of contract. During the course of his tenure at King Mountain, Kamiakin Wheeler

14  repeatedly borrowed money from King Mountain that he promised to repay.

15      6.7      In total, Kamiakin Wheeler borrowed $68,409.09 and has returned just $2,000, for

16  a balance of $66,409.09 that he still owes King Mountain (plus any interest authorized by law).

17      6.8      Therefore, Kamiakin Wheeler and James are liable for breach of contract.

18                    **VII.      THIRD CAUSE OF ACTION**

19            **(TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP)**

20      7.1      King Mountain repeats and realleges the other paragraphs of this Complaint as if

21  they were set forth fully herein.

22      7.2      Defendants were aware of a contractual relationship between King Mountain and

23  Diamond Mountain.

COMPLAINT - 20 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

1    7.3    Defendants acted to induce the relationship to end that relationship by, among

2  other things, travelling to meet with Diamond Mountain personnel in California, using King

3  Mountain confidential information, hiring former King Mountain personnel to work with

4  Diamond Mountain, providing a cigarette machine (paid for with King Mountain products but

5  owned by Lone Warrior), and otherwise using their (*i.e.*, Kamiakin Wheeler's and James's)

6  brands to sell to Diamond Mountain instead of King Mountain.

7    7.4    As a result of these efforts, Diamond Mountain does virtually (if that) no business

8  with King Mountain any more. King Mountain was earning approximately $100,000 per months

9  for the first three months of its relationship with Diamond Mountain. However, those royalties

10  fell sharply after the first three months, and King Mountain now earns nothing from its

11  relationship with Diamond Mountain.

12    7.5    Therefore, Defendants are liable for tortious interference with King Mountain's

13  contractual relationship.

14  ### VIII.    FOURTH CAUSE OF ACTION

15  ### (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS EXPECTANCY)

16    8.1    King Mountain repeats and realleges the other paragraphs of this Complaint as if

17  they were set forth fully herein.

18    8.2    King Mountain, during the period of Kamiakin Wheeler's and James's

19  employment with King Mountain, had taken steps to establish relationships in the state of New

20  York to sell tobacco products and cigarettes with Jacobs. King Mountain and Jacobs were

21  exchanging cost estimates, contractual documents, and otherwise preparing to do business with

22  each other.

23    8.3    After Kamiakin Wheeler and James were terminated from their employment with

COMPLAINT - 21 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

1  King Mountain, Defendants nonetheless continued to engage with Jacobs. Defendants were able

2  to do so by using King Mountain's confidential information and trademarks that Kamiakin

3  Wheeler and James developed while employed by King Mountain.

4      8.4    As a result, King Mountain's prospective business that it expected to do with

5  Jacobs did not materialize. Instead, Kamiakin Wheeler and James took the business for

6  themselves and Lone Warrior.

7      8.5    Doing so has damaged King Mountain.

8      8.6    Therefore, Defendants are liable for tortious interference with King Mountain's

9  prospective business expectancy.

## IX.   FIFTH CAUSE OF ACTION

### (CONVERSION)

12      9.1    King Mountain repeats and realleges the other paragraphs of this Complaint as if

13  they were set forth fully herein.

14      9.2    Kamiakin Wheeler and James, without justification, interfered with property

15  belonging to King Mountain. In particular and as set forth in more detail above, Kamiakin

16  Wheeler and James stole cigarettes belonging to King Mountain. Doing so deprived King

17  Mountain to the cigarettes.

18      9.3    The value of the cigarettes were in excess of $2 million.

19      9.4    In addition to this conversion, Kamiakin Wheeler and James have converted the

20  trademarks they researched for use by King Mountain.

21      9.5    Therefore, Kamiakin Wheeler and James are liable for conversion.

22

23

COMPLAINT - 22 -

## X.   SIXTH CAUSE OF ACTION

### (TRESPASS TO CHATTELS)

10.1    King Mountain repeats and realleges the other paragraphs of this Complaint as if they were set forth fully herein.

10.2    As set forth above, Kamiakin Wheeler and James intentionally took property belonging to King Mountain regardless of whether they innocently believed the property to belong to them.

10.3    Therefore, Kamiakin Wheeler and James are liable for trespass to chattels.

## XI.   SEVENTH CAUSE OF ACTION

### (UNJUST ENRICHMENT)

11.1    King Mountain repeats and realleges the other paragraphs of this Complaint as if they were set forth fully herein.

11.2    Kamiakin Wheeler received a benefit from King Mountain when he borrowed $68,409.09. Kamiakin Wheeler knew he was receiving the benefit of this money.

11.3    Kamiakin Wheeler has retained all but $2000 of this benefit. It is unjust for him to do so because he has funds that belong to King Mountain that Kamiakin Wheeler promised to repay.

11.4     Therefore, Kamiakin Wheeler is liable for unjust enrichment.

## XII.   EIGHTH CAUSE OF ACTION

### (UNFAIR COMPETITION UNDER STATE LAW)

12.1    King Mountain repeats and realleges the other paragraphs of this Complaint as if they were set forth fully herein.

12.2    King Mountain's registered design contains images of Mount Adams, a well-

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

known Washington state mountain that is partially located on Yakama nation territory:



12.3    King Mountain has also registered for the distinctive and non-functional trademark, "King Mountain."

12.4    The well-known Washington-state mountain imagery (one that is adjacent to the Yakama nation land) along with the reference to the "King" is a distinctive design, particularly in the field of cigarettes and the sales of other tobacco products and even more so in the sales of Native American-made cigarettes. It has been associated with King Mountain's products for multiple years, and King Mountain spent time and expense in developing this design.

12.5    This design is also non-functional, as it resides on packaging but plays no role in the ultimate use of the product.

12.6    Defendants' branding for its "Rainier" cigarettes, which are sold in New York, passes off their goods as if they were King Mountain goods. As detailed above, the "Rainier" brand uses similar mountain imagery as King Mountain. The "Rainier" brand also uses advertisements depicting itself as King Mountain, stating "The King is Back" and "The King of the Mountain has Returned!"

COMPLAINT - 24 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

1    12.7    Kamiakin Wheeler furthers this confusion by still affiliating himself with King

2    Mountain on social media.

3    12.8    Defendants' actions to confuse their "Rainier" brand with "King Mountain" was

4    done in bad faith. As detailed above, Defendants' stole cigarettes from King Mountain,

5    negotiated with a potential King Mountain partner (Jacobs), and have generally represented that

6    Defendants are now either King Mountain or the replacement for King Mountain.

7    12.9    Under New York law, Defendants can thus be liable for unfair competition.

8              **XIII.    NINTH CAUSE OF ACTION**

9                       **(CONVERSION)**

10    13.1    King Mountain repeats and realleges the other paragraphs of this Complaint as if

11    they were set forth fully herein.

12    13.2    Kamiakin Wheeler and James, without justification, interfered with property

13    belonging to King Mountain. In particular and as set forth in more detail above, Kamiakin

14    Wheeler and James stole cigarettes belonging to King Mountain to purchase cigarette

15    manufacturing machine that is owned in the name of Lone Warrior. Doing so deprived King

16    Mountain to the cigarettes and/or its machines.

17    13.3    Therefore, Defendants are liable for conversion.

18              **XIV.    TENTH CAUSE OF ACTION**

19                **(TRESPASS TO CHATTELS)**

20    14.1    King Mountain repeats and realleges the other paragraphs of this Complaint as if

21    they were set forth fully herein.

22    14.2    As set forth above, Kamiakin Wheeler and James intentionally took property

23    belonging to King Mountain regardless of whether they innocently believed the property to

COMPLAINT - 25 -

1  belong to them. That property was then exchanged for cigarette manufacturing machine.

2       14.3    Therefore, Kamiakin Wheeler and James are liable for trespass to chattels.

3                        **XV.    ELEVENTH CAUSE OF ACTION**

4                                   **(REPLEVIN)**

5       15.1    King Mountain repeats and realleges the other paragraphs of this Complaint as if

6  they were set forth fully herein.

7       15.2    King Mountain is the rightful owner of the cigarette manufacturing machines

8  owned that were leased by Lone Warrior to Diamond Mountain. King Mountain property was

9  used to purchase those machines.  Kamiakin Wheeler knew he was receiving the benefit of this

10  money.

11       15.3    Under RCW 7.64 *et seq.*, King Mountain is entitled to an order of replevin against

12  Defendants for the cigarette manufacturing machines.

13                         **XVI.    TWELTH CAUSE OF ACTION**

14                                **(UNJUST ENRICHMENT)**

15       16.1    King Mountain repeats and realleges the other paragraphs of this Complaint as if

16  they were set forth fully herein.

17       16.2    By obtaining the cigarette manufacturing machines using King Mountain

18  property, Defendants have been unjustly enriched through: (1) ownership of the cigarette

19  manufacturing machines; (2) lease payments from Diamond Mountain; and (3) additional

20  business from Diamond Mountain.

21       16.3    This property rightfully belongs to King Mountain.

22       16.4    As an equitable remedy for the unjust enrichment, King Mountain is entitled to a

23  constructive trust and/or restitution.

---

COMPLAINT - 26 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

## XVII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff, King Mountain Tobacco Company, Inc., prays for the following relief:

17.1   That this Court adjudge and decree that Defendants have engaged in the conduct complained of herein;

17.2   Damages of at least $2 million (in an amount to proven later) as compensation for cigarettes wrongfully taken;

17.3   Additional damages of $66,409.09 from Kamiakin Wheeler for funds borrowed but not repaid to King Mountain;

17.4   At least $3 million in damages for interference with King Mountain's business relationships;

17.5   Additional damages, in an amount to be proven, for the tortious interference with King Mountain's prospective business relationships;

17.6   Damages and/or injunctive relief for using marks in violation of state unfair competition laws;

17.7   Return of all property belonging to King Mountain, including cigarette machines and or trademarks that rightfully belong to King Mountain;

17.8   A constructive trust and/or restitution relating to property and proceeds thereof that rightfully belong to King Mountain;

17.9   Prejudgment interest, costs, and reasonable attorneys' fees; and

17.10   For any other relief as this Court may deem just and proper.

COMPLAINT - 27 -

BAKER & HOSTETLER LLP
999 Third Avenue, Suite 3600
Seattle, WA 98104-4040
Telephone: (206) 332-1380

1    DATED this 22nd day of November, 2019.

2                      Respectfully submitted,

3                      **BAKER & HOSTETLER LLP**

4

5                      Curt Roy Hineline, WSBA No. 16317

6                      999 Third Avenue, Suite 3600
                        Seattle, WA 98104-4040
                        Tel: (206) 332-1101

7                      Fax: (206) 624-7317
                      Email: chineline@bakerlaw.com

8

                      *Attorney for Plaintiff King Mountain Tobacco, Inc.*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

COMPLAINT - 28 -                            BAKER & HOSTETLER LLP
                                            999 Third Avenue, Suite 3600
                                            Seattle, WA 98104-4040
                                          Telephone: (206) 332-1380

# EXHIBIT 1

***EMPLOYMENT AGREEMENT***

THIS EMPLOYMENT AGREEMENT ("Agreement") is between **(1)** King Mountain Tobacco Co., Inc., a Yakama Nation Corporation ("King Mountain"), Mountain Tobacco Distributing, Inc., a Washington State Corporation, Treaty Mountain, Inc., a Yakama Nation Corporation, and Lincoln Asset Holdings Company, Inc., a Yakama Nation Corporation (the "Companies"); and **(2)** Kamiakin Wheeler ("Employee"), and is effective as of February 1, 2018 (the "Effective Date").

For good and valuable consideration, the Companies and Employee agree as follows:

1. **Employment**. As of the Effective Date, the Companies employ Employee as Chief of Marketing Operations. Employee accepts such employment and agrees to perform services for the Companies, for the period and upon the terms and conditions set forth in this Agreement. Although Employee will be working with and for all four of the Companies, and although each of the Companies is jointly and severally liable to Employee for their combined obligations under this Agreement, Employee will be paid by King Mountain, and work under the direction of King Mountain's corporate officers.

2. **Term**. The term of this Agreement shall commence on the Effective Date, and shall continue for a period of three (3) years (the "Employment Term") unless earlier terminated as provided in this Agreement.

3. **Renewal**. At any point before the scheduled expiration of the Employment Term or any renewal term agreed to by the parties, either party may propose a renewal of this Agreement for successive terms of three years. Any renewal shall include a base salary increase to be agreed to by the parties. Other terms and conditions shall be equal to or more generous than those applicable to the original Term.

4. **Position and Duties.** Employee shall serve as Chief of Marketing Operations for the Companies. In that position, he will work to retain and expand sales and coordinate the interface between the Companies and their customers. Employee will be at work substantially on a full-time basis. He will work to the best of his abilities to be a contributing company team member. Employee will be truthful in all aspects of his communications with officers, directors, and shareholders of the Companies; and will not breach any fiduciary duties he owes as an Employee to the Companies.

5. **Confidentiality**. The Employee acknowledges that in the course of performing and fulfilling his duties, he may have access to and be entrusted with confidential information concerning the present and contemplated financial status and activities of the Companies.

The Employee acknowledges and agrees that such information constitutes a proprietary right of the Companies, which the Employee is required to protect. The Employee shall not reveal confidential information of the Companies unless: (a) the Employee's job duties require the Employee to reveal such information and such information is only revealed to the extent necessary for the Employee to perform his job duties; or (b) is specifically authorized by the corporate officers of King Mountain. The Employee's duty to protect this confidential information shall survive the termination of this Agreement.

6. **Compensation**. Employee shall serve as an exempt salaried employee and shall receive the following compensation and benefits during the term of this Agreement:

    6.1.  **Base Salary**. As compensation for all services to be rendered by Employee under this Agreement, the Company shall pay to Employee a base salary at the following monthly rates:

    Monthly Base Salary: $11,458.34

    Salary will be paid in two equal installments of $5,729.17 on the first and fifteenth day of each month. If the first or fifteenth day of the month falls on a weekend or holiday, Employee shall be paid on the next business day following the weekend or holiday. Employee's base salary shall be increased by 5% annually, on the first day of February of every year during the term of this Agreement.

    6.2.  **Profit Improvement Retention Bonus**. As additional compensation for all services to be rendered by Employee under this Agreement, each year the Company shall pay to Employee a profit improvement retention bonus amount of five percent (5 %) of the increase in pretax profits above tax year 2017's combined pretax profits (less 2017 profits from sales to customers in the State of New York) for all companies included in the definition of Employer under this agreement, and including Wheeler family farming operations. Should any of the companies not make a profit in any year, that loss will not be deducted or otherwise used to adjust total pretax profits of the other companies for purposes of calculating Employee's profit improvement retention bonus under this Agreement.

    This profit improvement retention bonus shall be in effect during the employment of Employee with one or more of the Companies and shall continue to be paid for a period of five (5) years following the termination of the Employee's employment for any reason other than: (1) termination for cause pursuant to the

terms of this agreement which, if challenged by the employee, is held to be valid; or (2) voluntarily termination by the Employee.

This profit improvement retention bonus shall be made within thirty days after the Board's final approval of the Company's Annual Financial Statements for any given calendar year, but no later than May 1 of each calendar year for the prior calendar year.

6.3.    **Bonuses**.  As additional compensation for all services to be rendered by Employee under this Agreement, the Company shall pay the Employee an annual Christmas bonus of $2,500.

6.4.    **Participation in Benefit Plans**.  Employee shall be included to the extent eligible thereunder in any and all plans of the Company providing general benefits for the Company's employees, including but not limited to health and dental insurance, sick days, vacation, and holidays.  Employee's participation in any such plan or program shall be subject to the provisions of the plan or program, as amended from time to time.

6.5.    **Business Expenses**.  Provided that Employee obtains the advance approval of the King Mountain CEO or equivalent, and does so in accordance with the King Mountain's policies established from time to time, the Companies will pay or reimburse Employee for all reasonable and necessary out-of-pocket travel and other expenses incurred by Employee in the performance of Employee's duties under this Agreement, and will do so within ten business days of Employee's submittal of the following required paperwork:

> **6.5.1 Pre-travel justification**. Employee must complete and receive approval of estimated travel expenses before scheduling any travel or making any travel arrangements.  The pre-travel justification should include the following information:
> Customers or Suppliers Employee plans to visit;
> Cities of Travel
> Departure Date
> Return Date
> Expense Estimates for airfare, car rental, lodging, meals and entertainment

> **6.5.2 Post Travel Submission**. Within five business days of completing reimbursable travel, Employee shall submit appropriate vouchers and receipts confirming the items for which Employee is seeking

reimbursement.  Other than for emergency expenses, or additional charges imposed for changes in travel plans that are required for reasons other than Employee's convenience, any deviation greater than ten percent (10%) of the approved amount will be paid at the discretion of King Mountain Tobacco.

7.  **Termination.**

7.1.  **Disability**.  Employee's employment and this Agreement may, at the option of King Mountain, be terminated upon Employee becoming disabled for a period exceeding twelve (12) weeks (including lesser periods that amount to twelve (12) weeks within a twelve (12) month period).  For purposes of this Agreement, the term "disabled" or "disability" means Employee's inability on account of illness or injury, whether or not job-related, to perform the essential functions of his job and duties even with reasonable accommodation.  The determination of disability shall be made by a licensed physician retained by King Mountain for that purpose. Employee acknowledges and agrees this provision does not constitute termination in violation of the Americans with Disabilities Act, the State of Washington Human Rights Act, or any other law or ordinance enacted to prevent disability-related discrimination.

7.2.  **Death of Employee**.  Employee's employment and this Agreement shall terminate immediately upon the death of the Employee.

7.3.  **Termination Upon Expiration of the Term of this Agreement**.  The Companies or Employee may terminate the employment relationship upon the expiration of the term of this Agreement, in the event that a written extension or renewal for a subsequent period has not been executed at the natural expiration of this Agreement.  If Employee continues to serve after the natural expiration of this Agreement and without a written extension or renewal for a subsequent period, such employment shall be "at-will" and thus terminable by either party for any or no reason.

7.4.  **Termination With Cause.**  The Companies may only terminate this Agreement with cause and upon written notice to Employee, and may do so with no further liability to Employee of any kind. "Cause" includes any of the following that occurs on or after the Effective Date: conviction of Employee of any felony, or any crime involving moral turpitude, or any crime or offense involving the property of the Companies or governing Employee's conduct in connection with his employment as an Employee of King Mountain, significant and material

conflict of interest, serious and material impropriety or breach of fiduciary duty owed to the Companies, misappropriation of any money or other assets or property of the Companies, willful violation of reasonable, specific and lawful directions of King Mountain's CEO or equivalent corporate officer, Employee's attempt to assign this Agreement to another or by operation of law or by reason of judicial process.

8.  **Governing Law and Jurisdiction.**  This Agreement shall be construed and enforced in accordance with the laws of the State of Washington and any disputes under this Agreement shall be brought in the courts of the State of Washington.  Jurisdiction for resolution of any claims arising from this Agreement shall be vested exclusively in the courts of the State of Washington.

9.  **Miscellaneous.**

    9.1.  **Prior Agreements**.  This Agreement contains the entire Agreement of the parties relating to the subject matter hereof, including, without limitation, Employee's employment with the Companies, and supersedes all prior Agreements and understandings with respect to such subject matter.  The parties have made no agreements, representations, or warranties relating to the subject matter of this Agreement which are not set forth in this Agreement.

    9.2.  **Withholdings from Pay**.  The Companies may withhold from all compensation and benefits payable under this Agreement all federal, state, city or other taxes as required by law, as well as deductions authorized by the Employee and, to the extent permitted by law, an amount sufficient to reimburse the Companies for any overpayment to Employee.

    9.3.  **Waiver**.  A failure to enforce a term of this Agreement will not operate as a waiver of the right to enforce that or any other term hereof on any future occasion.  No term or condition of this Agreement shall be deemed to have been waived nor shall there be any estoppel to enforce any provisions of this Agreement, except by a statement in writing signed by the party against whom enforcement of the waiver or estoppel is sought.

    9.4.  **Amendment**. No Amendment to this Agreement shall be binding on the parties or any party unless in writing and signed by the parties to this Agreement.

    9.5.  **Authority to Bind the Companies**.  The person signing for each company below confirms and warrants that she/he has the authority to sign on behalf of, and to legally obligate, the Company on whose behalf she/he has signed.

**IN WITNESS WHEREOF**, the parties have signed this Agreement and it is effective as of the day and year set forth above.

**Employer:**
**King Mountain Tobacco Co., Inc.**

By: _____
[Name]

Its: _____CRO_____
[Title]

**Mountain Tobacco Distributing, Inc.**

By: _____
[Name]

Its: _____CRO_____
[Title]

**Treaty Mountain, Inc.**

By: _____
[Name]

Its: _____CRO_____
[Title]

**Lincoln Asset Holdings Company, Inc.**

By: _____
[Name]

Its: _____CRO_____
[Title]

**Employee:**

_____
Kamiakin Wheeler, Individually

## *AMENDMENT 1 TO FEBRUARY 1, 2018*
## *EMPLOYMENT AGREEMENT*

THIS IS AMENDMENT 1 to the February 1, 2018 EMPLOYMENT AGREEMENT ("Agreement") between **(1)** King Mountain Tobacco Co., Inc., a Yakama Nation Corporation ("King Mountain"), Mountain Tobacco Distributing, Inc., a Washington State Corporation, Treaty Mountain, Inc., a Yakama Nation Corporation, and Lincoln Asset Holdings Company, Inc., a Yakama Nation Corporation (the "Companies"); and **(2)** Kamiakin Wheeler ("Employee").

For good and valuable consideration, the Companies and Employee amend Paragraph 6.4 Participation in Benefit Plan, of the February 1, 2018 Employment Agreement entered into between them as parties, retroactive to February 1, 2018, to read as follows:

> **Participation in Benefit Plans**.  Employee, his spouse and children, shall be included to the extent eligible thereunder in any and all plans of the Company providing general benefits for the Company's employees and their families, including but not limited to health and dental insurance, sick days, vacation, and holidays.  Employee, his spouse and his children's participation in any such plan or program shall be subject to the provisions of the plan or program, as amended from time to time.

No other changes or amendments are made to the Agreement which shall continue in full force and effect according to its terms, as hereby amended.

**IN WITNESS WHEREOF**, the parties have signed this Amendment 1 to February 1, 2018 Employment Agreement on the date indicated following their signatures below.

**Employer:**
**King Mountain Tobacco Co., Inc.**

By: _____
　　　　[Name]

Its: _____CRO_____
　　　　[Title]

Date: _____2/5/18_____

**Mountain Tobacco Distributing, Inc.**

By: _Gordon J Boyd_
       [Name]

Its: _CRO_
        [Title]

Date: _2/5/18_


**Treaty Mountain, Inc.**

By: _Gordon J Boyd_
       [Name]

Its: _CRO_
        [Title]

Date: _2/5/18_


**Lincoln Asset Holdings Company, Inc.**

By: _Gordon J Boyd_
       [Name]

Its: _CRO_
        [Title]

Date: _2/5/18_


**Employee:**

_Kamiakin T. Wheeler_

Kamiakin Wheeler, Individually

Date: _Feb 5, 2018_

# EXHIBIT 2

### *EMPLOYMENT AGREEMENT*

THIS EMPLOYMENT AGREEMENT ("Agreement") is between **(1)** King Mountain Tobacco Co., Inc., a Yakama Nation Corporation ("King Mountain"), Mountain Tobacco Distributing, Inc., a Washington State Corporation, Treaty Mountain, Inc., a Yakama Nation Corporation, and Lincoln Asset Holdings Company, Inc., a Yakama Nation Corporation (the "Companies"); and **(2)** Kanim James ("Employee"), and is effective as of February 1, 2018 (the "Effective Date").

For good and valuable consideration, the Companies and Employee agree as follows:

1. **Employment**. As of the Effective Date, the Companies employ Employee as Operations and Sales Director. Employee accepts such employment and agrees to perform services for the Companies, for the period and upon the terms and conditions set forth in this Agreement. Although Employee will be working with and for all four of the Companies, and although each of the Companies is jointly and severally liable to Employee for their combined obligations under this Agreement, Employee will be paid by King Mountain, and work under the direction of King Mountain's corporate officers.

2. **Term**. The term of this Agreement shall commence on the Effective Date, and shall continue for a period of three (3) years (the "Employment Term") unless earlier terminated as provided in this Agreement.

3. **Renewal**. At any point before the scheduled expiration of the Employment Term or any renewal term agreed to by the parties, either party may propose a renewal of this Agreement for successive terms of three years. Any renewal shall include a base salary increase to be agreed to by the parties. Other terms and conditions shall be equal to or more generous than those applicable to the original Term.

4. **Position and Duties.** Employee shall serve as Operations and Sales Director for the Companies. In that position, he will work with sales, product and departmental managers to develop new markets and new business opportunities that complement the Companies' existing and future operations, and will assists in operational matters as appropriate. Employee will be at work substantially on a full-time basis. He will work to the best of his abilities to be a contributing company team member. Employee will be truthful in all aspects of his communications with officers, directors, and shareholders of the Companies; and will not breach any fiduciary duties he owes as an Employee to the Companies.

5.   **Confidentiality**.  The Employee acknowledges that in the course of performing and fulfilling his duties, he may have access to and be entrusted with confidential information concerning the present and contemplated financial status and activities of the Companies. The Employee acknowledges and agrees that such information constitutes a proprietary right of the Companies, which the Employee is required to protect.  The Employee shall not reveal confidential information of the Companies unless: (a) the Employee's job duties require the Employee to reveal such information and such information is only revealed to the extent necessary for the Employee to perform his job duties; or (b) is specifically authorized by the corporate officers of King Mountain.  The Employee's duty to protect this confidential information shall survive the termination of this Agreement.

6.   **Compensation**.  Employee shall serve as an exempt salaried employee and shall receive the following compensation and benefits during the term of this Agreement:

6.1.   **Base Salary**.  As compensation for all services to be rendered by Employee under this Agreement, the Company shall pay to Employee a base salary at the following monthly rates:

Monthly Base Salary:  $9,166.68

Salary will be paid in two equal installments of $4,583.34 on the first and fifteenth day of each month.  If the first or fifteenth day of the month falls on a weekend or holiday, Employee shall be paid on the next business day following the weekend or holiday.  Employee's base salary shall be increased by 5% annually, on the first day of February of every year during the term of this Agreement.

6.2.   **Profit Improvement Retention Bonus**.  As additional compensation for all services to be rendered by Employee under this Agreement, each year the Company shall pay to Employee a profit improvement retention bonus amount of five percent (5 %) of the increase in pretax profits above tax year 2017's combined pretax profits (less 2017 profits from sales to customers in the State of New York) for all companies included in the definition of Employer under this agreement, and including Wheeler family farming operations.  Should any of the companies not make a profit in any year, that loss will not be deducted or otherwise used to adjust total pretax profits of the other companies for purposes of calculating Employee's profit improvement retention bonus under this Agreement.

This profit improvement retention bonus shall be in effect during the employment of Employee with one or more of the Companies and shall continue to be paid for a period of five (5) years following the termination of the Employee's employment for any reason other than: (1) termination for cause pursuant to the terms of this agreement which, if challenged by the employee, is held to be valid; or (2) voluntarily termination by the Employee.

This profit improvement retention bonus shall be made within thirty days after the Board's final approval of the Company's Annual Financial Statements for any given calendar year, but no later than May 1 of each calendar year for the prior calendar year.

6.3.   **Bonus**.  As additional compensation for all services to be rendered by Employee under this Agreement, the Company shall pay the Employee an annual Christmas bonus of $2,500.

6.4.   **Participation in Benefit Plans**.  Employee shall be included to the extent eligible thereunder in any and all plans of the Company providing general benefits for the Company's employees, including but not limited to health and dental insurance, sick days, vacation, and holidays.  Employee's participation in any such plan or program shall be subject to the provisions of the plan or program, as amended from time to time.

6.5.   **Business Expenses**.  Provided that Employee obtains the advance approval of the King Mountain CEO or equivalent, and does so in accordance with the King Mountain's policies established from time to time, the Companies will pay or reimburse Employee for all reasonable and necessary out-of-pocket travel and other expenses incurred by Employee in the performance of Employee's duties under this Agreement, and will do so within ten business days of Employee's submittal of the following required paperwork:

> **6.5.1 Pre-travel justification**.  Employee must complete and receive approval of estimated travel expenses before scheduling any travel or making any travel arrangements.  The pre-travel justification should include the following information:
> Customers or Suppliers Employee plans to visit;
> Cities of Travel
> Departure Date
> Return Date
> Expense Estimates for airfare, car rental, lodging, meals and entertainment

**6.5.2 Post Travel Submission**.  Within five business days of completing reimbursable travel, Employee shall submit appropriate vouchers and receipts confirming the items for which Employee is seeking reimbursement.  Other than for emergency expenses, or additional charges imposed for changes in travel plans that are required for reasons other than Employee's convenience, any deviation greater than ten percent (10%) of the approved amount will be paid at the discretion of King Mountain Tobacco.

7.   **Termination.**

7.1.   **Disability**.  Employee's employment and this Agreement may, at the option of King Mountain, be terminated upon Employee becoming disabled for a period exceeding twelve (12) weeks (including lesser periods that amount to twelve (12) weeks within a twelve (12) month period).  For purposes of this Agreement, the term "disabled" or "disability" means Employee's inability on account of illness or injury, whether or not job-related, to perform the essential functions of his job and duties even with reasonable accommodation.  The determination of disability shall be made by a licensed physician retained by King Mountain for that purpose.  Employee acknowledges and agrees this provision does not constitute termination in violation of the Americans with Disabilities Act, the State of Washington Human Rights Act, or any other law or ordinance enacted to prevent disability-related discrimination.

7.2.   **Death of Employee**:  Employee's employment and this Agreement shall terminate immediately upon the death of the Employee.

7.3.   **Termination Upon Expiration of the Term of this Agreement**.  The Companies or Employee may terminate the employment relationship upon the expiration of the term of this Agreement, in the event that a written extension or renewal for a subsequent period has not been executed at the natural expiration of this Agreement.  If Employee continues to serve after the natural expiration of this Agreement and without a written extension or renewal for a subsequent period, such employment shall be "at-will" and thus terminable by either party for any or no reason.

7.4.   **Termination With Cause.**  The Companies may only terminate this Agreement with cause and upon written notice to Employee, and may do so with no further liability to Employee of any kind.  "Cause" includes any of the following that occurs on or after the Effective Date: conviction of Employee of any felony, or

Kanim James - Employment Agreement
Page 4 of 7

any crime involving moral turpitude, or any crime or offense involving the property of the Companies or governing Employee's conduct in connection with his employment as an Employee of King Mountain, significant and material conflict of interest, serious and material impropriety or breach of fiduciary duty owed to the Companies, misappropriation of any money or other assets or property of the Companies, willful violation of reasonable, specific and lawful directions of King Mountain's CEO or equivalent corporate officer, Employee's attempt to assign this Agreement to another or by operation of law or by reason of judicial process.

8.   **Governing Law and Jurisdiction.**  This Agreement shall be construed and enforced in accordance with the laws of the State of Washington and any disputes under this Agreement shall be brought in the courts of the State of Washington.  Jurisdiction for resolution of any claims arising from this Agreement shall be vested exclusively in the courts of the State of Washington.

9.   **Miscellaneous.**

   9.1.   **Prior Agreements.**  This Agreement contains the entire Agreement of the parties relating to the subject matter hereof, including, without limitation, Employee's employment with the Companies, and supersedes all prior Agreements and understandings with respect to such subject matter.  The parties have made no agreements, representations, or warranties relating to the subject matter of this Agreement which are not set forth in this Agreement.

   9.2.   **Withholdings from Pay.**  The Companies may withhold from all compensation and benefits payable under this Agreement all federal, state, city or other taxes as required by law, as well as deductions authorized by the Employee and, to the extent permitted by law, an amount sufficient to reimburse the Companies for any overpayment to Employee.

   9.3.   **Waiver.**  A failure to enforce a term of this Agreement will not operate as a waiver of the right to enforce that or any other term hereof on any future occasion. No term or condition of this Agreement shall be deemed to have been waived nor shall there be any estoppel to enforce any provisions of this Agreement, except by a statement in writing signed by the party against whom enforcement of the waiver or estoppel is sought.

   9.4.   **Amendment.**  No Amendment to this Agreement shall be binding on the parties or any party unless in writing and signed by the parties to this Agreement.

9.5.   **Authority to Bind the Companies**.  The person signing for each company below confirms and warrants that she/he has the authority to sign on behalf of, and to legally obligate, the Company on whose behalf she/he has signed.

**IN WITNESS WHEREOF**, the parties have signed this Agreement and it is effective as of the day and year set forth above.

**Employer:**
**King Mountain Tobacco Co., Inc.**

By:  _Gordon J Boyd_
    [Name]

Its:  _CRO_
    [Title]

**Mountain Tobacco Distributing, Inc.**

By:  _Gordon J Boyd_
    [Name]

Its:  _CRO_
    [Title]

**Treaty Mountain, Inc.**

By:  _Gordon J Boyd_
    [Name]

Its:  _CRO_
    [Title]

**Lincoln Asset Holdings Company, Inc.**

By:  _Gordon J Boyd_
    [Name]

Its:  _CRO_
    [Title]

Employee:

_____
Kanim James, Individually

## <u>*AMENDMENT 1 TO FEBRUARY 1, 2018 EMPLOYMENT AGREEMENT*</u>

THIS IS AMENDMENT 1 to the February 1, 2018 EMPLOYMENT AGREEMENT ("Agreement") between **(1)** King Mountain Tobacco Co., Inc., a Yakama Nation Corporation ("King Mountain"), Mountain Tobacco Distributing, Inc., a Washington State Corporation, Treaty Mountain, Inc., a Yakama Nation Corporation, and Lincoln Asset Holdings Company, Inc., a Yakama Nation Corporation (the "Companies"); and **(2)** Kanim James ("Employee").

For good and valuable consideration, the Companies and Employee amend Paragraph 6.4 Participation in Benefit Plan, of the February 1, 2018 Employment Agreement entered into between them as parties, retroactive to February 1, 2018, to read as follows:

> **Participation in Benefit Plans.**  Employee, his spouse and children, shall be included to the extent eligible thereunder in any and all plans of the Company providing general benefits for the Company's employees and their families, including but not limited to health and dental insurance, sick days, vacation, and holidays.  Employee, his spouse and his children's participation in any such plan or program shall be subject to the provisions of the plan or program, as amended from time to time.

No other changes or amendments are made to the Agreement which shall continue in full force and effect according to its terms, as hereby amended.

**IN WITNESS WHEREOF,** the parties have signed this Amendment 1 to February 1, 2018 Employment Agreement on the date indicated following their signatures below.

**Employer:**
**King Mountain Tobacco Co., Inc.**

By: _Gordon J Boyd_
      [Name]

Its: _CRO_
      [Title]

Date: _2/5/18_

**Mountain Tobacco Distributing, Inc.**

By: _Gordon J Boyd_
[Name]

Its: _CRO_
[Title]

Date: _2/5/18_

**Treaty Mountain, Inc.**

By: _Gordon J Boyd_
[Name]

Its: _CRO_
[Title]

Date: _2/5/18_

**Lincoln Asset Holdings Company, Inc.**

By: _Gordon J Boyd_
[Name]

Its: _2/5/14  CRO_
[Title]

Date: _2/5/18_

**Employee:**

_Kanim James_

Kanim James, Individually

Date: _2/5/18_